JS 44 (Rev. 12/07)(cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

SIDNEY SCHOLL,

## DEFENDANTS

WASHINGTON MUTUAL BANK, FA., (a/k/a Washington Mutual Bank), a Washington corporation; (SEE ATTACHMENT A)

**(b)** County of Residence of First Listed Plaintiff  Sonoma
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Seattle, Washington
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Michael D. Braun (167416); BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109, Los Angeles, CA 90025
Tel 310-442-7755; Fax 310-442-7756 (SEE ATTACHMENT B)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **LABOR** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | **PRISONER** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Security Act | | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | Transferred from | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(a)(2)

Brief description of cause:
Breach of Contract; Breach of Fiduciary Duty; Constructive Fraud; Negligent Misrepresentation, etc.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Unknown at this time

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND        ☐ SAN JOSE

DATE  8/20/2008

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: <u>47 USC 553</u>
Brief Description: <u>Unauthorized reception of cable service</u>

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ATTACHMENT A TO CIVIL COVER SHEET

JERRY GILL; CHARLES BOWLING; MARK D. ROHDE; Mark IV APPRAISALS, INC., an Oklahoma corporation; TURN-KEY APPRAISAL SERVICES, LLC, an Oklahoma limited liability corporation; and ROHDE APPRISAL SERVICES,

Defendants.

## **ATTACHMENT B TO CIVIL COVER SHEET**

Janet Lindner Spielberg (221926)
LAW OFFICES OF JANET LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel:    (310) 392-8801
Fax:    (310) 278-5938
E-mail: jlspielberg@jlslp.com

Joseph N. Kravec, Jr.
*(to be admitted Pro Hac Vice)*
*Wyatt A. Lison*
*(to be admitted Pro Hac Vice)*
SPECTER SPECTER EVANS
   & MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel:    (412) 642-2300
Fax:    (412) 642-2309
E-mail: jnk@ssem.com

*Attorneys for Plaintiff*

1  Michael D. Braun (167416)
   BRAUN LAW GROUP, P.C.
2  12304 Santa Monica Blvd., Suite 109
   Los Angeles, CA 90025
3  Tel:    (310) 442-7755
   Fax:    (310) 442-7756
4  E-mail: service@braunlawgroup.com

5  Janet Lindner Spielberg (221926)
   LAW OFFICES OF JANET LINDNER SPIELBERG
6  12400 Wilshire Blvd., Suite 400
   Los Angeles, CA 90025
7  Tel:    (310) 392-8801
   Fax:    (310) 278-5938
8  E-mail: jlspielberg@jlslp.com

9  Joseph N. Kravec, Jr.
   *(to be admitted Pro Hac Vice)*
10 *Wyatt A. Lison*
   *(to be admitted Pro Hac Vice)*
11 SPECTER SPECTER EVANS
       & MANOGUE, P.C.
12 The 26th Floor Koppers Building
   Pittsburgh, Pennsylvania 15219
13 Tel:    (412) 642-2300
   Fax:    (412) 642-2309
14 E-mail: jnk@ssem.com

15 *Attorneys for Plaintiff*

16            UNITED STATES DISTRICT COURT

17           NORTHERN DISTRICT OF CALIFORNIA

18

19 SIDNEY SCHOLL,                        CASE NO.: C08-03977

20                 Plaintiff,            COMPLAINT

21        v.                            **DEMAND FOR JURY TRIAL**

22 WASHINGTON MUTUAL BANK, FA.,
   (a/k/a Washington Mutual Bank), a
23 Washington corporation; JERRY GILL;
   CHARLES BOWLING; MARK D.
24 ROHDE; Mark IV APPRAISALS, INC., an
   Oklahoma corporation; TURN-KEY
25 APPRAISAL SERVICES, LLC, an
   Oklahoma limited liability corporation; and
26 ROHDE APPRISAL SERVICES,

27                 Defendants.

28

COMPLAINT
CASE NO.:

Plaintiff Sidney Scholl, by her undersigned counsel, brings this complaint against Washington Mutual Bank, FA a/k/a Washington Mutual Bank ("WaMu"); Jerry Gill; Mark IV Appraisals, Inc.; Charles Bowling; Turn-Key Appraisal Services, LLC; Mark D. Rohde; and Rohde Appraisal Services (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.      This is an action by Plaintiff seeking relief from Defendants for each of their roles in inducing her to purchase four properties at inflated values by, unbeknownst to Plaintiff, providing her incredible, unlawful appraisals to support those inflated values which failed to follow the strict requirements of the Uniform Standards of Professional Appraisal Practices ("USPAP").

2.      While a financial institution such as WaMu normally does not owe a duty of care to a borrower in preparing an appraisal of the security for a loan, WaMu did not act within the scope of its conventional activities as a lender of money with regards to Ms. Scholl's loans because WaMu did not merely procure appraisals to protect itself by ensuring the collateral provided adequate security for the loan. Instead, WaMu assumed a greater duty than that of a normal lender, and agreed to procure credible, lawful appraisals for Ms. Scholl with regards to each of the four properties at issue.

3.      Prior to entering into each of the four loan agreements, Ms. Scholl specifically told WaMu's loan officer that she would not purchase any of the four properties nor enter into any mortgage loan with WaMu for them unless credible appraisals confirmed the properties were actually worth the proposed sales price of each property. WaMu's loan officer specifically told Ms. Scholl that WaMu would undertake to procure credible, lawful appraisals on each property for Ms. Scholl so she and WaMu could confirm the actual worth of each property as she requested. WaMu's loan officer also indicated the appraisals obtained would be for Ms. Scholl's benefit in deciding whether to purchase the properties. Indeed, WaMu maintained an internal appraisal review team responsible for ensuring that appraisals performed for its borrowers' properties were done in compliance with state and federal laws. WaMu then arranged for the appraisal on each of Ms. Scholl's properties with each of the appraiser Defendants. In doing so, WaMu acted as Ms. Scholl's agent for the limited purpose of procuring a

1

1   credible, lawful appraisal on each of her four properties and each of the appraiser Defendants acted as
2   WaMu's and Ms. Scholl's agents or contractors for the purpose of preparing and providing credible,
3   lawful appraisals.

4       4.      To confirm that WaMu was acting as Ms. Scholl's agent in procuring appraisals for her
5   benefit, the appraisals procured by WaMu from appraiser defendants list Ms. Scholl as the
6   "borrower/client" and WaMu as the "lender/client." Likewise, the appraiser defendants caused their
7   appraisals to be delivered directly to Ms. Scholl and WaMu in California after the work was performed.
8   And finally, the appraisals indicate conclusively that, "the borrower [Ms. Scholl] . . . [and] the
9   mortgagee [WaMu] . . . may rely on this appraisal report as part of any mortgage finance transaction
10  that involves any one or more of these parties."

11      5.      In accord with her agreement with WaMu to procure appraisals for the four properties,
12  after each appraisal was delivered to her in California confirming the property was worth the sale price,
13  Ms. Scholl completed her loan process and purchased each of the properties with both personal funds
14  and money financed through WaMu loans. For the single property that returned an appraised value
15  slightly under the asking price, Ms. Scholl demanded that the seller lower the price, and refused to
16  purchase the property without the price being lowered.

17      6.      Ms. Scholl was unaware, however, that each of the four properties appraised by Jerry
18  Gill, Mark IV Appraisals, Inc., Charles Bowling, Turn-Key Appraisal Services, LLC, Mark D. Rohde,
19  and Rohde Appraisal Services (collectively "Appraiser Defendants") were not done pursuant to USPAP.
20  Nor was Ms. Scholl aware that WaMu, despite having an internal appraisal review team responsible for
21  ensuring that appraisals comply with USPAP, failed to notify her of the errors in the appraisals of which
22  WaMu knew or should have known and which caused each of the properties to be over-valued.

23      7.      WaMu and its internal appraisal review team, acting on Ms. Scholl's behalf as her agent
24  in procuring credible, lawful appraisals, either negligently or recklessly failed to recognize the clear
25  errors with the appraisal reports; or alternatively, WaMu and its internal appraisal review team
26  intentionally disregarded the fact that each property was over-appraised so that WaMu could close each
27  of Ms. Scholl's four loans.

28

2

8.     Had Ms. Scholl been informed that none of the four properties' values in question were supported by credible appraisals and that the properties were actually worth less than the proposed sales prices, she would not have purchased any of the properties. As a result, Ms. Scholl has been damaged by purchasing four properties at prices that were collectively at least $265,000.00 over their actual market values, entering into four loan agreements with WaMu, spending over $700,000.00 in costs, fees, down payments and interest payments on the four properties, as well as the numerous costs associated with purchasing and owning these four properties, when she would not have purchased any of them at that inflated price had any of the Appraiser Defendants performed credible, lawful appraisals disclosing the properties' actual market values, or had WaMu informed Ms. Scholl of the fact the appraisals were not performed pursuant to USPAP, were not credible, and stated inflated market values.

### PARTIES

9.     Plaintiff, Sidney Scholl, is a citizen of the State of California and a resident of Sonoma, California. On four occasions, Ms. Scholl entered into mortgage loan agreements with WaMu's office in Sonoma, California, to purchase the four separate properties at issue in this action. Prior to entering each said mortgage loan agreement, Ms. Scholl, using WaMu as her agent, entered into agreements with one or more of the Appraiser Defendants identified below to provide her with appraisal reports to be delivered in Sonoma, California for her to rely upon in deciding whether to purchase each of the four properties and enter mortgage loans for them with WaMu.

10.     Defendant WaMu operates as a consumer and small business banking company in the United States with assets totaling $346 billion. WaMu operates in four segments: Retail Banking, Card Services, Commercial, and Home Loans. The Home Loans segment originates and services home loans, procures and provides appraisals and other services to borrowers in connection with home loans, manages capital market operations, fulfillment and servicing of portfolio of home equity loans and lines of credit, originates and purchases mortgage loans to higher risk borrowers, provides financing and other banking services to mortgage bankers for the origination of mortgage

3

1  loans, and offers insurance-related products and reinsurance services. WaMu operates in 36 states,

2  including California. According to the company's 2006 Annual Report, the majority of WaMu's home

3  loan portfolio emanates from California.

4      11.     Defendant Jerry Gill is an Oklahoma resident, and a real estate appraiser licensed to

5  appraise real estate in Oklahoma. Defendant Gill is also the registered agent of Defendant Mark IV

6  Appraisals, Inc.

7      12.     Defendant Mark IV Appraisals, Inc. is a domestic for profit Oklahoma business

8  corporation with its principle place of business in Oklahoma City, Oklahoma. The registered agent for

9  Mark IV Appraisals, Inc. is Defendant Jerry Gill.

10      13.     Defendant Charles Bowling is an Oklahoma resident, and a real estate appraiser licensed

11  to appraise real estate in Oklahoma. Defendant Bowling is also the registered agent of Defendant Turn-

12  Key Appraisal Services, LLC.

13      14.     Defendant Turn-Key Appraisal Services, LLC is an Oklahoma limited liability

14  corporation with a principle place of business in Oklahoma City, Oklahoma. Turn-Key Appraisal

15  Services, LLC is the trade name for Defendant Charles Bowling's appraisal business, and Bowling

16  Appraisal Services, LLC.

17      15.     Defendant Mark D. Rohde is a North Carolina resident, and a real estate appraiser

18  licensed to appraise real estate in North Carolina. Defendant Rohde performs real estate appraisals

19  under the trade name Rohde Appraisal Services.

20      16.     Defendant Rohde Appraisal Services is the trade name under which Mark D. Rohde does

21  his appraisal services. Rohde Appraisal Services is not a business incorporated under the laws of any

22  state.

23                              **JURISDICTION AND VENUE**

24      17.     Jurisdiction of this Court is proper under 28 U.S.C. §1332(a)(2) (diversity jurisdiction).

25  Plaintiff is a citizen of the State of California and resides in Sonoma, California. Defendant WaMu is

26  incorporated in the State of Washington and has its corporate headquarters in Seattle, Washington.

27  Defendants Jerry Gill and Charles Bowling are citizens and residents of Oklahoma. Mark IV Appraisals,

28  Inc. is a for profit business corporation incorporated under the laws of Oklahoma. Turn-Key Appraisal

4

1 Services, LLC is a domestic limited liability company organized under the laws of Oklahoma.
2 Defendant Mark D. Rohdes is a resident of North Carolina, and Rohde Appraisal Services is the trade
3 name for Defendant Mark D. Rohdes' appraisal business.

4     18.    Plaintiff has suffered damages in excess of $75,000.00, exclusive of interest and costs,
5 for each of the properties involved in this lawsuit. Indeed, each property involved, which Plaintiff
6 would not have purchased but-for the conduct of each Defendant, is worth more than $75,000.00, and
7 Plaintiff's out-of-pocket damages as a result of Defendants' conduct specified herein thus far exceeds
8 $75,000.00, exclusive of interest and costs, for each property she did purchase.

9     19.    Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(a)(2) and (3).
10 A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial
11 district, Defendant WaMu is subject to personal jurisdiction in this judicial district, and there is no other
12 single district in which the action might otherwise be brought. Specifically, Plaintiff Scholl conducted
13 all of her business arrangements from Sonoma County, California in entering into each of her WaMu
14 loans and agreements for the related appraisals at issue in the lawsuit. WaMu has offices and regularly
15 does business in California, is registered to do business in California, and conducted all of its business
16 with Ms. Scholl from its Sonoma County, California offices. When Plaintiff Scholl applied for each
17 of the four WaMu mortgage loans at issue, WaMu agreed to procure, and did procure from its offices
18 in Sonoma County, California, the appraisals at issue from the Appraiser Defendants. Each Appraiser
19 Defendant entered into contracts with WaMu's California offices, and by virtue of Plaintiff's agency
20 relationship with WaMu, each Appraiser Defendant contracted with Plaintiff Scholl who resides in
21 Sonoma County, California to provide the appraisals at issue for her and for WaMu, and to deliver the
22 appraisals at issue to WaMu and to Plaintiff Scholl in Sonoma County, California. Pursuant to these
23 contracts, Appraiser Defendants did deliver their appraisal reports to Plaintiff Scholl and WaMu in
24 Sonoma County, California. The Appraiser Defendants also communicated directly with WaMu and
25 Plaintiff Scholl in California concerning the appraisals at issue as specified more fully in ¶¶ 46, 53, 59-
26 60, 63-65.

27

28

5

1

**ALLEGATIONS**

2       **A.      The Real Estate Mortgage Industry Provides Incentives for High Appraisals**

3           20.     Traditionally, a lender such as WaMu would have an interest in ensuring that a borrower

4   is able to repay a home loan, and that the loan is adequately collateralized in case the borrower defaults.

5   Likewise, a consumer borrowing money to invest in a home places their trust in the lender to procure

6   a credible appraisal (i.e., one done in compliance with applicable legal and professional standards so

7   as to provide an independent, objective and unbiased appraisal of their home's value) and to lend them

8   money on the most favorable repayment terms that is appropriate for the consumer based on that

9   credible assessment of that home's fair market value. Traditionally, the borrower and lender share a

10  common interest in having a property independently, objectively and credibly appraised to ensure both

11  that the borrower is not paying too much, and that the property value can support repayment of the loan

12  in the event of a default.

13          21.     While a lending institution and a borrower might traditionally share a common interest

14  in having a credible assessment of a home's value, this does not normally impose a duty on a lending

15  institution to prepare an accurate appraisal for the borrower. A financial institution acting within the

16  scope of its conventional activities as a lender of money normally procures an appraisal simply to ensure

17  any loan provided using the property as collateral has sufficient security. This is because banks, in their

18  traditional role as a lending institution, held onto mortgages for the life of the loan. Thus, while a bank

19  traditionally does not have a duty to obtain an accurate appraisal for a borrower, it is in both parties'

20  best interests to determine a home's actual value.

21          22.     Since traditionally banks held on to the mortgage for the life of the loan, their primary

22  interest was to make sure that the buyer paid off the principal and interest without delay or default.

23  Whenever a buyer defaulted on a loan it would have a direct financial impact on the lender who would

24  loose the ability to collect further interest on the loan. If the loan was properly based on the actual fair

25  market value of the property, however, the lender would be able to sell the property and recoup the

26  outstanding principal. Accordingly, it was critical that the market value of the property was properly

27  appraised and that the loan amount reflected that value.

28

6

1       23.     In recent years, the traditional model, whereby banks held a mortgage loan until it was

2   paid off, has changed. Banks such as WaMu no longer hold all, or even most of its mortgage loans, but

3   instead sell them to investment banks or government sponsored enterprises such as the Federal National

4   Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie

5   Mac"). These loans are then pooled together, securitized, and sold to the general public as mortgage

6   backed securities, allowing lenders such as WaMu to profit off the volume and value of loans it has

7   procured. The larger the aggregate value of the loans, the more profit for the lender.

8       24.     The paradigm shift away from retaining a portfolio of loans towards the sale of mortgage

9   backed securities fundamentally altered a lender's incentive to issue quality loans. By selling the vast

10   majority of their mortgage loan portfolio to other companies, banks no longer assumed the risk of a bad

11   loan. The risk of default was passed on to other companies and eventually the investors who bought

12   mortgage backed securities. More importantly, now a bank's profit directly correlates to the volume

13   and value of loans generated, not the likelihood that a loan would be repaid. Banks are thus

14   incentivized to offer as many loans at the highest dollar amounts that can be offered with little regard

15   to the viability of the loan.

16       25.     In this environment, there remains little incentive for lenders to obtain a credible

17   appraisal of a property's real market value and every incentive to offer the highest loan possible

18   regardless of whether the collateral provides adequate security for the loan.

19       **B.     Federal and State Laws Require Credible Appraisals**

20       26.     Despite the new economic paradigm fueling the mortgage lending industry, state and

21   federal regulations require that appraisals be "credible" by being independent, objective, unbiased and

22   performed in compliance with the minimum standards set forth in the Uniform Standards of

23   Professional Appraisal Practice ("USPAP"). These USPAP standards are incorporated into federal law,

24   *see* 12 C.F.R. § 34.44, and are incorporated into California, North Carolina, and Oklahoma laws. *See*

25   California Business and Professions Code §11319; 21 N.C. Admin. Code 57A.0501; Okla. Stat. Ann.

26   tit. 59, § 858-726. Additionally, the same USPAP standards are part of the contractual undertakings

27   expressly stated in the Uniform Residential Appraisal Report, which is the standard form that appraisers

28   use for their appraisal reports and which were used for the WaMu loans that are the subject of this

7

1    Complaint.  These appraisal reports also expressly contemplated that they would be delivered to the

2    borrower, Ms. Scholl, in California and acknowledged that Ms. Scholl may rely on the appraisals as part

3    of any mortgage finance transaction between her and WaMu.

4         27.    The USPAP guidelines in effect when Ms. Scholl purchased each of the four properties

5    at issue were effective January 1, 2005 through June 30, 2006.  Compliance with USPAP guidelines

6    is required where, as in Ms. Scholl's appraisals here, the appraisers were obligated by applicable laws

7    and regulations to follow the guidelines, and the appraisers certified that they followed USPAP

8    guidelines in conducting their appraisals.

9         28.    USPAP requires appraisers to conduct their appraisals independently: "An appraiser

10   must perform assignments with impartiality, objectivity, and independence, and without accommodation

11   of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party

12   or issue.  An appraiser must not accept an assignment that includes the reporting of predetermined

13   opinions and conclusions."  USPAP Ethics Rules (Conduct).

14        29.    USPAP requires appraisers to communicate their appraisals honestly: "An appraiser must

15   not communicate assignment results in a misleading or fraudulent manner.  An appraiser must not use

16   or communicate a misleading or fraudulent report or knowingly permit an employee or other person to

17   communicate a misleading or fraudulent report."  USPAP Ethics Rules (Conduct).

18        30.    USPAP requires that "[i]n developing a real property appraisal, an appraiser must: (a)

19   be aware of, understand, and correctly employ those recognized methods and techniques that are

20   necessary to produce a credible appraisal..."  USPAP Standards Rule 1-1.

21        31.    USPAP requires an appraiser "act in good faith with regard to the legitimate interests

22   of the client in the use of confidential information and in the communication of assignment results."

23   Accordingly, an appraiser "must not disclose confidential information or assignment results prepared

24   for a client to anyone other than the client and persons specifically authorized by the client."  USPAP

25   – Confidentiality.

26        32.    USPAP requires an appraiser to act competently.  This means an appraiser must be

27   familiar with the specific type of property being appraised, the market and geographic area the property

28   is located in, and the analytical method the appraiser chooses to use.  If an appraiser is not familiar with

8

1    any of these things, USPAP requires that the appraiser inform the clients that he/she lacks the necessary

2    knowledge or experience to complete it competently, and cannot accept the appraisal assignment

3    without such a disclosure.  USPAP – Competency Rule.

4        33.    USPAP also requires that each written real property appraisal report must contain a

5    signed certification that is similar in content to the following form:

6        I certify that, to the best of my knowledge and belief:

7        -    the statements of fact contained in this report are true and correct.

8        -    the reported analyses, opinions, and conclusions are limited only by the reported
             assumptions and limiting conditions and are my personal, impartial, and unbiased
9             professional analyses, opinions, and conclusions.

10       -    I have no (or the specified) present or prospective interest in the property that is the
             subject of this report and no (or the specified) personal interest with respect to the
11            parties involved.

12       -    I have no bias with respect to the property that is the subject of this report or to the
             parties involved with this assignment.
13
         -    my engagement in this assignment was not contingent upon developing or reporting
14            predetermined results.

15       -    my compensation for completing this assignment is not contingent upon the
             development or reporting of a predetermined value or direction in value that favors the
16            cause of the client, the amount of the value opinion, the attainment of a stipulated result,
             or the occurrence of a subsequent event directly related to the intended use of this
17            appraisal.

18       -    my analyses, opinions, and conclusions were developed, and this report has been
             prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.
19
         -    I have (or have not) made a personal inspection of the property that is the subject of this
20            report.

21       -    no one provided significant real property appraisal assistance to the person signing this
             certification.
22
     The appraisal reports for Ms. Scholl's loans that are the subject of this Complaint contained this, or
23
     materially similar, certifications.
24
         34.    Because WaMu is a federally regulated bank which bundles many of its home loans and
25
     sells them to investors, WaMu must certify that its loans are sufficiently collateralized. In order to do
26
     so, WaMu maintained an internal appraisal review process through which WaMu would check
27
     appraisals being performed on the property it was lending money for. For these appraisal reviews, the
28

9

1    same or similar USPAP ethics rules, competency rules, standards and certifications are required. Upon

2    information and belief, such appraisal reviews were performed by WaMu's own appraisal review team

3    for each of Ms. Scholl's loans.

4           **C.**     **WaMu Acted as Ms. Scholl's Agent and Undertook to Procure Lawful and Credible Appraisals from the Appraiser Defendants**

5

6             **1.**     **The Ernest Court and WB Meyer Properties**

7         35.    On or around August, 2005, Ms. Scholl began considering whether to invest personal

8    money in property in a growing market near Oklahoma City. Accordingly, Ms. Scholl hired a real estate

9    agent, Joe Pryor, who provided her with detailed information on several homes, and eventually

10   recommended she invest in two properties located at 16424 Ernest Court, Edmond, Ok. 73003 ("Ernest

11   Court"); and 1009 WB Meyer Parkway, Edmond, Ok. 73003 ("WB Meyer"). Both properties were new

12   constructions in a developed area, and the seller was asking $495,000.00 for the Ernest Court property

13   and $564,990.00 for the WB Meyer property.

14        36.    Before deciding whether to purchase either of the two homes, Ms. Scholl questioned her

15   real estate agent about whether the properties were worth the asking prices. Ms. Scholl was concerned

16   that the prices were too high because they were both used as "model homes," and had a higher price

17   from the addition of many small improvements and amenities which, she felt, raised the asking price

18   for the properties by the seller, but may not be supported in the open market. Mr. Pryor told Ms. Scholl

19   that if she did not trust whether the seller's asking prices were appropriate, that she should have her own

20   appraisal performed on the property. Mr. Pryor suggested that if Ms. Scholl intended to borrow money

21   from a bank to finance the purchases, that she ask the bank to have appraisals done for each home to

22   make sure they were worth the asking price since banks have to have appraisals done anyway.

23        37.    In or about September, 2005, Ms. Scholl first contacted Alber Saleh who managed

24   WaMu's Sonoma County, California branch office. Ms. Scholl told Mr. Saleh that she had some money

25   coming in from prior investments and that she was considering rolling the money over into multiple

26   properties in a growing suburban area. Ms. Scholl informed Mr. Saleh that she had a few houses in

27   mind to invest in, but she was concerned that the seller's asking prices were too high. Ms. Scholl

28   informed Mr. Saleh why she was concerned, and informed him about her conversation with Mr. Pryor

10

1    and his suggestion that she ask her prospective lender, WaMu, to procure an appraisal which she could

2    rely on in deciding whether to purchase the properties.

3        38.    Ms. Scholl made it clear to Mr. Saleh that her decision to purchase any property,

4    including the Earnest Court and WB Meyer properties, was dependent on receiving an appraisal which

5    confirmed that the seller's asking price was actually equal to or less than the true market value of the

6    property. Ms. Scholl had no intention on investing any of her own money, through cash or through a

7    loan financed by WaMu, in a home that was not worth the amount of money being asked for it, and she

8    made that clear to Mr. Saleh.

9        39.    Mr. Saleh informed Ms. Scholl that as part of the loan application process WaMu would

10    have appraisals performed on any property used as the collateral for a loan. Mr. Saleh also informed

11    Ms. Scholl that any appraisal performed by WaMu would not only be for the bank's benefit, but would

12    be for her benefit as well so that she knew the true value of the property before deciding to purchase the

13    property and to enter into a mortgage with WaMu in connection with the purchase. Mr. Saleh also

14    informed Ms. Scholl that WaMu had an internal appraisal process to select qualified appraisers and to

15    ensure the appraisals were performed credibly. Based on Mr. Saleh's assertions that WaMu would

16    procure an appraisals which she could rely on in deciding whether to invest her money in the properties

17    and enter the WaMu loans, and that WaMu would ensure the appraisals were credible, Ms. Scholl asked

18    Mr. Saleh to begin the application process for loans which eventually provided money to finance the

19    purchase of the Ernest Court and WB Meyer properties.

20        40.    As part of the loan application process, Mr. Saleh told Ms. Scholl that WaMu had several

21    approved appraisers near the properties' locations that could perform the appraisals. Although Mr.

22    Saleh read Ms. Scholl a list of potential appraisers, she was unfamiliar with the appraisal process and

23    trusted Mr. Saleh and WaMu to select the appraiser who would appraise the properties. In undertaking

24    its duty to procure credible appraisals, WaMu selected Jerry Gill and Mark IV Appraisals, Inc. to

25    perform the appraisals on both the Ernest Court and WB Meyer properties for Ms. Scholl. Accordingly,

26    WaMu entered into contracts for itself, and for and on Ms. Scholl's behalf and for Ms. Scholl's benefit,

27    with Defendants Jerry Gill and Mark IV Appraisals, Inc. to procure appraisals for the two homes for

28    both Ms. Scholl and WaMu. Defendants Gill and Mark IV Appraisals, Inc. acted either as independent

COMPLAINT
CASE NO.:

1  contractors for WaMu or as WaMu's agents in preparing Ms. Scholl's appraisals, and thus by extension

2  were also agents or contractors of Ms. Scholl.

3      41.    Mr. Gill performed an appraisal of the Earnest Court property on September 21, 2005,

4  and drafted a report which indicated the value of the property to be $495,000.00. Exhibit 1 at D. Mr.

5  Gill estimated that the value of the property was the exact amount the seller was asking for the property.

6      42.    Mr. Gill's appraisal report for the Ernest Court property lists Ms. Scholl as the

7  "Borrower/Client," lists WaMu as the "Lender/Client," and indicates it is being done for his clients

8  located in Sonoma, California. Exhibit 1 at C, E-J. Mr. Gill certified that the appraisal was done in

9  compliance with USPAP. Exhibit 1 at L. Accordingly, Mr. Gill certified his appraisal was performed

10  credibly, and not in a careless or negligent manner that might affect the results of the appraisal. USPAP

11  Standards 1 and 7. After its completion, Mr. Gill's report was delivered directly to Ms. Scholl and

12  WaMu in Sonoma, California on or about September 21, 2005.

13      43.    Mr. Gill performed an appraisal of the WB Meyer property on October 20, 2005, and

14  drafted a report which indicated the value of the property to be $567,000.00. Exhibit 2 at K. Mr. Gill

15  estimated that the WB Meyer property was worth $2,010.00 over the amount the seller was asking for

16  the property. Mr. Gill's appraisal report identifies him as the appraiser, and Mark IV Appraisals, Inc.

17  as the company preparing the appraisal. *Id.*

18      44.    Mr. Gill's appraisal report again identifies Ms. Scholl as the "Borrower/Client," WaMu

19  as the "Lender/Client," and certifies it was done in compliance with USPAP. Exhibit 2 at E, K-P.

20  Accordingly, Mr. Gill certified his appraisal was performed credibly, and acknowledged that "any

21  intentional or negligent misrepresentation(s) contained in [his] appraisal report may result in civil

22  liability" under state law. Exhibit 2 at K (Appraiser's Certification, ¶ 25) and USPAP Standards 1 and

23  7. Mr. Gill's report also confirms that the appraisal is being done for his clients located in Sonoma,

24  California, and was delivered directly to Ms. Scholl and WaMu in California. Exhibit 2 at E.

25      45.    Mr. Gill's appraisals had two purposes: One, for Ms. Scholl to rely on in deciding

26  whether to invest her money in the properties and thereby borrow money from WaMu. Two, for WaMu

27  to rely on in deciding whether to lend money to Ms. Scholl using the properties as collateral. This is

28  confirmed by Mr. Gill's appraisal reports, each of which state that "[t]he borrower [Ms. Scholl] ... [and]

COMPLAINT
CASE NO.:

1  the mortgagee [WaMu] ... may rely on this appraisal report as part of any mortgage finance transaction

2  that involves any one or more of these parties." *Id.* (Appraiser's Certification, ¶ 23).

3      46.    After Ms. Scholl reviewed each of the reports Mr. Gill sent to her, Ms. Scholl called Mr.

4  Gill directly to discuss questions she had regarding the bases for his appraised values. In calling Mr.

5  Gill, Ms. Scholl introduced herself by stating, "Hi, this is Sidney Scholl from Sonoma, California," as

6  she routinely does when calling a person she does not personally know. Ms. Scholl questioned Mr. Gill

7  about several discrepancies between the attributes of the two properties between that listed in the sales

8  information she was provided and Mr. Gill's appraisal reports, such as why one of the reports had a

9  different square footage of the property. Based on Ms. Scholl's questions, Mr. Gill made corrections

10  to his appraisal reports but did not change his ultimate conclusions on the properties' values.

11      47.    Upon receiving final appraisal reports which appeared to confirm that the price being

12  asked for these two properties was supported by credible, independent appraisals, Ms. Scholl went

13  forward and purchased the two homes and entered into loans with WaMu to help finance the purchases.

14  For the Earnest Court property, Ms. Scholl paid $105,431.22 for the costs and fees associated with the

15  closing and the initial down payment. Ms. Scholl borrowed $396,000.00 from WaMu to pay the

16  remaining balance of the sale price. For the WB Meyer property, Ms. Scholl paid $118,827.24 for the

17  costs, fees and initial down payment, and borrowed $451,792.00 from WaMu for the remaining balance.

18  Since entering into the loans, Ms. Scholl has paid WaMu $125,309.97 as interest-only payments on the

19  loans for both properties.

20      **2.    The Wimberley Creek Property**

21      48.    On or about December 1, 2005, Ms. Scholl approached WaMu's loan officer, Mr. Saleh,

22  about a third potential investment property located at 2032 Wimberley Creek Drive, Moore, Oklahoma

23  ("Wimberley Creek"). This property was constructed by the same builder who constructed the Earnest

24  Court and WB Meyer properties.

25      49.    As she had done prior to her first two loans with WaMu, Ms. Scholl stressed to Mr.

26  Saleh the importance of receiving a credible appraisal prior to purchasing the Wimberley Creek property

27  and indicated she would not purchase the home unless the appraisal verified that the true market value

28  of the property was at or above the seller's asking price. As WaMu had done with the previous two

1  houses, WaMu's loan officer, Mr. Saleh, indicated WaMu would procure an appraisal for itself and for

2  Ms. Scholl, which Ms. Scholl could review and rely on in determining whether to purchase the property

3  and enter into a loan with WaMu to help finance the purchase of that property.

4      50.    WaMu selected Charles Bowling of Turn-Key Appraisal Services, LLC to perform the

5  appraisal on the Wimberley Creek property. Mr. Bowling provided an appraisal report dated December

6  9, 2005 stating that the actual market value of the property was $192,000.00. Exhibit 3 at F.  Mr.

7  Bowling's appraised value was under the seller's asking price of $199,345.00.  *Id.* at A.  Mr. Bowling

8  caused this report to be delivered to Ms. Scholl after completion.

9      51.    As with Mr. Gill's reports, Mr. Bowling's appraisal indicates that Ms. Scholl is the

10 "Borrower/Client," and that WaMu is the "Lender/Client." *Id.* at A, F-L. Mr. Bowling certified that his

11 appraisal conformed to USPAP standards, and that "any intentional or negligent misrepresentation(s)

12 contained in [his] appraisal report may result in civil liability" under state law.  *Id.* at E-F (Appraiser's

13 Certification, ¶¶ 3, 25). Mr. Bowling's appraisal also states that "[t]he borrower [Ms. Scholl] ... [and]

14 the mortgagee [WaMu] ... may rely on this appraisal report as part of any mortgage finance transaction

15 that involves any one or more of these parties," confirming that the purpose for the appraisal report was

16 for Ms. Scholl to decide whether to purchase the property, and for WaMu to determine whether to lend

17 money with the property used as collateral.  *Id.* at F.

18      52.    Upon reviewing Mr. Bowling's report, Ms. Scholl became concerned about his valuation

19 and the two appraisals performed previously by Mr. Gill. Ms. Scholl understood that the WB Meyer

20 and Ernest Court properties had higher prices because of additions and amenities (which the Wimberley

21 Creek property did not have) which she believed might not be reflected in an appraisal.  However,

22 despite all three properties being constructed by the same builder, the appraisals performed by Mr. Gill

23 on the first two properties (with the amenities) came out at the asking price, while Mr. Bowling's

24 appraised value of the Wimberley Creek property (without as many amenities) came in below the asking

25 price.

26      53.    Ms. Scholl expressed her concern regarding the Wimberley Creek appraisal to WaMu's

27 loan officer, Mr. Saleh, and asked that he confirm that Mr. Bowling's valuation was accurate. Because

28 the appraised value came in under the seller's asking price for the property, Ms. Scholl informed Mr.

14

1  Saleh she would not purchase the home at that price. Mr. Saleh, under Ms. Scholl's direction, contacted
2  Mr. Bowling regarding the property's appraised value. Mr. Bowling indicated to Mr. Saleh that he
3  stood behind the value stated within the report.

4       54.    In light of the Wimberley Creek property being valued at an amount under the seller's
5  asking price, Ms. Scholl also told Mr. Saleh that she wanted to be sure that Mr. Gill's two appraisals
6  were accurate. However, Mr. Saleh dissuaded Ms. Scholl from contacting Mr. Gill or Mr. Bowling
7  regarding their appraisals by lecturing Ms. Scholl on the importance of appraisals in the home purchase
8  transaction. Mr. Saleh stated that each of the appraisers who had provided values for her properties
9  were acting in Ms. Scholl's best interest, and again stressed that the appraisers were working for Ms.
10 Scholl specifically to provide credible values which she could rely upon for her benefit in deciding to
11 purchase the properties and enters loans with WaMu. Mr. Saleh told Ms. Scholl not to question the
12 appraisers' conclusions; rather, he suggested, she should use their conclusions to determine whether to
13 purchase the properties and at what price.

14      55.    Based on Mr. Saleh's reassurances that the appraisals were being performed by
15 independent professionals who were credibly and competently acting on Ms. Scholl's behalf, and Ms.
16 Scholl's understanding that WaMu reviewed appraisal reports for credibility, Ms. Scholl did not further
17 question Mr. Gill's first two appraisals of the Ernest Court and WB Meyer properties at that time, and
18 did not further question Mr. Bowling's appraisal of the Wimberley Creek property at that time. Instead,
19 Ms. Scholl relied on Mr. Bowling's conclusion regarding the value of the Wimberley Creek property
20 being $192,000.00, negotiated with the property's seller for a lower price, and received "builder's
21 credits" to account for the difference between the appraised value and the asking price. Ms. Scholl
22 purchased the property and paid $45,574.40 for the fees and costs associated with the closing and the
23 initial down payment on the Wimberley Creek property, and borrowed $153,600.00 from WaMu for
24 the remaining amount through a mortgage loan. Since this time, Ms. Scholl has paid WaMu $21,344.00
25 in interest-only payments on the loan.

26                    **3.    The Yale Loop Property**

27      56.    On or around January 1, 2006, Ms. Scholl went to Mr. Saleh a fourth time for financing
28 the purchase of a house located in North Carolina. As she had done with the first three transactions,

15

1    Ms. Scholl requested Mr. Saleh to have the property appraised for her, and stated she would only

2    purchase the home if the appraisal supported the seller's asking price.

3        57.     WaMu once again agreed to procure an appraisal for itself and for Ms. Scholl's benefit,

4    and WaMu selected Mark D. Rohde and Rohde Appraisal Services to appraise the property located at

5    110 Yale Loop, Mooresville, North Carolina ("Yale Loop"). Mr. Rohde completed his appraisal on

6    January 11, 2006, and faxed Ms. Scholl a copy of the appraisal directly for her to review personally.

7    Exhibit 4 at A, I. Mr. Rohde estimated the value of the Yale Loop property to be $740,800.00, $4.00

8    over the seller's asking price of $740,796.00. *Id.* at I.

9        58.     As with the reports provided by Mr. Gill and Mr. Bowling, Mr. Rohde's appraisal

10    identifies Ms. Scholl as the "Borrower/Client," identifies WaMu as the "Lender/Client," and indicates

11    it was done pursuant to USPAP standards. Exhibit 4 at C, I-K, Y-CC. Also, Mr. Rohde certified that

12    "[a]ny intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil

13    liability" under state law. *Id.* at I (Appraiser's Certification, ¶ 25). Accordingly, Defendant Rohde

14    certified that his appraisal was done credibly, and that he would not disclose the results of his appraisal

15    with anyone other than his client. *Id.* at H; USPAP Standards 1 and 7, and Ethics Rule: Confidentiality.

16    Mr. Rohde's report also confirms that "[t]he borrower [Ms. Scholl] ... [and] the mortgagee [WaMu] ...

17    may rely on this appraisal report as part of any mortgage finance transaction that involves any one or

18    more of these parties," indicating that Ms. Scholl and WaMu could each individually rely on his

19    valuation in deciding whether Ms. Scholl should purchase the property and enter a loan with WaMu to

20    help finance that purchase, and whether the bank should lend money with the property as the collateral.

21    Exhibit 4 at I.

22        59.     On January 11, 2006, upon receiving Mr. Rohde's appraisal report, Ms. Scholl contacted

23    Mr. Rohde regarding what she considered to be serious questions about the report. Ms. Scholl asked

24    Mr. Rohde why some pages of his report seemed to deal with completely unrelated properties that were

25    appraised by Mr. Rohde years prior to the appraisal of the Yale Loop property. *Id.* at L-X. Mr. Rohde

26    responded by stating he was utilizing new software, that those pages were inadvertently included, and

27    that Ms. Scholl could simply remove the pages that did not specifically deal with the Yale Loop

28    property. *Id.* at A.

16

1    60.    Ms. Scholl also asked Mr. Rohde about a footnote in her appraisal report that states:

2    This appraisal is the second recently performed by appraiser on subject. First
     was a 2055 exterior that the estimated value was disputed by homeowner as too
3    low and this report was requested. Upon inspection of interior the home was
     better constructed than anticipated and better comps were found to more
4    adequately reflect the amenities and quality of the subject property. 2 of 3
     comps were removed and replaced for the aforementioned reason. Comp #1
5    of this report is the one that remained. Comp #1 on 2055 was removed even
     though on same street due to conversation with listing Realtor stating that
6    comp sold for much less than typical for property with similar square footage
     due to prior condition of property and functional obsolescence with the floor
7    plan on the second level.

8    *Id.* at K. Mr. Rohde did not provide Ms. Scholl with a copy of his first appraisal report, and did not tell

9    Ms. Scholl who authorized him to provide the report to the original homeowner. Instead, Mr. Rohde

10   explained that he was "confident of his appraisal" based on several factors, including the fact he spoke

11   to a real estate agent who had listed a home he used as a comparable home in the first appraisal report

12   which was located on the same street as Yale Loop. Mr. Rohde told Ms. Scholl that the unnamed real

13   estate agent indicated the home sold for much less than other homes typical in that market. Thus, Mr.

14   Rohde removed the home from his report, and replaced it with a much more expensive home from

15   another subdivision which he considered to be a "better comp." Unbeknownst to Ms. Scholl, nothing

16   in USPAP permits a certified real estate appraiser to give weight to the unfounded opinion of a real

17   estate agent as to the market value of a house when developing an opinion as to another home's

18   appraised value.

19   61.    Based on Mr. Rohde's assurances that the value he reached (as expressed in the appraisal

20   report given to Ms. Scholl and procured by WaMu) was a credible actual market value, Ms. Scholl

21   purchased the Yale Loop property and entered into a mortgage loan with WaMu. Ms. Scholl paid

22   $160,302.46 in cash to cover the fees and costs associated with the closing and the initial down

23   payment. Ms. Scholl also borrowed $592,000.00 from WaMu to pay the remaining balance and has

24   paid WaMu $90,521.83 in interest-only payments on the loan.

25

26   ///

27   ///

28   ///

17

1

2

**D.**    **Each of the Ms. Scholl's Four Properties were Appraised for Substantially Inflated Values**

3    62.    Since purchasing each of the four properties identified above, Ms. Scholl has learned that

4    each of the appraisals procured by WaMu negligently, recklessly, or intentionally over-valued the

5    property appraised.

6    63.    In January, 2007, Ms. Scholl began preparing to place the first two properties she

7    purchased, Ernest Court and WB Meyer, on the market. Ms. Scholl contacted her former real estate

8    agent, Mr. Pryor, about doing a market analysis for her and placing the homes on the market. However,

9    Mr. Pryor would not commit to selling the houses for her so she contacted several other realtors about

10    putting the houses up for sale. One realtor agreed, but suggested Ms. Scholl get new appraisals on the

11    properties to determine the then-current values of the homes.  Ms. Scholl asked Mr. Gill, who

12    performed the original appraisals on each of the two properties nearly a year and a half earlier, to

13    conduct new appraisals.

14    64.    Mr. Gill performed a second appraisal on the Ernest Court property on February 1, 2007

15    and estimated the value of the property to be $583,000.00. Exhibit 5 at G.  By Mr. Gill's estimate, the

16    value of the Earnest Court property increased by $88,000.00 from September 20, 2005 when Mr. Gill

17    first appraised the property for $495,000.00.  Compare Exhibit 1 at D to Exhibit 5 at G.

18    65.    Mr. Gill performed a second appraisal on the WB Meyer property on January 31, 2007

19    and estimated the value of the property to be $596,000.00. Exhibit 6 at H.  This estimate is $29,000.00

20    higher than his original valuation of the property from October 18, 2005.  Compare Exhibit 2 at K to

21    Exhibit 6 at H.

22    66.    Armed with what Ms. Scholl believed to be competent values of the two properties, Ms.

23    Scholl placed the Ernest Court property up for sale in February, 2007, and the WB Meyer property up

24    for sale in March, 2007, at prices below what she believed to be the market value for the homes based

25    on Mr. Gill's appraised values.  However, to Ms. Scholl's surprise, after several months of having the

26    homes on the market, she received no offers for either property.

27    67.    In June, 2007, after each property had been on the market for several months and Ms.

28    Scholl had lowered the prices of each of the homes, she consulted a friend of hers who is a manager of

18

COMPLAINT
CASE NO.:

1  a mortgage company regarding her concerns about the properties not selling.  In response to her

2  concerns, Ms. Scholl's friend asked to see Mr. Gill's original appraisals for the Earnest Court and WB

3  Meyers properties.  After reviewing them, her friend indicated there were several anomalies in the

4  reports, and suggested they be reviewed by an expert in the field.  Ms. Scholl's friend suggested that

5  the appraisals be sent to a local California appraiser with whom she was familiar.  Ms. Scholl agreed

6  and asked her friend to provide Mr. Gill's reports to the appraiser for the express purpose of

7  determining whether Mr. Gill's appraisals were valid and whether the value judgments were sound.

8  The appraiser contacted Ms. Scholl a few days later and indicated that there were several technical

9  inaccuracies that called into question the validity of the appraisals.

10      68.     Based on the suggestion that the appraisals Ms. Scholl relied on in purchasing the two

11  properties were not credible, Ms. Scholl consulted with an attorney in Oklahoma to determine if there

12  was anything she could do as a result of purchasing the properties, and taking out loans with WaMu,

13  based on faulty appraisals.  To verify the suspicions of the California appraiser, Ms. Scholl had each

14  of her Oklahoma appraisals reviewed by an Oklahoma appraiser to determine if they were done pursuant

15  to the appraisal regulations and recommended Lary Wadley, a licensed independent appraiser, to review

16  the appraisal reports.  Ms. Scholl sent Mr. Gill's first appraisals of the Ernest Court and WB Meyer

17  properties, and Mr. Bowling's appraisal of the Wimberley Creek property, to Mr. Wadley through her

18  attorney.

19      69.     Mr. Wadley performed a basic desk review each of the three appraisal reports to render

20  an opinion as to the adequacy and appropriateness of the original appraisals provided by WaMu and

21  prepared by Messrs. Gill and Bowling based upon the standards set forth in USPAP, Federal National

22  Mortgage Association Real Estate Appraisal Guidelines (FNMA), Federal Home Loan Mortgage

23  Corporation (FHLMC), and Valuation Information Technology, Inc.  Exhibits 7, 8, and 9 at D.  Mr.

24  Wadley completed his appraisal reviews and provided Ms. Scholl with his conclusions on October 4,

25  2007.  Exhibits 7, 8 and 9 at E.

26      70.     Mr. Wadley's desk review of Mr. Gill's October 20, 2005 appraisal of the WB Meyer

27  property revealed several problems. First, Mr. Wadley concluded that Mr. Gill improperly compared

28  the subject property to homes outside the property's subdivision even though there were comparable

19

1  homes within the subdivision of WB Meyer. Exhibit 7 at B-C. Mr. Wadley noted a series of problems

2  with Mr. Gill's market analysis of the WB Meyer property, including Mr. Gill's failure to explain why

3  he compared the property to other homes outside its neighborhood, and the fact the compared homes

4  do not have comparable sales prices or comparable price per square foot. *Id.* at B.

5       71.    Ultimately, Mr. Wadley concluded that,

6       [t]he comparables were from a more expensive addition than the subject's addition.
        There were plenty of sales in the Oak Tree Park addition to use for comparable sales.
7       The estimated range value for the subject from comparables from the Oak Tree Park
        addition as of the date of the appraisal would most likely be $425,000 to $445,000. The
8       comparables used from another subdivision have overestimated the subject's property.

9  Exhibit 7 at C. Based on Mr. Wadley's opinion, Mr. Gill's original October 20, 2005 appraisal of the

10  WB Meyer's property at $567,000.00 – which WaMu procured for Ms. Scholl from Mr. Gill and which

11  she specifically relied on in purchasing the property and in entering the loan thereafter with WaMu –

12  was approximately $132,000.00 (or 23.3%) over-appraised. *Id.* Thus, Ms. Scholl learned for the first

13  time upon the receipt of Mr. Wadley's report in October, 2007, that she had unwittingly paid at least

14  $132,000.00 more for the WB Meyer property than it was actually worth at the time of purchase based

15  on Mr. Gill's appraisal that WaMu procured for her benefit and assured her was credible and could be

16  relied on for a true market value in deciding whether to purchase the property and enter the WaMu loan

17  therefor. Upon information and belief, Mr. Wadley's desk review of Mr. Gill's appraisal establishes

18  only a bare minimum of USPAP violations and over-valuation, and an in-depth, detailed review of Mr.

19  Gill's appraisal of the WB Meyer property may reveal additional violations of USPAP and may reveal

20  that Ms. Scholl's property was over-appraised by Mr. Gill by more than $132,000.00.

21       72.    Similarly, Mr. Wadley's desk review found Mr. Gill's September 21, 2005 appraisal of

22  the Earnest Court property to be based on properties located in a non-comparable subdivision even

23  though there were comparable homes located within Earnest Court's subdivision. Exhibit 8 at B-C.

24  Specifically, Mr. Wadley stated that Mr. Gill used "comparable" properties "from a subdivision that is

25  much more expensive than the [Earnest Court property's] addition." *Id.* at B.

26       73.    Mr. Wadley concluded that Mr. Gill's use of the market analysis was inappropriate

27  because he used homes from a higher priced subdivision instead of the subject property's subdivision.

28  *Id.* at C. Mr. Wadley estimated that the property's value, at the time Ms. Scholl purchased it, would

20

1  be between $468,000.00 and $478,000.00 based on comparing it to properties within its own
2  subdivision. Based on Mr. Wadley's opinion, Mr. Gill's original September 21, 2005 appraisal of the
3  Earnest Court property at $495,000.00 – which WaMu procured for her from Mr. Gill and which Ms.
4  Scholl relied on in purchasing the property and entering the loan thereafter with WaMu – was
5  approximately $22,000.00 over-appraised. *Id.* Thus, Ms. Scholl learned for the first time upon the
6  receipt of Mr. Wadley's report in October, 2007 that she had unwittingly paid approximately $22,000.00
7  more for the Earnest Court property than it was actually worth at the time of purchase based on Mr.
8  Gill's appraisal that WaMu procured for her benefit and assured her was credible and could be relied
9  on for a true market value in deciding whether to purchase the property and enter the WaMu loan
10  therefor. Upon information and belief, Mr. Wadley's desk review of Mr. Gill's appraisal establishes
11  only a bare minimum of USPAP violations and over-valuation, and an in-depth, detailed review of Mr.
12  Gill's appraisal of the Ernest Court property may reveal additional violations of USPAP and may reveal
13  that Ms. Scholl's property was over-appraised by Mr. Gill by more than $22,000.00.

14      74.     Mr. Wadley's desk review of Mr. Bowling's December 9, 2005 appraisal of the
15  Wimberley Creek property showed similar violations of USPAP as Mr. Gill's appraisals. Mr. Wadley
16  concluded that Mr. Bowling compared the Wimberley Creek property to two other properties located
17  outside of its subdivision, despite there being homes similar to the property within its addition.
18  Spectifically, Mr. Wadly stated that:

19          [t]here was at least one other sale from the subject's addition that could have
            been used. The sales outside the subject's addition support a much higher
20          value than the sales within the subject's addition. The sales outside the
            addition appear to be given more weight in the report than those within the
21          subject's addition.... The sales outside the subject's addition that were given
            more weight appear to have overestimated the market value of the subject.
22  Exhibit 9 at C.

23      75.     The result of comparing the Wimberley Creek property to houses outside its addition,
24  and giving the compared homes outside its addition more weight than the property within Ms. Scholl's
25  property's addition, was for the Wimberley Creek property to be over-valued by approximately
26  $15,500.00. Compare Exhibit 3 at F to Exhibit 9 at C. Based on Mr. Wadley's opinion, Mr. Bowling's
27  original December 9, 2005 appraisal of the Wimberley Creek property at $192,000.00 – which WaMu
28  procured for her from Mr. Bowling and which Ms. Scholl relied on in purchasing the property and

21

1   entering the loan thereafter with WaMu – was approximately $15,500.00 (or over 8%) over-appraised.

2   Thus, Ms. Scholl learned for the first time upon the receipt of Mr. Wadley's report in October, 2007 that

3   she had unwittingly paid approximately $15,500.00 more for the Wimberley Creek property than it was

4   actually worth at the time of purchase based on Mr. Bowling's appraisal that WaMu procured for her

5   benefit and assured her was credible and could be relied on for a true market value in deciding whether

6   to purchase the property and enter the WaMu loan therefor. Upon information and belief, Mr. Wadley's

7   desk review of Mr. Bowling's appraisal establishes only a bare minimum of USPAP violations and

8   over-valuation, and an in-depth, detailed review of Mr. Bowling's appraisal of the Wimberley Creek

9   property may reveal additional violations of USPAP and may reveal that Ms. Scholl's property was

10  over-appraised by Mr. Bowling by more than $15,500.00.

11      76.     Upon learning that each of her Oklahoma properties had been substantially over-

12  appraised, Ms. Scholl became suspicious that the fourth property she purchased using a loan from

13  WaMu, Yale Loop in North Carolina, may have been similarly over-valued. To determine whether

14  her suspicion was true, Ms. Scholl requested Andrew Picarsic, a licensed real estate appraiser in North

15  Carolina, to review Mr. Rohde's appraisal of the Yale Loop property.

16      77.     Mr. Picarsic performed a detailed appraisal review of Mr. Rohde's January 11, 2006

17  appraisal on April 11, 2008. Exhibit 10 at A. Mr. Picarsic's review was to render an opinion as to the

18  adequacy and appropriateness of Mr. Rohde's appraisal based upon standards set forth by USPAP,

19  Fannie Mae, and the Statement of Work per WaMu's Published Appraisal Standards. *Id.* at B.

20      78.     Mr. Picarsic disagreed with Mr. Rohde's use of properties outside of Yale Loop's

21  subdivision as comparables in the appraisal because there were "many other comparable sales that were

22  more like the subject in physical characteristics and design and appeal" within the property's

23  subdivision. Exhibit 10 at A. In Mr. Picarsic's opinion, Mr. Rohde's appraisal of Yale Loop did not

24  comply with USPAP in regards to the analysis, preparation or reporting of the sales comparison

25  approach, and Mr. Rohde's conclusion of value is "not defensible." *Id.* at B.

26      79.     To come to this conclusion, Mr. Picarsic directly compared the Yale Loop property to

27  the same three "comparables" Mr. Rohde used in his appraisal report. *Id.* Based on the four properties'

28  square footage, number of bedrooms, number of bathrooms, and amenities – i.e., the physical attributes

22

1  which tend to indicate how much a home is worth – Mr. Picarsic stated that the Yale Loop property was

2  "substantially inferior" to two of the comparables, and "significantly inferior" to the third. *Id.* Indeed,

3  based on this direct comparison, Mr. Picarsic indicates that the Yale Loop property could not even be

4  appraised for $685,000, the lowest value of the three "comparables," because the Yale Loop property

5  was inferior to all three. *Id.*

6      80.    In Mr. Picarsic's opinion, Mr. Rohde violated USPAP and other appraisal standards by

7  certifying that he "used the sales that are locationally, physically and functionally the most similar to

8  the subject property" when he, in fact, chose properties which had more rooms and amenities in order

9  to justify a higher value for the Yale Loop property than it was actually worth. Exhibit 10 at B.

10 Additionally, Mr. Picarsic stated that Mr. Rohde "failed to employ correct adjustments for the full baths

11 and amenities differences between the [Yale Loop property] and the comparables" contrary to what Mr.

12 Rohde certified to in his report. *Id.*

13      81.    Mr. Picarsic concluded by stating,

14         the ignoring of more physically and functionally similar comparables the appraiser[] has
           issued a misleading report in contradiction to the requirements of his signed
15         certifications; Fannie Mae Supplemental Standards; Statement of Work per Washington
           Mutual Published Appraisal Standards; and 2005 Edition of the Uniform Standards of
16         Professional Appraisal Practice 2005 Edition. This series of errors resulted in serious
           violation of the USPAP 2005 Ethics Rule, specifically Conduct section.
17
   Exhibit 10 at B.
18

19      82.    Mr. Picarsic performed a retrospective appraisal of the Yale Loop property using a sales

20 comparison approach comparing the it to other properties within the same division with comparable

21 features and amenities, and assuming costs and property values to be what they were when Ms. Scholl

22 purchased the property in January, 2006. Exhibit 11 at B, D. Mr. Picarsic determined that the Yale

23 Loop property, at the time it was sold, should have appraised for approximately $645,000.00. *Id.* at B.

24 Based on Mr. Picarsic's opinion, Mr. Rohde's original January 11, 2006 appraisal of the Yale Loop

25 property at $740,800.00 – which WaMu procured for Ms. Scholl from Mr. Rohde and which she

26 specifically relied on in purchasing the property and entering the mortgage loan thereafter with WaMu

27 – was approximately $95,800.00 (or 13%) over-appraised. *Id.*; compare Exhibit 4 at I. Thus, Ms.

28 Scholl learned for the first time upon the receipt of Mr. Picarsic's report in April, 2008 that she had

23

1  unwittingly paid nearly $100,000.00 more for the Yale Loop property than it was actually worth at the

2  time of purchase based on Mr. Rohde's appraisal that WaMu procured for her benefit and assured her

3  was credible and could be relied on for a true market value in deciding whether to purchase the property

4  and enter the WaMu loan therefor.

5       83.    Although WaMu maintained an internal appraisal review team responsible for ensuring

6  appraisals provided for homes used as collateral for its home mortgage loans are performed lawfully

7  and credibly, WaMu failed to inform Ms. Scholl that any of the appraisals it procured for her did not

8  comply with USPAP standards, or that she should not rely on the Appraiser Defendant's valuations in

9  deciding whether to purchase the four houses. Instead, WaMu recklessly or intentionally disregarded

10  the fact that each of the four appraisals performed for Ms. Scholl, and the appraisal reports delivered

11  to her, did not meet USPAP standards. By telling Ms. Scholl it was procuring the appraisals for her

12  benefit, and indeed providing her appraisals that explicitly state – as WaMu's loan officer confirmed

13  – that she could rely on the appraisals in deciding whether to purchase the properties, and hence

14  whether she should borrow a sizeable amount of money from WaMu, WaMu intentionally, recklessly

15  or negligently misrepresented to Ms. Scholl that she could rely on the valuations within those reports

16  and encouraged her to proceed with the purchase of each of the four properties under the guise that the

17  appraisal reports were lawful, credible, and accurate, when, in fact, they were not.

18       84.    As a result of WaMu's, Jerry Gill's, Mark IV Appraisal, Inc.'s, Charles Bowling's, Turn-

19  Key Appraisal, LLC's, Mark D. Rohde's, and Rohde Appraisal Services' actions in providing Ms.

20  Scholl with four incredible, unlawful appraisals that falsely and erroneously verified market values for

21  the properties far in excess of their then actual market values, and which each Defendant falsely and

22  erroneously held out to be credible, accurate and lawful and told Ms. Scholl she could rely on them in

23  deciding whether to purchase the properties and enter WaMu loans therefrom, Ms. Scholl paid hundreds

24  of thousands of dollars for properties she would not have otherwise purchased at the prices she did,

25  entered loans with WaMu for those properties she would not have entered, and has been (and continues

26  to be) damaged thereby.

27

28

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNTS

### COUNT 1: BREACH OF CONTRACT/AGENCY

85.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them as if they were fully written herein.

#### A.    **Breach of Contract/Agency Against WaMu**

86.    Ms. Scholl entered into a contract and agency relationship with WaMu when Ms. Scholl requested that and WaMu agreed to procure appraisals for each of the four properties for her, and for her benefit. WaMu's loan officer, Alber Saleh, acting on behalf of WaMu, agreed to procure the four appraisals for Ms. Scholl and WaMu did, in fact, procure appraisals for each of the properties from the Appraiser Defendants on behalf of and for Ms. Scholl as specified throughout this Complaint. Ms. Scholl had the right to terminate the services of WaMu and Appraiser Defendants at any time prior to closing on the WaMu loans.

87.    Ms. Scholl paid WaMu and Appraiser Defendants for each of the appraisals WaMu agreed to procure for her as reflected by the Settlement Statements (HUD-1s) for each of her WaMu loans on the subject properties. *See* Exhibits 12 to 15 at B (Line 803).

88.    After procuring the appraisals for Ms. Scholl, WaMu conducted an internal review of the appraisals to determine whether the valuations obtained were credible and performed pursuant to USPAP standards.

89.    WaMu, pursuant to the contract and agency relationship, had a duty to procure for Ms. Scholl credible appraisal reports done in compliance with USPAP with accurate statements of the market values of the subject properties which she could rely on in deciding whether to purchase each of the four homes and enter loans with WaMu therefor. Alternatively, WaMu, pursuant to the agency relationship, had a duty to disclose to Ms. Scholl that the appraisals it did procure were not credible, and that she should not rely on the values obtained in deciding to purchase the subject properties and enter the WaMu loans therefor.

90.    WaMu breached its contract and agency relationship by failing to procure credible appraisals done in compliance with USPAP which Ms. Scholl could rely on, by delivering to her incredible, unlawful and unreliable appraisals that over-inflated the true market values of the subject

25

1  properties, and by failing to inform her that the appraisals were incredible, unreliable, unlawful and
2  over-inflated.

3      91.    WaMu's failure to procure credible, lawful appraisals for Ms. Scholl was also a breach
4  of the implied covenant of good faith and fair dealing implied in every contract since WaMu knew,
5  recklessly disregarded and/or should have known the appraisals were not credible, reliable or performed
6  in compliance with USPAP.  Additionally, WaMu's concealment and failure to disclose that the
7  appraisals it procured for Ms. Scholl were not credible, were not performed pursuant to USPAP, and
8  were not reliable, was also a breach of the implied covenant of good faith and fair dealing.

9      92.    As a result of WaMu's breaching its contract and agency relationship with Ms. Scholl,
10  Ms. Scholl has been damaged by paying WaMu to procure credible and lawful appraisals which she did
11  not receive, by purchasing four properties at prices that were collectively at least $265,000.00 over their
12  actual market values, entering into four loan agreements with WaMu, spending over $700,000.00 in
13  down payments and interest payments on the four properties, and incurring numerous costs associated
14  with purchasing and owning these four properties, when she would not have purchased any of them at
15  the inflated prices had any of the Appraiser Defendants performed credible, lawful appraisals disclosing
16  the properties' actual market values, or had WaMu informed Ms. Scholl of the fact the appraisals were
17  not performed pursuant to USPAP, were not credible, and stated inflated market values.

18      **B.    Breach of Contract/Agency Against Appraiser Defendants**

19      93.    Ms. Scholl, by and through her agent WaMu, entered into agreements with Appraiser
20  Defendants to provide Ms. Scholl with credible, accurate and lawful appraisals done in compliance with
21  USPAP for the four properties specified throughout this Complaint. This is evidenced by the fact that
22  Ms. Scholl is specifically named in the appraisal reports as each Appraisal Defendants'
23  "Borrower/Client."

24      94.    To the extent each Appraiser Defendant was acting as WaMu's agent in performing
25  appraisals on WaMu's behalf, each Appraiser Defendant was a sub-agent of Ms. Scholl due to her
26  agency relationship with WaMu to procure those appraisals for her.

27

28

26

COMPLAINT
CASE NO.:

1    95.    To the extent each Appraiser Defendant was acting as an independent contractor of
2    WaMu, hired for the specific purpose to provide an appraisal report for one of Ms. Scholl's properties,
3    each Appraiser Defendant was also a contractor of Ms. Scholl's due to her contract and agency
4    relationship with WaMu as illustrated by the fact she is specifically named in the appraisals as each
5    Appraisal Defendants' "Borrower/Client."

6    96.    Each Appraiser Defendant was asked by Ms. Scholl's agent, WaMu, to perform
7    appraisals for Ms. Scholl on one or more of the four properties she eventually purchased. Each
8    Appraiser Defendant was asked to provide a credible appraisal which conformed with USPAP standards
9    and which gave an accurate assessment of the home's then-current true market value. Each Appraiser
10   Defendant agreed to provide a credible, lawful appraisal for WaMu and Ms. Scholl which was
11   purportedly in compliance with USPAP standards. Each Appraiser Defendant did, in fact, provide both
12   WaMu and Ms. Scholl with appraisal reports and certified that their appraisals were credible and
13   complied with USPAP standards.

14   97.    WaMu and Ms. Scholl had the ability at any time to terminate the agreement to provide
15   the appraisal reports prior to completion of the appraisals.

16   98.    Ms. Scholl paid each Appraiser Defendant for the appraisal report done for her through
17   her agent WaMu.

18   99.    Each Appraiser Defendant delivered to Ms. Scholl a copy of their appraisal report
19   identifying Ms. Scholl as the appraiser's "client," and stating that she could rely on their determination
20   of the property's value in deciding whether or not to purchase the home. In doing so, each Appraiser
21   Defendant intended that Ms. Scholl would, in fact, rely on their appraisal in deciding whether to
22   purchase the property and enter into a mortgage transaction with WaMu.

23   100.   Each Appraiser Defendant certified that their appraisal was done in compliance with
24   USPAP standards and that the appraisal was done credibly.

25   101.   Each Appraiser Defendant breached their contract with Ms. Scholl by failing to provide,
26   as each promised and as each certified, an appraisal report stating an accurate fair market value for the
27   property appraised, which complied with USPAP standards, and which was done credibly as specified
28   throughout this Complaint. Each Appraiser Defendant's failure to provide a credible, lawful appraisal

27

1    was a breach of the implied covenant of good faith and fair dealing implied in every contract.

2    Additionally, each Appraiser Defendant's concealment and otherwise failure to disclose that the

3    appraisal they provided to Ms. Scholl was not credible, was not in compliance with USPAP, and did

4    not state an accurate fair market value for the property, was also a breach of the implied covenant of

5    good faith and fair dealing.

6         102.    Ms. Scholl has been damaged by each Appraiser Defendant's breach of its contract or

7    sub-agency relationship because each Appraiser Defendant failed to provide Ms. Scholl with a credible,

8    accurate appraisal performed in compliance with USPAP standards which each Appraiser Defendant

9    agreed to provide, and which Ms. Scholl paid for.  Each Appraiser Defendant further breached its

10    contract or sub-agency relationship with Ms. Scholl by stating she could rely on their determination of

11    the appraised property's value in deciding whether to purchase the home, which she did, knowing the

12    appraisal was neither credible nor performed in compliance with USPAP standards.  Had the Appraiser

13    Defendants provided lawful, credible appraisals which gave an accurate statement of each properties'

14    value, Ms. Scholl would not have purchased any of the four homes and would not have entered into the

15    four mortgage loan transactions with WaMu.  Ms. Scholl has subsequently been harmed, and continues

16    to be harmed, by having purchased four properties at prices well above the actual values and has been

17    further harmed as specified in paragraph 92 herein.

18                          **COUNT 2: BREACH OF FIDUCIARY DUTY**

19         103.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them

20    as if they were fully written herein.

21         **A.**     **Breach of Fiduciary Duty Against WaMu**

22         104.    By virtue of the agency relationship between Ms. Scholl and WaMu, WaMu owed Ms.

23    Scholl a fiduciary duty to act on Ms. Scholl's behalf and in Ms. Scholl's best interests in procuring

24    credible appraisal reports as it agreed to do.  WaMu undertook a duty to act loyally in all matters

25    connected with procuring credible appraisals, including the duty to inform Ms. Scholl of any material

26    facts regarding the four appraisal reports.

27

28

28

1       105.   WaMu breached its fiduciary duty to Ms. Scholl by failing to procure credible appraisal

2 reports which it agreed to do as Ms. Scholl's agent. Indeed, none of the four appraisal reports were

3 performed in compliance with USPAP standards, and none of the four appraisal reports could be relied

4 on for the values stated therein.

5       106.   WaMu also breached its fiduciary duty to Ms. Scholl by failing to disclose material

6 information regarding the appraisal reports to her. WaMu conducted internal reviews of each of the

7 four appraisal reports it procured for Ms. Scholl, and negligently, recklessly, or intentionally failed to

8 disclose to Ms. Scholl that each of the four appraisals was not credible, was not performed in

9 compliance with USPAP standards, and could not be relied on by Ms. Scholl in deciding whether to

10 purchase each of the four properties at issue in this Complaint.

11       107.   As a result of WaMu's breach of its fiduciary duty owed to Ms. Scholl, Ms. Scholl has

12 been damaged because she purchased four properties which she believed, based on WaMu's assertion

13 that it provided her with credible appraisals she could rely on, were worth the amounts she agreed to

14 pay, and hence entered into four mortgage loans with WaMu relying on the credibility of the appraisals.

15 However, none of the four properties were worth the amounts the sellers were asking for, or the

16 amounts that WaMu and the Appraiser Defendants certified they were worth. As a result, Ms. Scholl

17 owns four properties with values much less than the amounts she paid for, and is unable to sell them

18 to satisfy the loans she took out with WaMu in relying on the appraisals. Ms. Scholl has been further

19 damaged as specified in paragraph 92.

20       108.   WaMu's conduct described herein was willful, wanton and in reckless disregard of Ms.

21 Scholl's interests and the duties WaMu owed to her.

22       **B.**    **Breach of Fiduciary Duty Against Appraiser Defendants**

23       109.   By virtue of the sub-agency relationship between Ms. Scholl and each Appraiser

24 Defendant, each Appraiser Defendant owed Ms. Scholl a fiduciary duty to act on Ms. Scholl's behalf

25 and in Ms. Scholl's best interests in providing credible, accurate appraisals performed in compliance

26 with USPAP standards as each agreed to do. As part of their fiduciary obligations, each Appraiser

27

28

29

1  Defendant undertook a duty to act loyally in all matters connected with providing credible, accurate
2  appraisals, including the duty to inform Ms. Scholl of any material facts regarding the appraisals they
3  performed.

4        110.    Each Appraiser Defendant breached its fiduciary duty to Ms. Scholl by failing to provide
5  credible appraisal reports performed in compliance with USPAP standards that accurately state the fair
6  market value for the properties as each agreed to do as Ms. Scholl's sub-agent. Indeed, as explained
7  throughout this Complaint, none of the Appraiser Defendants' appraisal reports were done in
8  compliance with USPAP standards, none of the appraisal reports were credible, and none of the
9  appraisal reports could be relied on for the values stated as each Appraiser Defendant certified.

10       111.    As a result of each Appraiser Defendants' breach of their fiduciary duties owed to Ms.
11  Scholl, Ms. Scholl has been damaged because she purchased four properties that were not worth the
12  amounts that each Appraiser Defendant stated in their respective appraisal report, and Ms. Scholl
13  entered into four mortgage loans with WaMu to pay for the properties. As a result, Ms. Scholl owns
14  four properties with values much less than the amounts she paid for, owes hundreds of thousands of
15  dollars to WaMu to pay off the loans she took out to pay for the houses, and is unable to sell any of the
16  properties to satisfy the loans she took out with WaMu to cover the costs. Ms. Scholl has been further
17  damaged as set forth in paragraph 92.

18       112.    Appraiser Defendants' conduct described herein was willful, wanton and in reckless
19  disregard of Ms. Scholl's interests and their duties to her.

20                            **COUNT 3: CONSTRUCTIVE FRAUD**

21       113.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them
22  as if they were fully written herein.

23       **A.    Constructive Fraud Against WaMu**

24       114.    By virtue of the agency relationship between Ms. Scholl and WaMu, WaMu owed Ms.
25  Scholl a fiduciary duty to act on Ms. Scholl's behalf and in Ms. Scholl's best interests in procuring
26  credible appraisal reports as it agreed to do. WaMu undertook a duty to act loyally in all matters
27  connected with procuring credible appraisals, including the duty to not to omit or conceal any important
28  information regarding the appraisal reports it procured for Ms. Scholl.

                                        30

1     115.    WaMu breached its fiduciary duty to Ms. Scholl by failing to procure credible appraisal
2     reports which it agreed to do as Ms. Scholl's agent. Indeed, none of the four appraisal reports were
3     performed in compliance with USPAP standards, and none of the four appraisal reports could be relied
4     on for the values stated.

5     116.    Pursuant to its agreement to procure the appraisals for Ms. Scholl, WaMu performed its
6     own appraisal review of each of the appraisals prepared for and provided to Ms. Scholl. WaMu, through
7     its internal review, knew or should have known that each of the four appraisal reports was not credible
8     and was not done in compliance with USPAP standards, and thus could not be relied on by Ms. Scholl
9     for the values stated within.

10    117.    Despite the fact that each of the appraisal reports was not credible, WaMu published to
11    Ms. Scholl each of the four appraisal reports and told Ms. Scholl that she could rely on the values stated
12    in deciding whether to purchaser the homes and thus to enter into mortgage loans with WaMu. In doing
13    so, WaMu omitted the fact that the appraisals were not credible and could not be relied to encourage Ms.
14    Scholl to purchase each of the four properties and hence borrow hundreds of thousands of dollars from
15    WaMu to pay for them.

16    118.    Ms. Scholl relied on WaMu's and each Appraiser Defendant's statement that she could
17    rely on the appraised value in deciding whether to purchase each of the four properties and enter into
18    each of the four mortgage loan agreements with WaMu, and did in-fact rely on them in purchasing each
19    of the four homes. As a result, Ms. Scholl has been damaged because she purchased four properties
20    which she believed, based on WaMu's assertion that it provided her with credible appraisals she could
21    rely on, were worth the amounts she agreed to pay. However, none of the four properties were worth
22    the amounts the sellers were asking for, or the amounts the Appraiser Defendants' certified they were
23    worth. As a result, Ms. Scholl owns four properties with values much less than the amounts she paid
24    for, and is unable to sell them to satisfy the loans she took out with WaMu to cover the costs. Ms.
25    Scholl has been further damaged as specified in paragraph 92.

26    119.    WaMu's conduct described herein was willful, wanton and in reckless disregard of Ms.
27    Scholl's interests and the duties WaMu owed to her.

28

31

1

**B.    Constructive Fraud Against Appraiser Defendants**

2    120.    By virtue of the sub-agency relationship between Ms. Scholl and each Appraiser
3 Defendant, each Appraiser Defendant owed Ms. Scholl a fiduciary duty to act on Ms. Scholl's behalf
4 and in Ms. Scholl's best interests in providing credible, accurate appraisals performed in compliance
5 with USPAP standards as each agreed to do. Each Appraiser Defendant undertook a duty to act loyally
6 in all matters connected with providing credible, accurate appraisals, including the duty to not to omit
7 or conceal any important information regarding their appraisal performed for Ms. Scholl.

8    121.    Pursuant to their agreement to provide a credible and lawful appraisal for Ms. Scholl,
9 each Appraiser Defendant certified that they had complied with USPAP guidelines in performing their
10 appraisal, and that their appraisal was credible. However, each Appraiser Defendant knew that based
11 on the "comparable" houses they chose to use, and based on the various assumptions they made, that
12 the appraisal report(s) they provided to Ms. Scholl were not credible, did not provide an accurate
13 statement of the fair market value of the property appraised, and did not comply with USPAP standards
14 as detailed throughout this Complaint.

15    122.    Despite the fact that each Appraiser Defendant knew their appraisal report was not
16 credible, accurate or lawful, each Appraiser Defendant gave their report to Ms. Scholl and told Ms.
17 Scholl that she could rely on the value stated within the report in deciding whether to purchase the
18 property and enter into a mortgage loan with WaMu. Each Appraiser Defendant, with the intent that
19 Ms. Scholl actually rely on their report and purchase the property appraised, failed to disclose the fact
20 that their appraisal could not be relied on by Ms. Scholl since it was not credible, accurate or performed
21 in compliance with USPAP.

22    123.    Ms. Scholl relied on each Appraiser Defendant's false conclusion about the value of each
23 of the four properties, their false statement that their appraisal was credible and done in compliance with
24 USPAP, and their false statement that she could rely on their appraisal in deciding whether to purchase
25 the appraised property and enter into a mortgage loan agreement with WaMu to finance the purchase.
26 As a result, Ms. Scholl purchased each of the four homes that are the subject of this Complaint, and has
27 been damaged because none of the four properties were actually worth the amounts that the Appraiser
28 Defendants' stated in their incredible, unlawful appraisal reports, as further specified in paragraph 92.

1     As a result, Ms. Scholl owns four properties with values much less than the amounts she paid for, and

2     is unable to sell them to satisfy the loans she took out with WaMu to cover the costs of the properties.

3           124.     Appraiser Defendants' conduct was willful, wanton and in reckless disregard of Ms.

4     Scholl's interests and their duties to her.

5                  **COUNT 4: NEGLIGENT MISREPRESENTATION**

6           125.     Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them

7     as if they were fully written herein.

8           **A.**     <u>**Negligent Misrepresentation Against Jerry Gill and Mark IV Appraisals, Inc.**</u>

9           126.     Jerry Gill and Mark IV Appraisals, Inc. were hired by WaMu and Ms. Scholl to provide

10     appraisal services to WaMu and to Ms. Scholl. Pursuant to the agreement, Mr. Gill, on his own behalf

11     and on behalf of Mark IV Appraisals, Inc., prepared appraisal reports for the Ernest Court and WB

12     Meyer properties.

13           127.     Mr. Gill held himself out to be a certified real estate appraiser, professionally licensed

14     by the State of Oklahoma, and competent to provide lawful, accurate and credible appraisal services for

15     Plaintiff Scholl. Mr. Gill also certified that his appraisals were done in compliance with USPAP

16     standards as required by law. Accordingly, Mr. Gill acknowledged and certified that "any intentional

17     or negligent misrepresentation(s) contained in [his] appraisal report may result in civil liability."

18           128.     Mr. Gill prepared two appraisal reports for Plaintiff Scholl in which he made a

19     representation as to the most material fact regarding Plaintiff Scholl's decision whether to purchase the

20     two properties – the values of the homes. Mr. Gill indicated the WB Meyer property to be worth

21     $567,000.00, and the Ernest Court proper to be worth $495,000.00.

22           129.     Mr. Gill's valuations of the two properties were not accurate, and there was no reasonable

23     ground for him to believe they were accurate. An independent review of Mr. Gill's appraisals revealed

24     that Mr. Gill used properties outside Plaintiff Scholl's properties' subdivisions as "comparables," even

25     though there were comparable homes within the subdivisions which would reflect a more accurate

26     value. Additionally, Mr. Gill did not explain in his reports why he choose to use properties with

27     dissimilar features from the appraised homes that were outside Ms. Scholl's properties' subdivisions.

28     The use of dissimilar properties located outside the subdivisions of Ms. Scholl's properties as well as

33

1  Mr. Gill's other violations of USPAP, whether done negligently, recklessly, or intentionally, was
2  unreasonable and resulted in Mr. Gill over-appraising Ms. Scholl's homes by a combined amount of at
3  least $154,000.00.

4      130.    Mr. Gill provided his appraisal reports to Ms. Scholl with the intent expressly stated in
5  those reports that both she and WaMu "rely on this appraisal report as part of any mortgage finance
6  transaction." Mr. Gill's appraisal reports identify Ms. Scholl as his client, and indicates that the
7  intended use "is for the lender/client to evaluate the property that is the subject of the appraisal for a
8  mortgage finance transaction." Indeed, Ms. Scholl relied on Mr. Gill's appraisals in deciding to
9  purchase the two properties and to enter into two mortgage loans with WaMu.

10     131.    Ms. Scholl was unaware of the actual value of the two homes Mr. Gill appraised, and in
11 reliance of Mr. Gill's appraisals she purchased both properties and entered into mortgage loans with
12 WaMu to pay for the homes. Ms. Scholl had no reason to doubt the voracity of Mr. Gill's statements
13 as specified throughout this Complaint. Indeed, Mr. Gill certified he had complied with all of the
14 appropriate standards, including USPAP, and certified that his valuations were accurate, which,
15 unbeknownst to Ms. Scholl, they were not.

16     132.    Mr. Gill's negligent misrepresentation of the properties' values, that those values were
17 accurate, that they could be relied upon and that they were determined in compliance with USPAP, and
18 Ms. Scholl's reliance on Mr. Gill's misrepresentations, has caused Ms. Scholl to suffer damages by
19 virtue of purchasing the properties and entering into the mortgage loan agreements with WaMu. Ms.
20 Scholl purchased the properties appraised by Mr. Gill for at least $154,000.00 more than their true fair
21 market value at the time of purchase. Ms. Scholl paid $224,258.46 as down payments, closing costs and
22 fees in purchasing the properties and entering into the mortgage loans with WaMu. In addition, Ms.
23 Scholl has paid $125,309.97 in interest-only payments to WaMu, and still has an outstanding balance
24 of $847,792.00 for the two loans for homes that were only worth at most $908,000.00 combined at the
25 time she purchased them. Ms. Scholl has also incurred, and continues to incur, other costs associated
26 with her purchase and ownership of those properties. Had Mr. Gill informed Ms. Scholl of the actual

27

28

34

1  value of the two homes when he prepared his appraisal reports or of any of his other misrepresentations,

2  Ms. Scholl would not have purchased either of the homes, or would have only purchased the homes for

3  the actual amounts they were worth.

4  **B.    Negligent Misrepresentation Against Charles Bowling and Turn-Key Appraisal**
   **Services, LLC**

5

6      133.    Charles Bowling and Turn-Key Appraisal Services, LLC were hired by WaMu and Ms.

7  Scholl to provide appraisal services to both Ms. Scholl and to WaMu. Pursuant to the agreement, Mr.

8  Bowling, on his own behalf and on behalf of Turn-Key Appraisal Services, LLC, prepared an appraisal

9  report for the Wimberley Creek property.

10     134.    Mr. Bowling held himself out to be a certified real estate appraiser, professionally

11  licensed by the State of Oklahoma, and competent to provide lawful, accurate and credible appraisal

12  services for Ms. Scholl. Mr. Bowling also certified that his appraisal was done in compliance with

13  USPAP standards as required by law, and that "any intentional or negligent misrepresentation(s)

14  contained in [his] appraisal report may result in civil liability."

15     135.    Mr. Bowling prepared an appraisal report for Ms. Scholl in which he made a

16  representation as to the most material fact regarding Ms. Scholl's decision whether to purchase the

17  property – the value of the home. Mr. Bowling indicated the Wimberley Creek property to be worth

18  $192,000.00.

19     136.    Mr. Bowling's valuation of Wimberley Creek was not accurate, and there was no

20  reasonable ground for Mr. Bowling to believe that it was accurate. An independent review of Mr.

21  Bowling's appraisal revealed that Mr. Bowling used houses outside Wimberley Creek's addition and

22  gave the properties outside its addition more weight than the one comparable property within Wimberley

23  Creek's addition. The use of dissimilar properties outside the subdivision of the Wimberley Creek

24  property, whether done negligently, recklessly, or intentionally, was unreasonable and resulted in Mr.

25  Bowling over-appraising Ms. Scholl's property by at least $15,500.00.

26     137.    Mr. Bowling provided his appraisal report to WaMu and had it delivered to Ms. Scholl

27  with the intent expressly stated in the report that both the bank and Ms. Scholl "rely on this appraisal

28  report as part of any mortgage finance transaction." Mr. Bowling's appraisal report identifies Ms. Scholl

1   as Mr. Bowling's client and indicates that the intended use "is for the lender/client to evaluate the

2   property that is the subject of the appraisal for a mortgage finance transaction." Indeed, Ms. Scholl did,

3   in fact, rely on Mr. Bowling's appraisal in deciding to purchase the property and to enter into a mortgage

4   loan with WaMu.

5        138.    Ms. Scholl was unaware of the actual value of the Wimberley Creek property at the time

6   she purchased it, and purchased it relying on Mr. Bowling's appraisal. Ms. Scholl had no reason to

7   doubt the voracity of Mr. Bowling's statements as specified throughout this Complaint. Indeed, Mr.

8   Bowling certified he had complied with all of the appropriate standards, including USPAP, and certified

9   that his valuation was accurate.

10       139.    Mr. Bowling's negligent misrepresentation of Wimberley Creek's value, that those values

11  were accurate, that they could be relied upon and that they were determined in compliance with USPAP,

12  and Ms. Scholl's reliance on Mr. Bowling's misrepresentations, has caused Ms. Scholl to suffer

13  damages by purchasing the property and entering into a mortgage loan agreement with WaMu. Ms.

14  Scholl purchased the property appraised by Mr. Bowling for at least $15,500.00 more than its true fair

15  market value at the time of purchase. Ms. Scholl has paid $45,574.40 as a down payment, closing costs

16  and fees in purchasing property and entering into a mortgage loan with WaMu. In addition, Ms. Scholl

17  has paid $21,344.00 in interest-only payments to WaMu, and still has an outstanding balance of

18  $153,600.00 for a home that was only worth at most $176,500.00 at the time she purchased it. Ms.

19  Scholl has also incurred, and continues to incur, costs associated with the purchase and ownership of

20  this property. Had Mr. Bowling informed Ms. Scholl of the actual value of the home when he prepared

21  his appraisal report or of any of his other misrepresentations, Ms. Scholl would not have purchased the

22  home, or would have only purchased the home for the actual amount it was worth.

23       **C.    Negligent Misrepresentation Against Mark D. Rohde and Rohde Appraisal
             Services**

24

25       140.    Mark D. Rohde and Rohde Appraisal Services were hired by WaMu and Ms. Scholl to

26  provide appraisal services to both Ms. Scholl and WaMu. Pursuant to the agreement, Mr. Rohde, on

27  his own behalf and on behalf of Rohde Appraisal Services, prepared an appraisal report for the Yale

28  Loop property.

36

1    141.    Mr. Rohde held himself out to be a certified real estate appraiser, professionally licensed

2  by the State of North Carolina, and competent to provide lawful, accurate and credible appraisal services

3  for Ms. Scholl.  Mr. Rohde also certified that his appraisal was done in compliance with USPAP

4  standards as required by law, and that "any intentional or negligent misrepresentation(s) contained in

5  [his] appraisal report may result in civil liability."

6    142.    Mr. Rohde prepared an appraisal report for Ms. Scholl in which he made a representation

7  as to the most material fact regarding Ms. Scholl's decision whether to purchase the property – the value

8  of the home.  Mr. Rohde indicated the Yale Loop property to be worth $740,800.00.

9    143.    Mr. Rohde's valuation of Yale Loop was not accurate, and there was no reasonable

10  ground for Mr. Rohde to believe that it was accurate. An independent review of Mr. Rohde's appraisal

11  revealed that Mr. Rohde used houses outside Yale Loop's subdivision even though there were

12  comparable homes within the subdivision, and that even compared to the homes selected as

13  "comparables," the Yale Loop property was mis-appraised because it was "substantially inferior" to two

14  of the three selected homes, and "significantly inferior" to the third, but Mr. Rohde concluded its value

15  was higher than two of the three properties.  The use of the properties outside Yale Loop's subdivision

16  and his disregard for acceptable appraisal rules was unreasonable, violated USPAP, and resulted in Mr.

17  Rohde over-appraising the Yale Loop property by approximately $95,800.00.

18    144.    Mr. Rohde provided his appraisal report to Ms. Scholl with the intent expressly stated

19  in the report that both she and WaMu "rely on this appraisal report as part of any mortgage finance

20  transaction." Mr. Rohde's appraisal report identifies Ms. Scholl as Mr. Rohde's client and indicates that

21  the intended use "is for the lender/client to evaluate the property that is the subject of the appraisal for

22  a mortgage finance transaction."  Indeed, Ms. Scholl relied on Mr. Rohde's appraisal in deciding to

23  purchase the property and enter into a mortgage loan with WaMu.

24    145.    Ms. Scholl was unaware of the actual value of the Yale Loop property at the time she

25  purchased it, and purchased it in reliance of Mr. Rohde's appraisal. Ms. Scholl had no reason to doubt

26  the voracity of Mr. Rohde's statements as specified throughout this Complaint.  Indeed, Mr. Rohde

27  certified he had complied with all of the appropriate standards, including USPAP, and certified that his

28  valuation was accurate.

37

146.    Mr. Rohde's negligent misrepresentation of Yale Loop's value, that those values were accurate, that they could be relied upon and that they were determined in compliance with USPAP, and Ms. Scholl's reliance thereon, has caused Ms. Scholl to suffer damages by purchasing the property and entering into a mortgage loan agreement with WaMu. Ms. Scholl purchased the Yale Loop property for approximately $95,800.00 more than its true fair market value at the time of purchase. Ms. Scholl has paid $160,302.46 as a down payment, closing costs and fees for the property. In addition, Ms. Scholl has paid $90,521.83 as interest-only payments to WaMu, and still has an outstanding balance of $592,000.00 for a home that was only worth $645,000.00 at the time she purchased it. Ms. Scholl has also incurred, and continues to incur, other costs associated with her purchase and ownership of the property. Had Mr. Rohde informed Ms. Scholl of the actual value of the home when he prepared his appraisal report or of any of his other misrepresentations, Ms. Scholl would not have purchased the property, or would have only purchased the home for the actual amount it was worth.

### D.    Negligent Misrepresentation Against WaMu

147.    This count is plead in the alternative if WaMu asserts, or the Court finds, that WaMu only procured the four appraisals at issue in this Complaint for its own benefit acting in its traditional role as a lending institution, and not as Ms. Scholl's agent which she hired to procure the appraisals for her to rely on and for her benefit.

148.    As part of Ms. Scholl's mortgage loan transactions with WaMu, WaMu by and through its agent Alber Saleh, and confirmed by the appraisal reports WaMu caused to be delivered to Ms. Scholl, indicated it would procure appraisals specifically for Ms. Scholl's benefit which WaMu indicated she could rely on in deciding whether to purchase each of the properties, and hence to enter into the four mortgage loans with WaMu. WaMu's agent, Alber Saleh, also informed Ms. Scholl that WaMu maintained an internal appraisal review process responsible for ensuring that appraisals performed on properties used as collateral for its home mortgage loans were accurate and complied with USPAP standards to ensure any appraisal WaMu procured for Ms. Scholl would be credible. To the extent WaMu contends it never intended to procure any of the four appraisals at issue for Ms. Scholl

38

1  for her to rely on in deciding whether to purchase the properties at issue and enter into four mortgage

2  loans with WaMu, and WaMu contends it was only procuring the appraisals for its own benefit, then

3  WaMu's representations described herein were untrue.

4          149.    If WaMu asserts, or the Court finds, that WaMu acts only in the traditional role of a

5  lender and does not procure appraisals for a borrower's benefit in any instance, but instead only procures

6  appraisals for its own business interests to determine if a property is sufficiently collateral for a loan,

7  then WaMu had no reasonable ground to believe to be true its statement that it would procure appraisal

8  reports for Ms. Scholl's benefit, which she could rely on in deciding whether to purchase the four

9  properties and enter into the WaMu mortgage loans. Indeed, the only reason WaMu could have told Ms.

10  Scholl that she could rely on the appraisals it procured was to induce Ms. Scholl to rely on the appraisals

11  and, consequently, purchase each of the four properties and to borrow money from WaMu to pay for the

12  properties.

13          150.    Ms. Scholl was unaware that WaMu was not procuring appraisals for her benefit. Indeed,

14  in addition to WaMu telling Ms. Scholl that it would procure appraisals for her benefit, the appraisals

15  WaMu procured for and published to her, either directly by WaMu or through the Appraiser Defendants,

16  specifically indicate that she could rely on the appraisals in deciding whether to purchase the homes and

17  borrow money from WaMu, and list "SIDNEY SCHOLL" as each Appraiser Defendants' "client." As

18  a consequence of WaMu's misrepresentation, Ms. Scholl relied on WaMu's statement that it was

19  procuring appraisals for her benefit, and, as the appraisals appeared to confirm WaMu's statement and

20  the sellers' asking prices for the properties at issue, she purchased each of the four homes and entered

21  into four mortgage loans with WaMu.  Had WaMu not misrepresented that she could rely on the

22  appraisals it procured for her and published to her, Ms. Scholl would have hired independent appraisers

23  of her own to determine the value of each property and to decide whether to purchase each of the four

24  properties and, hence, whether to enter into the four loans with WaMu.

25          151.    As a result of WaMu's misrepresentation, and Ms. Scholl's reliance thereon, Ms. Scholl

26  has suffered damages exceeding $700,000.00. This amount includes the amount of money Ms. Scholl

27  paid as down payments on the four homes, costs, fees, and expenses for the closings of the four homes,

28  and monthly interest payments paid directly to WaMu for the four homes. In addition to this amount,

39

1   Ms. Scholl has paid, and continues to pay, thousands more for taxes, bills, and miscellaneous expenses
2   related to owning the four properties. Despite paying over $700,000.00 thus far on the four houses, Ms.
3   Scholl still owes WaMu a total of $1,593,392.00 on the properties at issue which were worth at most
4   $1,719,000.00 at the time she purchased them. Had WaMu not misrepresented the fact it was not
5   procuring appraisal reports for her benefit, Ms. Scholl would have purchased independent appraisals to
6   indicate the properties' true fair market values, and would not have purchased any of the properties for
7   the amounts she paid, and would not have borrowed nearly $1.6 million from WaMu.

8               **COUNT 5: NEGLIGENCE AGAINST EACH APPRAISER DEFENDANT**

9          152.   Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them
10  as if they were fully written herein.

11         153.   Plaintiff pleads this count in the alternative to each Appraiser Defendant acting recklessly
12  or intentionally in performing their roles as licensed, certified appraisers as detailed throughout this
13  Complaint.

14         154.   Each licensed, certified Appraiser Defendant, in performing an appraisal, had a duty to
15  use the skill, prudence, and diligence as other members of their profession commonly possess and
16  exercise.

17         155.   Each Appraiser Defendant owed this duty of care to Ms. Scholl as the person who is
18  listed on the appraisals as each Appraiser Defendant's client, as the person who paid for each Appraiser
19  Defendant's appraisal services, and as the person who is identified as being a party who could rely on
20  their report in deciding whether to purchase the appraised home and to enter into a mortgage loan with
21  WaMu.

22         156.   Each Appraiser Defendant breached their duty of care owed to Ms. Scholl to perform
23  their appraisals with the skill, prudence and diligence as other members of the appraisal profession and,
24  instead, acted negligently in performing their appraisals for Ms. Scholl in the ways detailed throughout
25  this Complaint.

26         157.   As a direct and proximate cause of each Appraiser Defendant's breach of their duties,
27  Ms. Scholl has been harmed by having paid for the four incredible appraisals, by having purchased the
28  four properties at issue in this action based on those incredible appraisals, and by having entered into

40

1    four mortgage loans with WaMu based on those incredible appraisals. Ms. Scholl has suffered hundreds

2    of thousands of dollars in damages as a direct result of each Appraiser Defendant's negligence, and

3    continues to suffer thousands more by virtue of owning four properties she cannot sell to pay off her four

4    WaMu loans.

5

**COUNT 6: UNFAIR BUSINESS PRACTICES IN VIOLATION OF
BUSINESS & PROFESSIONS CODE §§ 17200, *et seq.***

6

7       158.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them

8    as if they were fully written herein.

9       159.    The UCL defines unfair business competition to include any "unlawful, unfair or

10    fraudulent" act or practice. Cal. Bus. & Prof. Code, § 17200.

11       **A.    <u>Action for "Unlawful" Business Practices Against Defendants</u>**

12       160.    A business practice is "unlawful" under the Unfair Competition Law if it is forbidden

13    by law, including state or federal laws or regulations.

14       161.    The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated

15    into federal law by 12 C.F.R. §§ 34.44, into California law by Cal. Bus. & Prof. Code, § 11319, into

16    North Carolina law by 21 N.C. Admin. Code 57A.0501, and into Oklahoma law by Okla. Stat. Ann. tit.

17    59, § 858-726. USPAP requires appraisers to perform a credible appraisal done in compliance with

18    USPAP standards, to not commit substantial errors or omissions that significantly affect an appraisal,

19    and to not render appraisal services in a careless or negligent manner which could affect the credibility

20    of an appraisal report. USPAP's standards and certifications apply to appraisers performing an original

21    appraisal as well as appraisers reviewing another appraiser's work such as the reviews WaMu performed

22    on Ms. Scholl's appraisals.

23       162.    USPAP also requires that each written real property appraisal report must contain a

24    signed certification that is similar in content to the following form:

25       I certify that, to the best of my knowledge and belief:

26       -      my engagement in this assignment was not contingent upon developing or reporting predetermined results.

27

28       -      my analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

41

1  The appraisal reports for the WaMu loans that are the subject of this Complaint contained this or a
2  materially identical certification.

3      163.    Appraiser Defendants violated the "unlawful" prong of the UCL by failing to provide
4  credible appraisals in compliance with USPAP standards as detailed throughout this Complaint because
5  each Appraiser Defendant committed substantial errors that affected the appraisal and inflated the
6  appraised property's value stated in the reports, and otherwise rendered their appraisal services in a
7  careless or negligent manner in violation of USPAP which affected the credibility of each of Appraiser
8  Defendant's appraisal report(s) and property values stated therein.

9      164.    WaMu likewise violated the "unlawful" prong of the UCL by recklessly or intentionally
10 disregarding each Appraiser Defendant's violations of USPAP, and by its own failure to perform a
11 credible review as required by USPAP after undertaking to do so.  WaMu's internal appraisal reviewers
12 were bound to follow the same USPAP guidelines as Appraiser Defendants, yet WaMu's reviews of Ms.
13 Scholl's appraisals were done in a careless, negligent or reckless manner which affected the credibility
14 of their reviews of the appraisals.

15     165.    Because of Defendants' unlawful acts and practices, Ms. Scholl purchased four properties
16 she would not have otherwise purchased, entered into four mortgage loan contracts with WaMu that she
17 would not have otherwise entered into, and paid for appraisals that were not credible, accurate or lawful.
18 Ms. Scholl has thus been harmed by having to pay hundreds of thousands of dollars in costs, fees, and
19 expenses related to the purchase and maintenance of each of the four properties identified in this
20 Complaint, and Ms. Scholl continues to be damaged by virtue of having to pay bills and taxes to
21 maintain each of the four properties. Ms. Scholl requests that this Court cause Defendants to restore this
22 money to her.

23     166.    Because of Defendants' unlawful acts and practices, WaMu and Appraiser Defendants
24 also injured Ms. Scholl and obtained money unlawfully by charging her for credible, lawful appraisals
25 which they failed to provide.  Thus, Ms. Scholl requests that this Court cause Defendants to restore this
26 money to her.

27     167.    Additionally, through its unlawful acts and practices, WaMu has obtained money from
28 Ms. Scholl, and continues to obtain money from her, in the form of mortgage payments.  As such, Ms.

1   Scholl requests that this Court cause WaMu to restore this money to her and to enjoin WaMu from

2   continuing to benefit from its unfair practices as discussed herein. Otherwise, Ms. Scholl will be

3   irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

4         **B.**    **Action for "Unfair" Business Practices Against WaMu**

5       168.    A business practice is "unfair" under the Unfair Competition Law if the reasons,

6   justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the

7   alleged victim.

8       169.    Defendant WaMu has violated the "unfair" prong of the UCL when it informed Ms.

9   Scholl it would procure credible, accurate and lawful appraisals for her which she could rely on in

10   determining whether to purchase each of the four properties at issue in this Complaint, and to enter into

11   four mortgage loan transactions with WaMu in one or more of the three following ways:

12         a.    WaMu's business practice was unfair because it failed to procure credible,

13   accurate and lawful appraisals performed pursuant to USPAP standards, and provided Ms. Scholl with

14   incredible, inaccurate and unlawful appraisals with the knowledge that Ms. Scholl would, in fact, rely

15   on the appraisals procured for her; or,

16         b.    WaMu told Ms. Scholl it would procure four appraisals which she could rely on

17   in deciding whether to purchase each of the four properties at issue in this Complaint, and hence enter

18   into four mortgage loans with WaMu, and, in fact, procured four appraisals which state that she was the

19   client for each Appraiser Defendant, and that she could rely on the appraisals in deciding whether to

20   purchase the properties and whether to enter into mortgage loans with WaMu. This business practice

21   was unfair because WaMu never intended to procure a credible, accurate and lawful appraisal for Ms.

22   Scholl to rely on in deciding whether to purchase each of the four properties and to enter into four

23   mortgage loans with WaMu; but, instead, WaMu intended to procure the appraisals for its own business

24   purposes in deciding whether to give Ms. Scholl a loan collateralized by the property appraised even

25   though it provided Ms. Scholl an appraisal report which indicates Ms. Scholl could rely on the appraisal

26   in deciding whether to purchase the properties and to enter into the mortgage loan agreements.

27         c.    WaMu's business practice was also unfair because it assured Ms. Scholl that it

28   reviewed all appraisals for credibility and compliance with USPAP and that it would ensure that the

COMPLAINT
CASE NO.:

1 appraisals were accurate and that she could rely on them, when WaMu intentionally, recklessly or

2 negligently reviewed or failed to review Ms. Scholl's appraisal reports.

3       170.    The gravity of the harm to Ms. Scholl resulting from any of WaMu's unfair acts

4 outweighs any conceivable reasons, justifications and/or motives of WaMu for engaging in such

5 deceptive acts and practices. By committing the acts and practices alleged herein, WaMu has engaged

6 in unfair business practices within the meaning of California Business and Professions Code §§ 17200

7 et seq.

8       171.    Through its unfair acts and practices, WaMu has obtained and continues to obtain money

9 from Ms. Scholl in the form of the mortgage payments and has obtained money from Ms. Scholl for the

10 appraisal reports. As such, Ms. Scholl requests that this Court cause WaMu to restore this money to her

11 and to enjoin WaMu from continuing to benefit from its unfair practices as discussed herein. Otherwise,

12 Ms. Scholl will be irreparably harmed and/or denied an effective and complete remedy if such an order

13 is not granted.

14 **COUNT 7: VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT**
   **CALIFORNIA CIVIL CODE § 1750, _et seq._ AGAINST DEFENDANTS**
15

16       172.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them

17 as if they were fully written herein.

18       173.    The claim for relief is brought pursuant to the Consumer Legal Remedies Act, California

19 Civil Code § 1750, et seq. (the "CLRA").

20       174.    Plaintiff is a "consumer" within the meaning of Civil Code § 1761(b).

21       175.    Defendants have violated the CLRA in at least the following respects:

22            a.      In violation of Civil Code § 1770(a)(7), WaMu and each Appraiser Defendant

23 represented their home appraisal services to be of a particular standard or quality – i.e., being credible,

24 accurate, reliable and performed in compliance with USPAP standards – which they were not.

25       176.    Plaintiff has notified Defendants in writing of the particular violations of Civil Code §

26 1770 and demanded that Defendants rectify the problems associated with their illegal behavior detailed

27 above, which actions are in violation of § 1770.

28

                                                 44

177.    Defendants failed within 30 days of receipt of Plaintiff's notices of demand to give, or agree to give within a reasonable time, the requested remedies. Pursuant to Civil Code § 1780(b) and (d), Plaintiff filed this Complaint and seeks the following damages as provided for in Civil Code § 1780:

a.    actual damages in excess of the jurisdictional limits of this Court.

b.    punitive damages;

c.    any other relief which the Court deems proper; and,

d.    court costs and attorneys' fees.

## COUNT 8: QUASI-CONTRACT/UNJUST ENRICHMENT AGAINST DEFENDANTS

178.    Plaintiff hereby incorporates the foregoing paragraphs in this complaint and restates them as if they were fully written herein. Ms. Scholl pleads this Count in the alternative.

179.    Each Appraiser Defendant engaged in unlawful conduct by representing to Ms. Scholl that the home appraisals provided for the purpose of obtaining her home mortgage loan were performed credibly, in compliance with USPAP standards, and could be relied on by Ms. Scholl in deciding whether to purchase the four properties at issue in this action and to enter into the four mortgage loan transactions with WaMu, but actually provided incredible appraisal reports that did not comply with USPAP standards, and that she could not rely on in deciding whether to purchase the four properties at issue and to enter into the mortgage loan transactions with WaMu as detailed throughout this Complaint.

180.    Likewise, Defendant WaMu acted unlawfully by representing to Ms. Scholl that it procured credible, lawful appraisals that complied with USPAP standards which she could rely on in deciding whether to purchase each of the four properties at issue, and to enter into four mortgage loan agreements with WaMu, when, in-fact, the appraisals it procured for Ms. Scholl were not credible or done in compliance with USPAP standards, and she could not rely on them in deciding whether to purchase each of the four properties or to enter into the four mortgage loan agreements with WaMu. Alternatively, WaMu acted unlawfully by representing to Ms. Scholl that it would procure appraisals for Ms. Scholl's benefit when, in-fact, it never intended to procure appraisals for Ms. Scholl's benefit, but instead only intended to procure appraisals for its own business interests.

45

1    181.    Defendants took monies from Ms. Scholl in exchange for what were supposed to be
2    credible, lawful appraisal reports done in compliance with USPAP standards, but did not provide such
3    appraisals. WaMu also took monies in the form of interest, charges, fees and a secured interest in each
4    of the four properties at issue related to mortgage loans she entered with WaMu in reliance on those
5    appraisals as described throughout this Complaint. As a result of their unlawful conduct alleged herein,
6    Defendants have been unjustly enriched at the expense of Ms. Scholl in the amount that the appraisal
7    cost and WaMu has also been unjustly enriched at the expense of Ms. Scholl in the amount of WaMu's
8    secured interest in Ms. Scholl's properties as well as the interest, charges and fees paid to WaMu related
9    to mortgage loans she entered with WaMu , thereby creating a quasi-contractual obligation on
10    Defendants to restore these ill-gotten gains to Ms. Scholl.

11                                          **PRAYER**

12    WHEREFORE, Ms. Scholl requests an award and relief as follows for all Counts for which they
13    are available:

14    A.    Compensatory damages.

15    B.    Punitive damages.

16    C.    Restoration of all monies Ms. Scholl paid to Defendants.

17    D.    Enjoin WaMu from continuing to obtain the proceeds from the loans it entered upon its
18    unlawful and unfair conduct with Ms. Scholl.

19

20    E.    Restitution in such amount that Ms. Scholl paid for each of her four appraisals, and of
21    the profits, security interests, interest, charges and fees Defendants obtained from Ms. Scholl.

22    F.    Restitution in the amount that Ms. Scholl overpaid for each of the four properties.

23    G.    An order awarding Ms. Scholl her cost of suit, including pre and post-judgment interest.

24    H.    An order awarding Ms. Scholl's counsel's attorneys' fees.

25    I.    An order requiring an accounting for, and imposition of a constructive trust upon all
26    monies received by Defendants as a result of their unfair and unlawful conduct alleged herein.

27    J.    Such other and further relief as may be deemed necessary and appropriate.

28

                                              46

1

## DEMAND FOR JURY TRIAL

2      Plaintiff demands a trial by jury for each Count of this Complaint for which a jury trial may be

3  had under applicable law.

4

5  Dated: August 20, 2008

6                                    BRAUN LAW GROUP, P.C.

7                                    By:

8                                         Michael D. Braun (167416)
                                         12304 Santa Monica Blvd., Suite 109
                                         Los Angeles, CA 90025
9                                        Tel:    (310) 442-7755
                                         Fax:    (310) 442-7756
10

11                                       Janet Lindner Spielberg (221926)
                                         LAW OFFICES OF JANET LINDNER SPIELBERG
12                                       12400 Wilshire Blvd., Suite 400
                                         Los Angeles, CA 90025
                                         Tel:    (310) 392-8801
13                                       Fax:    (310) 278-5938

14                                       Joseph N. Kravec, Jr. *(to be admitted Pro Hac Vice)*
                                         Wyatt A. Lison *(to be admitted Pro Hac Vice)*
15                                       SPECTER SPECTER EVANS
                                            & MANOGUE, P.C.
16                                       The 26th Floor Koppers Building
                                         Pittsburgh, Pennsylvania 15219
17                                       Tel:    (412) 642-2300
                                         Fax:    (412) 642-2309
18
                                         *Attorneys for Plaintiff*
19

20

21

22

23

24

25

26

27

28

47

COMPLAINT
CASE NO.:

**FROM:**
Jerry Gill
Mark IV Appraisals
4216 N Portland, Ste 103
Oklahoma City, OK 73112
405-942-3131
405-9433450
Telephone Number: 405-604-0727    Fax Number: 405-604-0727
405-410-4042 cell

**TO:**
Telephone Number:    Fax Number:
Alternate Number:    E-Mail:

# INVOICE

| INVOICE NUMBER | |
|---|---|

| DATE | |
|---|---|

| REFERENCE | |
|---|---|
| Internal Order #: | |
| Lender Case #: | |
| Client File #: | |
| Main File # on form: | 050530JG |
| Other File # on form: | Summary Appraisal |
| Federal Tax ID: | |
| Employer ID: | |

## DESCRIPTION

Lender: Washington Mutual Bank, FA          Client:
Purchaser/Borrower: Sidney Scholl
Property Address: 16424 Ernest Court
City: Edmond
County: Oklahoma          State: OK          Zip: 73003
Legal Description: Lot 4, Block 11, Regency Pointe Sec 1

| FEES | AMOUNT |
|---|---|
| | 350.00 |
| SUBTOTAL | 350.00 |

| PAYMENTS | | | AMOUNT |
|---|---|---|---|
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| | | SUBTOTAL | 0.00 |
| | | TOTAL DUE $ | 350.00 |

**A**

| Borrower/Client | Sidney Scholl | | | | File No. | 050530JG |
|---|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code | 73003 |
| Lender | Washington Mutual Bank, FA | | | | | |

## TABLE OF CONTENTS



URAR ........................................................................................................ 1
Subject Photos, Interior ................................................................................ 3
Building Sketch (Page - 1) ............................................................................. 4
Location Map .............................................................................................. 5
Flood Map .................................................................................................. 6
Statement of Limiting Conditions ................................................................... 7

**B**

Mark IV Appraisals, Inc.

File No. 050530JG

Summary Appraisal

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 050530JG

## Property Description

| Property Address | 16424 Ernest Court | City Edmond | State OK | Zip Code 73003 |
|---|---|---|---|---|

Legal Description  Lot 4, Block 11, Regency Pointe Sec 1    County Oklahoma

Assessor's Parcel No.  R205281700    Tax Year N/Ass'd  R.E. Taxes $    Special Assessments $ 0.00

Borrower Sidney Scholl    Current Owner Bridgeport Development Group LLC  Occupant: ☐ Owner ☐ Tenant ☒ Vacant

Property rights appraised ☒ Fee Simple ☐ Leasehold   Project Type ☒ PUD ☐ Condominium (HUD/VA only)   HOA $ 450Annual / Mo.

Neighborhood or Project Name  Regency Pointe Addition    Map Reference OC1/244/111    Census Tract NA

Sale Price $    Date of Sale    Description and $ amount of loan charges/concessions to be paid by seller

Lender/Client Washington Mutual Bank, FA    Address 591 Broadway, Sonoma, CA 95476

Appraiser Jerry Gill    Address 4216 N Portland, Ste 103, Oklahoma City, OK 73112

| Location | ☐ Urban ☒ Suburban ☐ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|

| | | | PRICE $(000) | AGE (yrs) | | |
|---|---|---|---|---|---|---|
| Built up | ☐ Over 75% ☒ 25-75% ☐ Under 25% | ☒ Owner 95 | 300 Low 0 | One family 100 | ☒ Not Likely ☐ Likely | |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☐ Tenant 5 | 750 High 4 | 2-4 family | ☐ In process | To |
| Property values | ☒ Increasing ☐ Stable ☐ Declining | ☐ Vacant (0-5%) | Predominant | Multi-family | | |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☐ Vacant (over 5%) | 450 2 | Commercial | | |
| Marketing time | ☐ Under 3 mos ☒ 3-6 mos ☐ Over 6 mos | | | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:  Bounded on the North by West 2nd Street, on the South by West 15th Street, on the West by Portland Avenue and on the East by May Avenue, in Southwest Edmond.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):  A new market area of quality homes in mostly new condition.  Good access to all amenities, schools and good access to a crosstown expressway and about 5 miles to Downtown Edmond.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):  The metropolitan Oklahoma City area has been favorably affected with the advent of lower interest rates over the past 4-5 years, ranging from 4.5 to 6.5 percent giving a very volatile market. All forms of financing is available with conventional lending being the most used.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? ☒ Yes ☐ No

Approximate total number of units in the subject project  23    Approximate total number of units for sale in the subject project  7

Describe common elements and recreational facilities:  Greenbelt, pool, park and common area maintenance.

| Dimensions  95 x 120 | | Topography | Fairly level |
|---|---|---|---|
| Site area  11,400 | Corner Lot ☒ Yes ☐ No | Size | Typical for area |
| Specific zoning classification and description  Single Family Residential | | Shape | Rectangular |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | View | Appears adequate |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | | View | Residential |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | |
|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | Asphalt | ☒ | | Landscaping | Average for the area |
| Gas | ☒ | | Curb/gutter | Concrete | ☒ | | Driveway Surface | Concrete |
| Water | ☒ | | Sidewalk | Concrete | ☒ | | Apparent easements Normal/Utility |
| Sanitary sewer | ☒ | | Street lights | Average | ☒ | | FEMA Special Flood Hazard Area ☐ Yes ☒ No |
| Storm sewer | ☒ | | Alley | Greenbelt | ☒ | | FEMA Zone  X   Map Date 7/2/2002 |

FEMA Map No.  40109C0064G

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.):  No apparent adverse easements or encroachments observed.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units  One | Foundation  Concrete | Slab  Yes | Area Sq. Ft.  None | Roof ☐ |
| No. of Stories  Two | Exterior Walls  Brick Ven | Crawl Space  No | % Finished | Ceiling  Cncld ☒ |
| Type (Det./Att.)  Detached | Roof Surface  Composition | Basement  None | Ceiling | Walls  Cncld ☒ |
| Design (Style)  Traditional | Gutters & Dwnspts  Metal | Sump Pump  NA | Walls | Floor ☐ |
| Existing/Proposed  Proposed | Window Type  Vinyl | Dampness  None observed | Floor | None ☐ |
| Age (Yrs.)  0 | Storm/Screens  Vinyl | Settlement  None observed | Outside Entry | Unknown ☐ |
| Effective Age (Yrs.)  0 | Manufactured House  No | Infestation  None observed | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | None |
| Level 1 | 1 | 1 | 1 | 1 | | | | | 1.5 | 1 | | 2,065 |
| Level 2 | | | | | | | | 3 | 2 | | 1 | 1,749 |
| Guest Hse | | | | | | | | | 1 | | | 282 |

Finished area above grade contains:  9 Rooms;  5 Bedroom(s);  4.5 Bath(s);  4,096  Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | CTile/HdWdCpt/Good | Type | Cent | Refrigerator | ☒ | None | ☒ | Fireplace(s) # One | ☒ | None | ☐ |
| Walls | Drywall/Good | Fuel | Gas | Range/Oven | ☒ | Stairs | | Patio  Covered | ☒ | Garage | # of cars |
| Trim/Finish | Stained/Good | Condition | New | Disposal | ☒ | Drop Stair | | Deck | ☐ | Attached | Two |
| Bath Floor | CTile/Good | COOLING | | Dishwasher | ☒ | Scuttle | | Porch  Covered | ☒ | Detached | |
| Bath Wainscot | Painted/Good | Central | Cent | Fan/Hood | ☒ | Floor | ☒ | Fence | ☐ | Built-in | |
| Doors | Solidcore/Good | Other | NA | Microwave | ☒ | Heated | | Pool | ☐ | Carport | |
| Interior/Solidcore/Good | | Condition | New | Washer/Dryer | ☒ | Finished | | Driveway | | Concrete | |

Additional features (special energy efficient items, etc.):  Vinyl Windows, and ceiling Fans. Stainless steel range and refrigerator

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:  New construction with very high quality features, trim, ceramic and slate tile, cabinets, fixtures and appliances.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:  No adverse environmental conditions observed

C

File No. 050530JG

Summary Appraisal

## UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 050530JG

**Valuation Section**

| COST APPROACH | | |
|---|---|---|
| ESTIMATED SITE VALUE | = $ | 52,000 |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | |
| Dwelling 3,814 Sq. Ft. @$ 109.50 = $ | | 417,633 |
| Sq. Ft. @$ | = | |
| Garage/Carport 427 Sq. Ft @$ 25.00 = | | 10,675 |
| Total Estimated Cost New = $ | | 428,308 |
| Less Physical Functional External | | |
| Depreciation 4,283 = | | 4,283 |
| Depreciated Value of Improvements = $ | | 424,025 |
| "As-Is" Value of Site Improvements = $ | | 2,000 |
| INDICATED VALUE BY COST APPROACH = $ | | 478,025 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): 70 years remaining economic life

Cost estimates from Marshall and Swift Residential Handbook

The appraiser feels the Sales Comparison Approach is the best indicator of value.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 16424 Ernest Court Edmond | 16917 Shore Run Drive Edmond | | 17204 Kingfisher Edmond | | 17105 Whimbrel Lane Edmond | |
| Proximity to Subject | | 0.50 miles | | 0.58 miles | | 0.54 miles | |
| Sales Price | $ | | 564,000 | | 480,000 | | 484,500 |
| Price/Gross Living Area | $ 47.3 | $ 137.56 | | $ 126.35 | | $ 134.85 | |
| Data and/or | Plans & | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | |
| Verification Source | Specifications | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust |
| Sales or Financing | | Cash | | Conventional | | Conventional | |
| Concessions | | None | | None | | None | |
| Date of Sale/Time | | 5/2/2005 | | 5/25/2005 | | 6/15/2005 | |
| Location | SW Edmond | Superior | −25,000 | Superior | −25,000 | Superior | −25,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 11,400 | 14,976 | | 13,348 | | 11,780 | |
| View | Residential | Residential | | Residential | | Residential | |
| Design and Appeal | 1.5 Sty Brk Ven | 1.5 Sty Brk Ven | | 2 Sty Brk Ven | | 2 Sty Brl Ven | |
| Quality of Construction | Excellent | Excellent | | Excellent | | Excellent | |
| Age | 0 | 2004 | | 2004 | | 2004 | |
| Condition | Good/New | Good/New | | Good/New | | Good/New | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 9 5 4.5 | 9 4 4.5 | | 9 4 4 | +500 | 10 4 3.5 | −1,000 |
| Gross Living Area | 4,096 Sq. Ft. | 4,100 Sq. Ft | 0 | 3,799 Sq. Ft | +15,741 | 3,593 Sq. Ft | +26,659 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | See Below | Average | −4,600 | Average | −4,600 | Average | −4,600 |
| Heating/Cooling | Cent.Cent. | Cent.Cent | | Cent.Cent. | | Cent.Cent. | |
| Energy Efficient Items | Vinyl/Winds | StDrs/Thrml/Winds | | StDrs/Thrml/Winds | | StmDrs/ThrmlWn | |
| Garage/Carport | Two | 3 Car Att Gar | −2,000 | 3 Car Att Gar | −2,000 | StmDrs/ThrmlWn | −2,000 |
| Porch, Patio, Deck, Fireplace(s), etc. | CovPch/CovPat One Good | Cov Pch/Cov Pat Two Good | −500 | CovPch/CovPat One Good | | CovPch/CovPat One Good | |
| Fence, Pool etc. | None | None | | None | | None | |
| Kitchen Equipment | RO DW Disp MW | RO DW Disp MW | | RO DW Disp MW | | RO DW Disp MW | |
| Net Adj. (total) | | + X − $ | 32,100 | + X − $ | 15,359 | + X − $ | 5,941 |
| Adjusted Sales Price of Comparable | | $ | 531,900 | $ | 464,641 | $ | 478,559 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): No sales of subject's size in same addition as subject, but all sales found in subject's immediate area and all comparable sales as close in size, style, and proximity as available and all similar in style, effective age and most amenities. All sales new when sold. Adjustment for location due to comparable sales being located in a golf course community with gated entry, park pool etc. $53.00 adjustment was given for square footage. All comparables are within Edmond, OK, and are impacted by same market forces as subject neighborhood. Functional depreciation due to separation of guest house from main living area.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | 10/1/2004 $52,000Lot Only OK Cnty Ct Hse | Original Sales Price | Original Sales Price | Original Sales Price |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: New Construction. Contract for sale in the amount of $495,000, no unusual seller concessions. Property listed at $495,000

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 495,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ NA /Mo. x Gross Rent Multiplier NA = $ | |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications

Conditions of Appraisal: All Cash "As Is" For loan purposes only. The digital signature is the exact replica(s) of the appraiser(s) below

Final Reconciliation: Subject property is very high quality construction with quality materials and fits well in this suburban neighborhood. The Cost Approach represents the upper limit of value, but the appraiser feels the Sales Comparison Approach the indicator of value since it represents the Direct Market Approach. The Income Approach is not considered here since it is not a factor in this neighborhood.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac form 439/FNMA form 1004B (Revised 6/93 )

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF September 20, 2005 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 495,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature |
| Name Jerry Gill | Name ☐ Did ☐ Did Not Inspect Property |
| Date Report Signed September 21, 2005 | Date Report Signed |
| State Certification # 10306CRA State OK | State Certification # State |
| Or State License # State | Or State License # State |

Freddie Mac Form 70 6/93

PAGE 2 OF 2

Fannie Mae Form 1004 6-93

Form CA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**D**

## Subject Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client  Sidney Scholl | | | |
| Property Address  16424 Ernest Court | | | |
| City  Edmond | County  Oklahoma | State  OK | Zip Code  73003 |
| Lender  Washington Mutual Bank, FA | | | |



**Subject Front**

| | |
|---|---|
| 16424 Ernest Court | |
| Sales Price | |
| Gross Living Area | 4,096 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.5 |
| Location | SW Edmond |
| View | Residential |
| Site | 11,400 |
| Quality | Excellent |
| Age | 0 |



**Subject Rear**



**Subject Street**

Form PICPIX.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1 800 ALAMODE

**E**

File No. 05063GJG

## Subject Interior Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client  Sidney Scholl | | | | |
| Property Address  16424 Ernest Court | | | | |
| City  Edmond | County  Oklahoma | | State  OK | Zip Code  73003 |
| Lender  Washington Mutual Bank, FA | | | | |



**Subject Interior**

| | |
|---|---|
| 16424 Ernest Court | |
| Sales Price | |
| Gross Living Area | 4,096 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.5 |
| Location | SW Edmond |
| View | Residential |
| Site | 11,400 |
| Quality | Excellent |
| Age | 0 |



**Subject Interior**



**Subject Interior**

F

## Comparable Photo Page

| Borrower/Client | Sidney Scholl | | | |
|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | |
| City  Edmond | | County  Oklahoma | State  OK | Zip Code  73003 |
| Lender  Washington Mutual Bank, FA | | | | |



**Comparable 1**

| | |
|---|---|
| 16917 Shore Run Drive | |
| Prox. to Subject | 0.50 miles |
| Sale Price | 564,000 |
| Gross Living Area | 4,100 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.5 |
| Location | Superior |
| View | Residential |
| Site | 14,976 |
| Quality | Excellent |
| Age | 2004 |



**Comparable 2**

| | |
|---|---|
| 17204 Kingfisher | |
| Prox. to Subject | 0.58 miles |
| Sale Price | 480,000 |
| Gross Living Area | 3,799 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Superior |
| View | Residential |
| Site | 13,348 |
| Quality | Excellent |
| Age | 2004 |



**Comparable 3**

| | |
|---|---|
| 17105 Whimbrel Lane | |
| Prox. to Subject | 0.54 miles |
| Sale Price | 484,500 |
| Gross Living Area | 3,593 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | Superior |
| View | Residential |
| Site | 11,790 |
| Quality | Excellent |
| Age | 2004 |

Form PICPIX.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**G**

File No. 05053CUS

## Building Sketch (Page - 1)

| Borrower/Client | Sidney Scholl | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003 |
| Lender | Washington Mutual Bank, FA | | | | | |



Comments.

Form SKT.BldSkt — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

H

File No. 05053LHG

## Location Map

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code | 73003 |
| Lender | Washington Mutual Bank, FA | | | | |



File No. 05053G16

## Flood Map

| Borrower/Client | Sidney Scholl | | | |
|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | |
| City Edmond | | County Oklahoma | State OK | Zip Code 73003 |
| Lender Washington Mutual Bank, FA | | | | |



InterFlood

www.interflood.com • 1-800-252-6633

**Prepared for:**
Mark IV Appraisals, Inc.

16424 Ernest Court
Edmond, OK 73003

**Subject**
16424 Ernest Court

FLOODSCAPE

Flood Hazard Map

**Map Number**
40109C0064G

**Effective Date**
July 2, 2002

For more information about
flood zones and flood
insurance, contact:

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

© 1999-2005 SourceProse and/or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,616. Other patents pending. For info: info@floodsource.com

Form MAP.FLOOD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**J**

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Mark IV Appraisals, Inc.
Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

K

File No. 05053OJG

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 16424 Ernest Court, Edmond, OK 73003

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _Jerry Bell_ | Signature: _____ |
| Name: Jerry Bell | Name: _____ |
| Date Signed: September 21, 2005 | Date Signed: _____ |
| State Certification #: 10306CRA | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State: Oklahoma | State: _____ |
| Expiration Date of Certification or License: December 31, 2006 | Expiration Date of Certification or License: _____ |
|  | ☐ Did  ☐ Did Not Inspect Property |

Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

L

**FROM:**
Jerry Gill
Mark IV Appraisals
4216 N Portland, Ste 103
Oklahoma City, OK 73112

405 263 3131    405 243 3450

Telephone Number: 405-604-0727    Fax Number: 405-604-0727

405 410 4042 cell

**TO:**

Telephone Number:    Fax Number:
Alternate Number:    E-Mail:

# INVOICE

**INVOICE NUMBER**

**DATE**

**REFERENCE**

Internal Order #:
Lender Case #:
Client File #:
Main File # on form:    050571JG
Other File # on form:    Summary Appraisal
Federal Tax ID:
Employer ID:

---

## DESCRIPTION

Lender: Washington Mutual    Client: Washington Mutual
Purchaser/Borrower: Sidney Scholl
Property Address: 1009 W B Meyer Pkwy
City: Edmond
County: Oklahoma    State: OK    Zip: 73003-2970
Legal Description: Lot 11, Block 14 Oaktree Park 3rd Amended Addition

---

| FEES | AMOUNT |
|---|---|
| Single Family Residential | 400.00 |
| | |
| **SUBTOTAL** | 400.00 |

| PAYMENTS | | | AMOUNT |
|---|---|---|---|
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| | | **SUBTOTAL** | |
| | | **TOTAL DUE** | $    400.00 |

**A**

10/17/2005

**B**

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | File No. 050571JG | |
| City | Edmond | County Oklahoma | | | |
| Lender | Washington Mutual | | State OK | Zip Code 73003-2970 | |

## TABLE OF CONTENTS



Invoice .............................................................................................................................................................. 1
URAR .............................................................................................................................................................. 2
Building Sketch (Page - 1) ............................................................................................................................ 8
Flood Map ..................................................................................................................................................... 9
Location Map ................................................................................................................................................ 10

Form TOCP — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

C



**D**

Mark IV Appraisals, Inc.

File No. 050571JG

# Uniform Residential Appraisal Report

Summary Appraisal
File # 050571JG

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 1009 W B Meyer Pkwy | City Edmond State OK Zip Code 73003-2970 |
| Borrower Sidney Scholl | Owner of Public Record Bridgeport Development Corp. County Oklahoma |
| Legal Description Lot 11, Block 14 Oaktree Park 3rd Amended Addition | |

Assessor's Parcel # R204441440     Tax Year 2004     R.E. Taxes $ 30.17

Neighborhood Name Oaktree Park Addition     Map Reference 36420     Census Tract 1082.13

Occupant ☐ Owner ☐ Tenant ☒ Vacant     Special Assessments $ 0.00     ☒ PUD   HOA $ 480    ☒ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)

Lender/Client Washington Mutual     Address 591 Broadway, Sonoma, CA 95476

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).    MLS

**CONTRACT**

I ☒ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.   No unusual seller concessions.

Contract Price $ 564,990   Date of Contract Pending   Is the property seller the owner of public record? ☒ Yes ☐ No   Data Source(s) Okla Cnty Ct Hse

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No

If Yes, report the total dollar amount and describe the items to be paid.    None

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE | AGE | | One-Unit | 100 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | | 2-4 Unit | % |
| Growth ☒ Rapid ☐ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 275 Low | New | | Multi-Family | % |
| Neighborhood Boundaries Bounded by Sorghum Road on the North, by Coffee Creek Road on the South, | | | | | | 650 High | 15 | | Commercial | % |
| Santa Fe Avenue on the West and Kelly Avenue on the East in Northwest Edmond. | | | | | | 400 Pred. | 5 | | Other | % |

Neighborhood Description   A good market area of quality homes in mostly good condition. Good access to all amenities, schools and shops. About 4 miles to Downtown Edmond.

Market Conditions (including support for the above conclusions)   The metropolitan Oklahoma City area has been favorably affected with the advent of lower interest rates over the past 4-5 years, ranging from 4.5 to 6.5 percent giving a very volatile market. All forms of financing is available with conventional lending being the most used.

**SITE**

Dimensions 123 x 154    Area 18,942 Sq. Ft.    Shape Rectangular    View Residential

Specific Zoning Classification Single Family Residential    Zoning Description R-1

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone X   FEMA Map # 40109C0080G   FEMA Map Date 7/2/2002

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If No, describe

No apparent adverse easements or encroachments observed.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls | Concrete | Floors | CTile/Cpt/HDwdGoo |
| # of Stories 1.5 | | ☐ Full Basement ☐ Partial Basement | | Exterior Walls | Brick | Walls | Drywall/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area None sq.ft. | | Roof Surface | Composition | Trim/Finish | Stained/Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish % | | Gutters & Downspouts | Metal | Bath Floor | C Tile/Good |
| Design (Style) 2 Sty Brk Ven | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | Vinyl | Bath Wainscot | Painted/Good |
| Year Built 2005 | | Evidence of ☐ Infestation | | Storm Sash/Insulated | IG Glass | Car Storage | ☐ None |
| Effective Age (Yrs) 0 | | ☐ Dampness ☐ Settlement | | Screens | Aluminum | ☒ Driveway # of Cars 3 |
| Attic ☒ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | | Driveway Surface Concrete |
| ☒ Drop Stair ☐ Stairs | | ☐ Other Fuel Gas | | ☒ Fireplace(s) # 1 ☐ Fence | | ☒ Garage # of Cars 3 |
| ☐ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Cov ☐ Porch Covered | | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other | | ☐ Att. ☒ Det. ☐ Built-In |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 10 Rooms 4 Bedrooms 3.5 Bath(s) 4,203 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).   Thermal windows, storm doors and ceiling fans.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).   Home is new construction located in a neighborhood of like properties. No repairs noted or required.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

| | | |
|---|---|---|
| Freddie Mac Form 70 March 2005 | Page 1 of 6 | Fannie Mae Form 1004 March 2005 |

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**E**



DORCHESTER
2nd floor



## Uniform Residential Appraisal Report

Summary Appraisal
File # 050571JG

| There are | 3 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 419,900 | to $ 507,780 |
| There are | 0 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | to $ |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1009 W B Meyer Pkwy | 3705 Hunters Creek | | 3701 Hunters Creek | | 3625 Hunters Creek | |
| | Edmond, OK 73003-2970 | Edmond | | Edmond | | Edmond | |
| Proximity to Subject | | 0.73 miles SW | | 0.73 miles SW | | 0.92 miles SW | |
| Sale Price | $ 564,990 | | $ 570,000 | | $ 597,500 | | $ 586,870 |
| Sale Price/Gross Liv. Area | $ 134.43 sq.ft. | $ 121.64 sq.ft. | | $ 137.96 sq.ft. | | $ 121.53 sq.ft. | |
| Data Source(s) | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conventional | | Conventional | | Conventional | |
| Concessions | | None | | None | | None | |
| Date of Sale/Time | | 6/17/2005 | | 7/29/2005 | | 8/3/2005 | |
| Location | NE Edmond | Same | | Same | | Same | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 18,942 Sq. Ft. | 21,160 | | 40,800 | | 21,160 | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | 2 Sty Brk Ven | 2 Sty Brk Ven | | 2 Sty Stone Ven | | 2 Sty Brk Ven | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 0 | 0 | | 0 | | 0 | |
| Condition | Good/New | Good/New | | Good/New | | Good/New | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 10  4  3.5 | 11  4  3.5 | | 11  4  3.5 | | 11  4  3.5 | |
| Gross Living Area | 4,203 sq.ft. | 4,686 sq.ft. | -25,116 | 4,331 sq.ft. | -6,656 | 4,829 sq.ft. | -32,552 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Cent. | Cent.Cent. | | Cent.Cent.; | | Cent.Cent. | |
| Energy Efficient Items | Vinyl Windows | Vinyl Windows | | Vinyl Windows | | Vinyl Windows | |
| Garage/Carport | 3 Car Att Gar | 3 Car Att Gar | | 3 Car Att Gar | | 3 Car Att Gar | |
| Porch/Patio/Deck | Cov Pch/CovPat | Cov Pch/CovPat | | Cov Pch/CovPat | | Cov Pch/CovPat | |
| Kitchen Equipment | R/O DW MW | R/O DW MW | | R/O DW MW | | R/O DW MW | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 25,116 | ☐ + ☒ - | $ 6,656 | ☐ + ☒ - | $ 32,552 |
| Adjusted Sale Price | | | | | | | |
| of Comparables | | | $ 544,884 | | $ 590,844 | | $ 554,318 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Okla County Assessors Ofc
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) Oklahoma County Assessor Ofc
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 1/4/2005 | No other | No other | No other |
| Price of Prior Sale/Transfer | $52,000 | deed filings | deed filings | deed filings |
| Data Source(s) | Okla Cnty Ct Hse | within past 12 months | within past 12 months | within past 12 months |
| Effective Date of Data Source(s) | 10/18/2005 | 10/18/2005 | 10/18/2005 | 10/18/2005 |

Analysis of prior sale or transfer history of the subject property and comparable sales    Lot sale only

Summary of Sales Comparison Approach    A number of homes being built in this addition, but most are custom and some new sales, but none of subject's size sales size discovered in subject's addition.   All sales discovered in subject's immediate area and all a similar addition and similar in quality, condition and age. $52.00 used as adjustment for square footage.

Indicated Value by Sales Comparison Approach $ 567,000
Indicated Value by: Sales Comparison Approach $  567,000    Cost Approach (if developed) $ 577,424    Income Approach (if developed) $
Subject property is in very good condition with quality materials and located in the same addition as the comparable sales.  The cost approach indicates the highest value, but the appraiser feel the sales comparison approach best supports the value.  The income approach is not considered in this assignment.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  All cash "As is", for loan purposes only   The digital signature(s) below are exact replica(s) of the appraiser(s) listed below.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$  567,000 , as of    August 3,  2005 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                    Page 2 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**G**

File No. 050571JG

# Uniform Residential Appraisal Report

Summary Appraisal
File # 050571JG

While this home is not the largest in the addition, it has all the same amenities and quality features similar to those here. The solid core doors, beautiful trim, light fixtures, plumbing fixtures,carpet, hardwood floors in some rooms, ceramic tile in entry, kitchen and baths, stainless steel appliances are all of the highest quality found in even more expensive homes.

*ADDITIONAL COMMENTS*

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Lot sales in this area have been sold in the amount of $52,000 for most lots recently.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 52,000 |
|---|---|---|---|---|
| Source of cost data  Marshall & Swift Residential Handbook | DWELLING | 4,203 Sq.ft. @ $ 118.80 | =$ | 499,316 |
| Quality rating from cost service  V Good  Effective date of cost data  5/1/2005 | | Sq.ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ | |
| 50 Years.  The cost factors are based on data obtained from the | Garage/Carport | 994 Sq.ft. @ $ 35.00 | =$ | 34,790 |
| Residential cost handbook by Marshall & Swift and/ or known local | Total Estimate of Cost-New | | =$ | 534,106 |
| building costs. Physical depreciation (if any) has been calculated by the | Less  Physical | Functional  External | | |
| Age /Life Method, which is based on a percentage of estimated total | Depreciation | 10,682 | =$( | 10,682) |
| economic life of the improvements. No functional or economic | Depreciated Cost of Improvements | | =$ | 523,424 |
| obsolescence was observed. | "As-is" Value of Site Improvements | | =$ | 2,000 |
| Estimated Remaining Economic Life (HUD and VA only)   60 Years | INDICATED VALUE BY COST APPROACH | | =$ | 577,424 |

*COST APPROACH*

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $   NA   X Gross Rent Multiplier   NA   = $   Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

*INCOME*

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No   Unit type(s) ☒ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project   Oak Tree Park

| Total number of phases | 1 | Total number of units | 170 | Total number of units sold | |
|---|---|---|---|---|---|
| Total number of units rented | | Total number of units for sale | 3 | Data source(s)  MLS | |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☒ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☒ No  Data Source

Are the units, common elements, and recreation facilities complete? ☒ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☒ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.   Greenbelt, park, pool  and common area maintenance.

*PUD INFORMATION*

Freddie Mac Form 70 March 2005                    Page 3 of 6                    Fannie Mae Form 1004 March 2005

H

File No. 050571JG

## Uniform Residential Appraisal Report

Summary Appraisal
File # 050571JG

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report

Summary Appraisal
File # 050571JG

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

J

File No. 050571JG

Summary Appraisal
**Uniform Residential Appraisal Report**    File # 050571JG

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER    Jerry Gill | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Jerry Gill | Name |
| Company Name  Mark V Appraisals, Inc | Company Name |
| Company Address  4216 N Portland, Ste 103 | Company Address |
| Oklahoma City, OK 73112 | |
| Telephone Number  405-604-0725 | Telephone Number |
| Email Address  markivappraisals@coxinet.net | Email Address |
| Date of Signature and Report  October 20, 2005 | Date of Signature |
| Effective Date of Appraisal  October 18, 2005 | State Certification # |
| State Certification #  10306CRA | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State  OK | |
| Expiration Date of Certification or License  12/31/2006 | **SUBJECT PROPERTY** |

ADDRESS OF PROPERTY APPRAISED
1009 W B Meyer Pkwy
Edmond, OK 73003-2970
APPRAISED VALUE OF SUBJECT PROPERTY $    567,000

**LENDER/CLIENT**
Name  Rebecca Simmons
Company Name  Washington Mutual
Company Address  591 Broadway
Sonoma, CA 95476
Email Address  rebecca.simmons@wamu.net

**SUBJECT PROPERTY**
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection _____
☐ Did inspect interior and exterior of subject property
   Date of Inspection _____

**COMPARABLE SALES**
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
   Date of Inspection _____

Freddie Mac Form 70 March 2005        Page 6 of 6        Fannie Mae Form 1004 March 2005

**K**

### Subject Photo Page

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003-2970 |
| Lender | Washington Mutual | | | | |



**Subject Front**

1009 W B Meyer Pkwy
| | |
|---|---|
| Sales Price | 564,990 |
| Gross Living Area | 4,203 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | NE Edmond |
| View | Residential |
| Site | 18,942 Sq.Ft. |
| Quality | Good |
| Age | 0 |



**Subject Rear**



**Subject Street**

L

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client | Sidney Scholl |
| Property Address | 1009 W B Meyer Pkwy |
| City | Edmond | County | Oklahoma | State | OK | Zip Code | 73003-2970 |
| Lender | Washington Mutual |



### Comparable 1

3705 Hunters Creek

| Prox. to Subject | 0.73 miles SW |
|---|---|
| Sale Price | 570,000 |
| Gross Living Area | 4,686 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | Same |
| View | Residential |
| Site | 21,160 |
| Quality | Good |
| Age | 0 |



### Comparable 2

3701 Hunters Creek

| Prox. to Subject | 0.73 miles SW |
|---|---|
| Sale Price | 597,500 |
| Gross Living Area | 4,331 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | Same |
| View | Residential |
| Site | 40,800 |
| Quality | Good |
| Age | 0 |



### Comparable 3

3625 Hunters Creek

| Prox. to Subject | 0.92 miles SW |
|---|---|
| Sale Price | 586,870 |
| Gross Living Area | 4,829 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | Same |
| View | Residential |
| Site | 21,160 |
| Quality | Good |
| Age | 0 |

**M**

File No. 050571JG

**Building Sketch (Page - 1)**

| Borrower/Client | Sidney Scholl | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | | |
| City | Edmond | County | Oklahoma | | State | OK | Zip Code 73003-2970 |
| Lender | Washington Mutual | | | | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2451.6 | 2451.6 |
| GLA2 | Second Floor | 1751.0 | 1751.0 |
| GAR | Garage | 260.3 | |
| | Garage | 734.1 | 994.5 |
| | | | |
| | Net LIVABLE Area | ( Rounded ) | 4203 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 14.0 x 36.7 | | 513.8 |
| 30.2 x 45.3 | | 1366.6 |
| 5.0 x 23.7 | | 118.5 |
| 8.2 x 52.6 | | 430.9 |
| 0.8 x 13.8 | | 11.0 |
| 1.0 x 7.8 | | 7.8 |
| 0.5 x 3.0 x 1.0 | | 1.5 |
| 0.5 x 3.0 x 1.0 | | 1.5 |
| Second Floor | | |
| 4.0 x 8.0 | | 32.0 |
| 12.0 x 15.0 | | 180.0 |
| 9.0 x 27.0 | | 243.0 |
| 12.0 x 19.5 | | 234.0 |
| 6.0 x 19.0 | | 114.0 |
| 14.0 x 31.0 | | 434.0 |
| 6.5 x 13.0 | | 84.5 |
| 4.0 x 15.0 | | 60.0 |
| 4.7 x 8.5 | | 40.0 |
| 6.5 x 50.7 | | 329.6 |
| 18 Items | ( Rounded ) | 4203 |

Form SKT.BldSkl — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**N**

File No. 050571JG

**Flood Map**

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003-2970 |
| Lender | Washington Mutual | | | | |



o

File No. 050571JG

## Location Map

| Borrower/Client | Sidney Scholl | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003-2970 |
| Lender | Washington Mutual | | | | | |



Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

P

Bowling Appraisal Services (405)732-2184

File No. WMU-2032| Page #

# Uniform Residential Appraisal Report

SE-051130-0642
File # WMU-2032

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 2032 WIMBERLEY CREEK DRIVE | City MOORE | State OKL Zip Code 73160 |
| Borrower SIDNEY SCHOLL | Owner of Public Record BRIDGEPORT DEVELOPMENT | County CLEVELAND |
| Legal Description LOT 10, BLOCK 2, THE CREEKS AT WIMBERLEY | | |
| Assessor's Parcel # 142659 | Tax Year 2005 | R.E. Taxes $ 0.00 |
| Neighborhood Name THE CREEKS AT WIMBERLEY | Map Reference OC3-184 | Census Tract 2021.01 |

Occupant ☐ Owner ☐ Tenant ☒ Vacant  Special Assessments $ 0.00  ☒ PUD  HOA $ 200.00 ☒ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)

Lender/Client WASHINGTON MUTUAL  Address NO ADDRESS GIVEN

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). MLS, COURTHOUSE RECORDS. SUBJECT IS CURRENTLY LISTED FOR $199,345.00 NO RECORDED DEED TRANSFERS WITHIN THE PREVIOUS 36 MONTHS NOTED.

I ☒ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. SUBJECT CONTRACT APPEARS TO BE TYPICAL OF AREA TRANSACTIONS.

Contract Price $ 199,345  Date of Contract 11/22/2005  Is the property seller the owner of public record? ☒ Yes ☐ No  Data Source(s) COURTHOUSE

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No

If Yes, report the total dollar amount and describe the items to be paid.  NONE

---

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use |
|---|---|---|---|---|---|---|
| Location ☒ Urban ☐ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE $(000) | AGE (yrs) | One-Unit 7 |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 130 Low | 0 | 2-4 Unit |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 225 High | 10 | Multi-Family |
| | | 200 Pred. | 0-5 | Commercial 1 |

Neighborhood Boundaries N.-S.E. 4TH ST, S-S.E. 19TH ST., E-SUNNYLANE RD., W-BRYANT AVE.

Neighborhood Description PREDOMINANT LAND USE IS SFR'S WITH LIMITED COMM & APRT USE ALONG PERIMETER. MARKET AREA CONSISTS OF MEDIUM-LARGE SIZE HOMES MASONRY OF GOOD CONSTRUCTION QUALITY. SUBJECT NEIGHBORHOOD IS SIMILAR TO NEARBY LOCATIONS, OF SIMILAR DESIGN & AGE, ALL SUPPORT FACILITIES ARE WITHIN CLOSE PROXIMITY, INCLUDING SCHOOLS & SHOPPING.

Market Conditions (including support for the above conclusions) AREA REAL ESTATE MARKET IS BEST DESCRIBED AS STABLE. SUPPLY AND DEMAND IS IN BALANCE, WITH SOME AREAS EXPERIENCING A SHORTAGE OF LISTINGS. OVERALL PROPERTY VALUES APPEAR TO BE STABLE, WITH A SMALL NUMBER OF AREAS EXPERIENCING AN INCREASE IN VALUES.

| | | | |
|---|---|---|---|
| Dimensions 80 X 120 | Area 9,600 Sq.Ft. | Shape RECTANGULAR | View AVERAGE |
| Specific Zoning Classification R-1 (SFR'S) | Zoning Description SINGLE FAMILY RESIDENTIAL | | |

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Private |
|---|---|---|---|---|---|
| Electricity | ☒ | | Off-site Improvements - Type | | |
| Gas | ☒ | | Street ASPHALT | ☒ | |
| Water | ☒ | | Alley UTILITY EASEMENT | | ☒ |
| Sanitary Sewer | ☒ | | | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 40027C0041F  FEMA Map Date 3/17/1997

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe EASEMENTS ARE OF RECORD. NO VIOLATIONS OR ENCROACHMENTS NOTED. ALL UTILITIES ARE ON SITE. TYPICAL INTERIOR LOT FOR MARKETING AREA.

---

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | Foundation Walls CONCRETE | Floors CRMC/CRPT/GO |
| # of Stories 1 | ☐ Full Basement ☐ Partial Basement | Exterior Walls BV/FR/GOOD | Walls DRWLL/PT/GOO |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area N/A sq.ft. | Roof Surface COMP/GOOD | Trim/Finish WD/STAIN/GOOD |
| ☒ Existing ☐ Proposed ☐ Under Const. | Basement Finish N/A % | Gutters & Downspouts ALM/GOOD | Bath Floor CERAMIC/GOOD |
| Design (Style) 1 STY/AVER | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type DH/INS/GOOD | Bath Wainscot CERAMIC/GOOD |
| Year Built 2005 | Evidence of ☐ Infestation | Storm Sash/Insulated YES | Car Storage ☐ None |
| Effective Age (Yrs) 0 | ☐ Dampness ☐ Settlement | Screens YES | ☒ Driveway # of Cars 3 CA |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities | Driveway Surface CONCRET |
| ☒ Drop Stair ☐ Stairs | ☐ Other Fuel GAS | ☐ Woodstove(s) # | ☐ Garage # of Cars G3A |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Fireplace(s) # 1 ☐ Fence | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☒ Patio/Deck PATIO ☒ Porch COVD | ☐ Att. ☐ Det. ☐ Bu |
| Appliances ☐ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe) | | ☐ Pool ☐ Other | |

Finished area above grade contains: 6 Rooms  3 Bedrooms  2 Bath(s)  2,155 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). COVERED PORCH, STORM WINDOWS, STORM CELLAR.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). NO MEASURABLE EVIDENCE OF FUNCTIONAL, PHYSICAL, OR EXTERNAL OBSOLESCENCE NOTED. FLOOR PLAN & ELEVATION IS TYPICAL FOR SFR'S OF THIS AGE & QUALITY. SUBJECT IS CONSIDERED TO BE IN GOOD MARKETING CONDITION. SUBJECT 3 CAR DRIVE-WAY IS CURRENTLY NOT INSTALLED. VALUE ESTIMATE IS BASED ON SUBJECT TOO DRIVE-WAY BEING INSTALLED.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe NO ADVERSE CONDITIONS THAT WOULD AFFECT MARKETABILITY WERE NOTED. SUBJECT IS CONSIDERED TO BE IN GOOD MARKETING CONDITION.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe SUBJECT PROPERTY CONFORMS TO THE NEIGHBORHOOD.

---

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

A

# Uniform Residential Appraisal Report

SE-051130-0542
File # WMU-2032

| | | |
|---|---|---|
| There are **61** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ **130,000** to $ **226,900** | | |
| There are **61** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ **96,000** to $ **189,000** | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 2032 WIMBERLEY CREEK DR. MOORE, OK | 1007 RENITA WAY MOORE, OK | | 713 KELSI DRIVE MOORE, OK | | 2626 S.E. 6TH CIRCLE MOORE, OK | |
| Proximity to Subject | | 0.08 miles | | 0.46 miles | | 0.87 miles | |
| Sale Price | $ 199,345 | $ | 170,420 | $ | 204,600 | $ | 189, |
| Sale Price/Gross Liv. Area | $ 237.34 sq.ft. | $ 82.08 sq.ft. | | $ 92.71 sq.ft. | | $ 94.06 sq.ft. | |
| Data Source(s) | | MLS/COURTHOUSE | | MLS/COURTHOUSE | | MLS/COURTHOUSE | |
| Verification Source(s) | | COURTHOUSE RECORDS | | COURTHOUSE RECORDS | | COURTHOUSE RECORDS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustm |
| Sales or Financing | | FHA | | CONV | | CONV | |
| Concessions | | 0 SLR PTS | | 0 SLR PTS | | 0 SLR PTS | |
| Date of Sale/Time | | 12/05/05 | | 08/16/05 | | 07/29/05 | |
| Location | URBAN | URBAN | | URBAN | | URBAN | |
| Leasehold/Fee Simple | Fee Simple | FEE | | FEE | | FEE | |
| Site | 9,600 Sq.Ft. | 9,600 Sq.Ft. | | 10,000 Sq.Ft. | | 10,000 Sq.Ft. | |
| View | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Design (Style) | 1 STY/AVER | 1 STY/FR/AVER | | 1 STY/AVER | | 1 STY/FR/AVER | |
| Quality of Construction | BV/FR/AVER | BV/FR/AVER | | BV/FR/AVER | | BV/FR/AVER | |
| Actual Age | 0 | 0 | | 0 | | 0 | |
| Condition | GOOD | GOOD | | GOOD | | GOOD | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6    3    2 | 6    3    2 | | 7    4    2 | | 6    3    2.5 | |
| Gross Living Area | X      2,155 sq.ft. | 2,076 sq.ft. | 0 | 2,206 sq.ft. | 0 | 2,116 sq.ft. | |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | C/H/A | C/H/A | | C/H/A | | C/H/A | |
| Energy Efficient Items | THRML WNDS | THRML WNDS | | THRML WNDS | | THRML WNDS | |
| Garage/Carport | G3A | G2A | +2,600 | G3A | | G3A | |
| Porch/Patio/Deck | PRCH/PATIO | PRCH/PATIO | | PRCH/PATIO | | PRCH/PATIO | |
| APPLIANCES | RO,VH,DW,MW | RO,VH,DW,MW | | RO,VH,DW,MW | | RO,VH,DW,MW | |
| SECURITY | SECURITY | SECURITY | | SECURITY | | SECURITY | |
| | N/A | N/A | | N/A | | N/A | |
| Net Adjustment (Total) | | ⊠ + ☐ - | $ 2,600 | ☐ + ☐ - | $ | ☐ + ⊠ - | $ |
| Adjusted Sale Price | | Net 1.5 % | | Net % | | Net 0.3 % | |
| of Comparables | | Gross 1.5 % | $ 172,920 | Gross % | $ 204,600 | Gross 0.3 % | $ 189, |
| ☐ I did ⊠ did not research the sale or transfer history of the subject property and comparable sales. If not, explain | | | | | | APPRAISER DID RESEARCH SALES | |

HISTORY FOR SUBJECT PROPERTY AND COMPARABLES.

My research ☐ did ⊠ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)    MLS / COURTHOUSE RECORDS
My research ☐ did ⊠ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)    MLS / COURTHOUSE RECORDS.
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | NO RESALE | NO RESALE | NO RESALE | NO RESALE |
| Data Source(s) | WITHIN 36 MOS | WITHIN PREV 12 MOS | WITHIN PREV 12 MOS | WITHIN PREV 12 MOS |
| Effective Date of Data Source(s) | 12/08/2005 | 12/09/2005 | 12/09/2005 | 12/09/2005 |

Analysis of prior sale or transfer history of the subject property and comparable sales    NO PREVIOUS LISTINGS OR SALES OF THE SUBJECT PROPERTY WITHIN THE PREVIOUS 36 MONTHS NOTED.
NO PREVIOUS SALES OR LISTINGS OF THE COMPARABLES WITHIN THE PREVIOUS 12 MONTHS NOTED, EXCEPT AS LISTED ABOVE

Summary of Sales Comparison Approach    THE COMPARABLES USED WERE LOCATED WITHIN THE IMMEDIATE MARKETING AREA. ALL COMPARABLES ARE OF SIMILAR AGE, SIZE & CONSTRUCTION QUALITY WHEN COMPARED TO THE SUBJECT PROPERTY. COMPARABLES 1 & 2 ARE OVER 6 MONTHS OLD, HOWEVER THERE HAS BEEN NO NOTICEABLE CHANGE IN THE MARKET SINCE THE SALES DATES OF THESE SALES. RECENT COMPARABLES OF SIMILAR SIZE & CONDITION WERE VERY LIMITED, ACCORDING TO DATA SOURCES LISTED IN THIS REPORT. MAJORITY OF COMPARABLES HAVE BEEN UPDATED & CONSIDERED TO BE IN GOOD CONDITION. COMPARABLES 2 & 3 WARRANTED A $7.50 PER FT ADJUSTMENT FOR CONDITION. COMPARABLES 2 & 3 WERE UPDATED PRIOR TO THE SALE. ALL COMPARABLES AFTER ADJUSTMENTS WERE CONSIDERED IN THE FINAL ANALYSIS.

Indicated Value by Sales Comparison Approach $ 192,000

Indicated Value by: Sales Comparison Approach $ 192,000    Cost Approach (if developed) $    Income Approach (if developed) $
VALUE ESTIMATE IS BASED ON THE SALES COMPARISON APPROACH. HOUSING IN THE AREA IS TYPICALLY OWNER OCCUPIED, THEREFORE, THE INCOME APPROACH HAS BEEN OMITTED.

This appraisal is made ☐ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:    SUBJECT 3 CAR DRIVE IS CURRENTLY NOT INSTALLED. 3 CAR DRIVE-WAY WILL NEED TO BE INSTALLED.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 192,000 , as of 12/08/2005 , which is the date of inspection and the effective date of this appraisal.

**B**

File No. WMU-2032 Page 4

# Uniform Residential Appraisal Report

SE-051130-0542
File # WMU-2032

THE COMPARABLES USED IN THIS REPORT ARE CONSIDERED TO BE THE BEST INDICATORS OF VALUE AS OF THE TIME OF THIS APPRAISAL REPORT.

**ADDITIONAL COMMENTS**

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | | | | |
|---|---|---|---|---|
| Source of cost data | OPINION OF SITE VALUE | | | = $ |
| Quality rating from cost service | DWELLING | Sq.Ft. @ $ | | = $ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) Effective date of cost data | | Sq.Ft. @ $ | | = $ |
| | | | | = $ |
| | Garage/Carport | Sq.Ft. @ $ | | = $ |
| | Total Estimate of Cost-New | | | = $ |
| | Less     Physical | Functional | External | |
| | Depreciation | | | = $( ) |
| | Depreciated Cost of Improvements | | | = $ |
| | "As-is" Value of Site Improvements | | | = $ |
| Estimated Remaining Economic Life (HUD and VA only) Years | INDICATED VALUE BY COST APPROACH | | | = $ |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)? ☒ Yes ☐ No    Unit type(s) ☒ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project   THE CREEKS AT WIMBERLEY

| Total number of phases | 1 | Total number of units | 16 | Total number of units sold | 4 |
|---|---|---|---|---|---|
| Total number of units rented | 0 | Total number of units for sale | 11 | Data source(s)   MLS DATA SOURCE | |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☒ No   If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☒ No   Data Source   MLS DATA SOURCES / INSPECTION

Are the units, common elements, and recreation facilities complete? ☐ Yes ☒ No   If No, describe the status of completion.   ENTRANCE IS STILL UNDER CONSTRUCTION. NEW CONSTRUCTION IS ACTIVE IN THE SUBJECT SUBDIVISION. APPROXIMATLY 10 UNITS ARE STILL UNDER CONSTRUCTION.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☒ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.   ENTRY, STREETS.

Freddie Mac Form 70 March 2005                    Page 3 of 6                    Fannie Mae Form 1004 March 2

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

C

File No. WMU-2032 Page

# Uniform Residential Appraisal Report

SE-081130-0842
File # WMU-2032

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what his or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

---

Freddie Mac Form 70 March 2005

Page 4 of 6

Fannie Mae Form 1004 March 2

**D**

## Uniform Residential Appraisal Report

File No. WMU-2032 Page #

SE-081130-0542
File # WMU-2032

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

E

File No. WMU-2032| Page #

SE-051130-0542
File # WMU-2032

# Uniform Residential Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia; or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name CHARLES BOWLING | Name |
| Company Name TURN-KEY APPRAISAL SERVICES, LLC | Company Name |
| Company Address P.O. BOX 272193 | Company Address |
| OKLAHOMA CITY, OK 73137 | |
| Telephone Number 405-706-9280 | Telephone Number |
| Email Address CBOWLING11@COX.NET | Email Address |
| Date of Signature and Report 12/9/2005 | Date of Signature |
| Effective Date of Appraisal 12/08/2005 | State Certification # |
| State Certification # CRA#11600 | or State License # |
| or State License # | State |
| or Other (describe) State # | Expiration Date of Certification or License |
| State OKLA | |
| Expiration Date of Certification or License 02/28/2007 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 2032 WIMBERLEY CREEK DRIVE | Date of Inspection |
| MOORE, OKLA 73160 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 182,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name WASHINGTON MUTUAL | COMPARABLE SALES |
| Company Name WASHINGTON MUTUAL | |
| Company Address NO ADDRESS GIVEN | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

F

**Supplemental Addendum**

File No. WMU-2032 Page 4

File No. WMU-2032

| Borrower/Client | SIDNEY SCHOLL | | | |
|---|---|---|---|---|
| Property Address | 2032 WIMBERLEY CREEK DRIVE | | | |
| City MOORE | | County CLEVELAND | State OKLA | Zip Code 73160 |
| Lender WASHINGTON MUTUAL | | | | |

### Scope of The Summary Appraisal Report

This is a summary appraisal report of a single family residential dwelling in a urban residential neighborhood. It was completed in a three step process: a physical analysis of the subject site and improvements, a location analysis of the market for houses such as the subject. The subject was inspected and data from the Oklahoma County Assessor's office was obtained for the physical analysis. Published data from the Oklahoma City Multiple Listing Service were researched and analyzed for use in the economic analysis of the subject. Market sales and demographic data from the Census Bureau and the City of Moore & Oklahoma City were reviewed for the location analysis. Following all appropriate analysis, A report of the appraisal was prepared on FNMA Form 1004 with the usual and standard addenda.

The research, Analysis, and report were completed in accordance with the Uniform Standards of Professional Appraisal Practice which is consistent with the requirements of a summary appraisal report.

### Addendum to Direct Sales Comparison Approach

An extensive search of the market has revealed sales which are recited in the D. S. C. approach and are believed to be the best available indicators of value which *most adequately represent the subject, as of the date of this appraisal* report. Any dissimilarities are resolved with appropriate adjustments. All adjustments are reasonable, self explanatory & extracted from the market were possible. The comparables used are considered to be of similar age, size & construction quality when compared to the subject property. Subject is located within a newer addition with limited recent closed sales. Comparables 2 & 3 are located within a competing type neighborhood with similar amenities. All comparables after adjustments were considered in the final analysis.

The adjusted values produce a statistical weighted mean of $192,073 and a median of $198,500. The final value falls slightly below the weighted mean and within the range indicated by all three sales.

### Function of The Summary Appraisal Report

The function of this appraisal is to be used for mortgage lending and multiple other purposes, such as bids at foreclosure sales, large protective advances, operating budgets, and sale on the property.

### Purpose of The Summary Appraisal Report

The purpose of this appraisal is to estimate market value as defined on FNMA Form 1004B, attached.

### History of The Property

No recorded deed transactions or listings of the subject property, from within the previous 36 months were discovered in the Cleveland County Clerk's office. No recorded listings or prior sales of the comparables within the previous 12 months except as listed in the appraisal report.

### Normal Marketing Period

Normal marketing period is the amount of time necessary to expose a property to the open market in order to achieve a sale. Implicit in this definition are the following characteristics:
1. The property will be actively exposed and aggressively marketed to potential purchasers through marketing channels commonly used by buyers and sellers of similar type properties.
2. The property will be offered at a price reflecting the most probable markup over market value used by sellers of similar type properties.
3. A sale will consummate under terms and conditions of the definition of market value required by the regulation. Based on the current sales activity and area market trends it appears that the property would require approximately 3-6 months of marketing time under the present market conditions. This was extracted from area sales and listings that are presently on the market and from interviews with area brokers. Listings that are reasonably priced appear to be marketed within the above mentioned time frame. However, listings that are overpriced, have extended marketing times, with a sales price far below the original listing price. This marketing period is based on the assumption that the property will be aggressively marketed by residential real estate professionals.

### The Condition of the subject property

The subject property is a new construction of good construction quality. No further inspections were required. Value estimate is based on the 3 car concrete drive-way being installed.

**G**

File No. WMU-2032 Page #

## Subject Photo Page

| Borrower/Client | SIDNEY SCHOLL | | | | |
|---|---|---|---|---|---|
| Property Address | 2032 WIMBERLEY CREEK DRIVE | | | | |
| City | MOORE | County | CLEVELAND | State | OKLA | Zip Code | T3160 |
| Lender | WASHINGTON MUTUAL | | | | |



**Subject Front**

2032 WIMBERLEY CREEK DR.

| Sales Price | 199,346 |
|---|---|
| Gross Living Area | 2,155 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | URBAN |
| View | AVERAGE |
| Site | 9,800 Sq.Ft. |
| Quality | BV/FR/AVER. |
| Age | 0 |



**Subject Rear**



**Subject Street**

Form PICPIX.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**H**

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client SIDNEY SCHOLL | |
| Property Address 2032 WIMBERLEY CREEK DRIVE | |
| City MOORE   County CLEVELAND | State OKLA   Zip Code 73160 |
| Lender WASHINGTON MUTUAL | |



### Comparable 1

**1007 RENITA WAY**

| | |
|---|---|
| Prox. to Subject | 0.06 miles |
| Sale Price | 170,420 |
| Gross Living Area | 2,076 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | URBAN |
| View | AVERAGE |
| Site | 9,600 Sq.Ft. |
| Quality | BV/FR/AVER |
| Age | 0 |



### Comparable 2

**713 KELSI DRIVE**

| | |
|---|---|
| Prox. to Subject | 0.45 miles |
| Sale Price | 204,800 |
| Gross Living Area | 2,269 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2 |
| Location | URBAN |
| View | AVERAGE |
| Site | 10,000 Sq.Ft. |
| Quality | BV/FR/AVER |
| Age | 0 |



### Comparable 3

**2626 S.E. 6TH CIRCLE**

| | |
|---|---|
| Prox. to Subject | 0.57 miles |
| Sale Price | 199,000 |

File No. WMU-2032| Page #1

**Location Map**

| Borrower/Client | SIDNEY SCHOLL | | | | |
|---|---|---|---|---|---|
| Property Address | 2032 WIMBERLEY CREEK DRIVE | | | | |
| City | MOORE | County | CLEVELAND | State | OKLA |

Zip Code 73160
Lender WASHINGTON MUTUAL



J



**Flood Map**

File No. WMU-2032! Page #1

| | |
|---|---|
| Borrower/Client SIDNEY SCHOLL | |
| Property Address 2032 WIMBERLEY CREEK DRIVE | |
| City MOORE | County CLEVELAND | State OKLA | Zip Code 73160 |
| Lender WASHINGTON MUTUAL | |



**K**

**Building Sketch (Page – 1)**

File No. WhSU-2032I Page #1

| | |
|---|---|
| Borrower/Client | SIDNEY SCHOLL |
| Property Address | 2032 WIMBERLEY CREEK DRIVE |
| City MOORE | County CLEVELAND    State OKLA    Zip Code 73160 |
| Lender WASHINGTON MUTUAL | |



Sketch by Apex IV™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GXA1 | First Floor | 2154.81 | 2154.81 |
| GAR | G3A | 627.70 | 627.70 |
| | | | |
| | | | |
| | | | |
| TOTAL LIVABLE    (rounded) | | | 2155 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 13.4 x | 36.6 | 490.44 |
| 6.9 x | 29.3 | 202.17 |
| 9.1 x | 12.2 | 111.02 |
| 25.6 x | 46.7 | 1195.52 |
| 4.3 x | 36.2 | 155.66 |
| | | |
| 5 Calculations Total (rounded) | | 2155 |

Form SKT.BldSkt — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

L

# ROHDE APPRAISAL SERVICE

Phone: 704-663-0282
Fax: 704-663-0341
Email:
rohdeappraisal@alltel.net

*Fax Cover Sheet*

| Send to: Sidney Scholl | From: Mark Rohde |
|---|---|
| Attention: | Office location: |
| Office location: | Date: 1/27/06 |
| Fax number: 767 935 - 3560 | Phone number: |

☐ URGENT    ☐ REPLY ASAP    ☐ PLEASE COMMENT    ☐ PLEASE REVIEW    ☐ FOR YOUR INFORMATION

TOTAL PAGES, INCLUDING COVER:  182

Comments:

Hello Sidney,
    I have deleted the irrelevant comments
on the Extended Comments page per our conversation.
    The other pages that obviously do not belong,
just remove.
        Thanks + have a great day,
                Mark

🔺
**Organization**

**A**

Loan#03-2783-000000013-0
File No.    004A601

## ADDITIONAL COMMENTS

| | |
|---|---|
| Borrower or Owner | Scholl, Sidney |
| Property Address | 110 Yale Loop |
| City Mooresville | County Iredell | State NC | Zip Code 28117 |
| Lender or Client | Washington Mutual |

### MARKET CONDITIONS
The supply and demand for properties in this market area is near equilibrium but it is considered a buyers market with typical marketing times for most homes at three to six months with conventional, FHA, VA or owner financing.

### ADVERSE SITE CONDITIONS AND/OR EXTERNAL FACTORS
The subject septic system does not adversely affect the value or marketability of the subject property. No determination was made concerning the subject septic system's adequacy or condition. The water source for the subject property is a community well; no determination was made by the appraiser as to the adequacy or potability of the water supply. Community and private wells are typical for the subject neighborhood and there is no adverse impact on the value and marketability of the subject property associated with this community water system.

### SALES COMPARISON APPROACH
1. Due to a lack of more recent comparable sales in the subject market area, it was necessary to consider sales over six months old. The sales analyzed are less than a year old and property values have been relatively stable over the last year so no time adjustments were warranted. It was considered more appropriate to go back in time to find comparable sales than to leave the subject market area or use less similar properties that would require larger adjustments which might tend to weaken the market analysis.
2. Adjustments for significant differences in gross living area were made on the basis of $50 per square foot and rounded to the nearest hundred dollars.
3. Adjustments: outdoor BBQ/Outdoor fireplace/deck/porch/patio/security/Irrigation/Audio-$2,000.
4. Due to a lack of recent comparable sales in the subject's immediate neighborhood, it was necessary to use sales which are over one mile away from the subject property. The sales considered are located in similar competing neighborhoods in the subject market area and are similar in style and market appeal. They are considered the best indicators of value for the subject property available at the time of the appraisal.
5. Effective age estimates made for the Comparables are based on field observations, assessor's records and conversations with parties familiar with the updating and maintenance of the improvements.

### RECONCILIATION
Single family properties of this type are not typically valued based on their income potential. The Income Approach was not used in the valuation of the subject property because of a lack of sufficient recent sales with rental information to develop and adequately support a gross rent multiplier. The conclusions of the Sales Comparison Analysis and Cost Approach equally give the best indication of the most probable price the subject property would bring on the open market.

### CONDITIONS OF APPRAISAL
This appraisal was prepared with the subject in 'as is' condition. No personal property was included in the estimate of value.

**B**

# Uniform Residential Appraisal Report

Loan# 03-3763-000600013-0
File # 0044001

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address 110 Yew Long | City Mooresville | State NC | Zip Code 28117 |
|---|---|---|---|

Borrower Schell, Sidney    Owner of Public Record Simonini Builders, Inc    County Iredell

Legal Description L1008-The Point PH10-M1-P 9-46-148 DBP 1606/1333

Assessor's Parcel # 4604 56 2158 300    Tax Year 2005    R.E. Taxes $ N/A

Neighborhood Name The Point    Map Reference MLS 13/2    Census Tract 604

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ None    ☒ PUD   HOA $ 85    ☐ per year ☒ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)

Lender/Client Washington Mutual    Address 1325 N Congress Ave #201 (West Palm Beach)FL33401

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).
** SEE ADDITIONAL FIELD TEXT ADDENDA **

I ☒ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Typical offer to purchase.

Contract Price $ 747,996    Date of Contract Current    Is the property seller the owner of public record? ☒ Yes ☐ No  Data Source(s) County Records

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No

If Yes, report the total dollar amount and describe the items to be paid.

N/A

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $(000) | AGE (yrs) | One-Unit 80.0 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 550 Low 1 | 2-4 Unit ___ % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 5MM High 1 | Multi-Family ___ % |
| | | | 1,250 Pred. 2 | Commercial 5.0 % |
| | | | | Other 10.0 % |

Neighborhood Boundaries
Subject is bounded to the north by Hwy. 150, to the east by #77, to the south by Lake Norman, and to the west by Lake Norman.

Neighborhood Description
Employment centers are easily accessible and commute times during peak traffic periods are considered reasonable. Neighborhood of very good to excellent quality homes.

Market Conditions (including support for the above conclusions)
General market conditions in the neighborhood are stable. Homes in this general area do require sellers to offer sales or financing concessions to the market. ** See Additional Comments **

| Dimensions N/A | Area 1.18 Acres | Shape Irregular | View Street |
|---|---|---|---|

Specific Zoning Classification Single Family Residential    Zoning Description R-27

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☐ | ☒ Community Well | Street Asphalt | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☐ | ☒ Private Septic | Alley None | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone Zone C    FEMA Map # 370299 0300    FEMA Map Date 3/7/88

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe.

** SEE ADDITIONAL FIELD TEXT ADDENDA **

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☐ Concrete Slab ☒ Crawl Space | Foundation Walls Pad & Pier | Floors Tile,Hdwd,Crpt/Good |
| # of Stories 3.00 | ☐ Full Basement ☐ Partial Basement | Exterior Walls Cedar | Walls Drywall/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area ___ sq. ft. | Roof Surface Cedar Shake | Trim/Finish Wood/Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | Basement Finish N/A % | Gutters & Downspouts Aluminum | Bath Floor Tile/Good |
| Design (Style) 3-Story | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type 3 Pane Vinyl | Bath Wainscot Tile/Good |
| Year Built New | Evidence of ☐ Infestation | Storm Sash/Insulated No/Yes | Car Storage ☐ None |
| Effective Age (Yrs) New | ☐ Dampness ☐ Settlement | Screens Yes | ☒ Driveway # of Cars One Car |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities ☐ WoodStove(s) # | Driveway Surface Concrete |
| ☐ Drop Stair ☐ Stairs | ☐ Other Fuel Gas | ☒ Fireplace(s) # One ☒ Fence | ☒ Garage # of Cars 3 |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck ☒ Porch | ☐ Carport # of Cars |
| ☒ Finished ☐ Heated | ☐ Individual ☐ Other | ☐ Pool ☒ Other millwork | ☒ Att. ☐ Det. ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☒ Other (describe) trash/garbage/water

Finished area above grade contains:    1    Rooms 3    Bedrooms 3.50    Bath(s) 3161    Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.)
** SEE ADDITIONAL FIELD TEXT ADDENDA **

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).

The subject is new construction with no significant measurable physical depreciation.  No functional or external depreciation was noted.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe.

** SEE ADDITIONAL FIELD TEXT ADDENDA **

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe.

N/A

C

1. New software + Song anyone
nationwide, That's why tapped
living will band not. Take
smile property + travel + ent.
Email ; signature +

2. Was confident of appraisal. Cost analysis
best + what used mainly as new construction.

**D**

**Uniform Residential Appraisal Report**

Loan #: [illegible]
File #: [illegible]

There are ___ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ N/A to $ N/A
There are ___ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 650000.00 to $ 785000.00

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 140 West Loop Mooresville | 100 Brawley Harbor Pt Mooresville 13/2 | 1706 Brawley School Rd 737 Mooresville 13/2 | 106 White Crest Mooresville 13/2 |
| Proximity to Subject | | Subject Neighborhood/2.5 mile | Subject Neighborhood/2.8 Mile | Subject Neighborhood/2.5 Mile |
| Sale Price | $ 745000 | $ [illegible] | $ [illegible] | $ 785000 |
| Sale Price/Gross Liv. Area | $ 236.16 sq.ft. | $ 168.72 sq.ft. | $ 205.14 sq.ft. | $ sq.ft. |
| Data Source(s) | | MLS/Exterior Inspect | MLS/Exterior Inspect | MLS/Exterior Inspect |
| Verification Source(s) | | County Records | County Records | County Records |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Sale or Financing Concessions | | Conv. NoConcession | | Conv. NoConcession | | Conv. NoConcession | |
| Date of Sale/Time | | 8/7/2005 | | 10/14/2005 | | 6/16/2005 | |
| Location | Street/Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1.19Acres/Avg | 1.29Acres/Avg | | 1.23Acres/Avg | | 0.91Acres/Avg | |
| View | Street/Avg | Street/Avg | | Street/Avg | | Street/Avg | |
| Design (Style) | 2-Story/VGis | 2-Story/VGis | | 2-Story/VGis | | 2-Story/VGis | |
| Quality of Construction | VeryGood | VeryGood | | VeryGood | | VeryGood | |
| Actual Age | New | 2 | 2000 | 1 | 1000 | 3 | 5000 |
| Condition | New | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | -1000 | Total Bdrms. Baths | -1000 | Total Bdrms. Baths | -1000 |
| Room Count | 9  3  2.50 | 7  4  3-1 | -1000 | 8  4  3-1 | -1000 | 10  4  3-1 | -1000 |
| Gross Living Area | 3151 sq.ft. | 3047 sq.ft. | -1000 | 3734 sq.ft. | -31000 | 3868 sq.ft. | -35850 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Comparable | | Comparable | | Comparable | |
| Heating/Cooling | FWA/CAC/Gas | FWA/CAC/Gas | | FWA/CAC/Gas | | FWA/CAC/Gas | |
| Energy Efficient Items | Average | Comparable | | Comparable | | Comparable | |
| Garage/Carport | 3 Car Garage | 2 Car Garage | 4500 | 3 Car Garage | | 2 Car Garage | 4500 |
| Porch/Patio/Deck | Dck/Porch/Pat | Dck/Porch/Pat | | Similar | 2000 | Dck/Porch/Pat | |
| Amenities | Amenities | similar | 2000 | similar | 2000 | similar | 2000 |
| Pool/Sp | Amenities | Pool/Sp | | Pool/Sp | | Pool/Sp | |
| BBQ/Grill/FPL | Other | Imp/pool | | | 4000 | Imp/pool | |
| Net Adjustment (Total) | | + X - | 6500 | + X - | -25190 | + X - | -26350 |
| Adjusted Sale Price of Comparables | | Net Adj. 0.90% Gross Adj. 1.90% | $ | Net Adj. -3.60% Gross Adj. 5.90% | $ 691500 | Net Adj. 6.30% Gross Adj. 6.30% | $ 751500 |

X did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

N/A

My research ☐ did X did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) County Records
My research ☐ did X did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | None | None | None | None |
| Price of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | Inspection date | Inspection date | Inspection date | Inspection date |

Analysis of prior sale or transfer history of the subject property and comparable sales

** SEE ADDITIONAL FIELD TEXT ADDENDA **

Summary of Sales Comparison Approach
** SEE ADDITIONAL FIELD TEXT ADDENDA **

Indicated Value by Sales Comparison Approach $ 745000

Indicated Value by Sales Comparison Approach $ 745000    Cost Approach (if developed) $ 743008    Income Approach (if developed) $ N/A

** SEE ADDITIONAL FIELD TEXT ADDENDA **

This appraisal is made X "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.
** SEE ADDITIONAL FIELD TEXT ADDENDA **

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 745000    as of 1/6/2006    , which is the date of inspection and the effective date of this appraisal.

**E**

License#3-2763-000000013-0
File # 00+A601

## Uniform Residential Appraisal Report

N/A

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)
Typical of lots in the neighborhood. Derived from tax info, sales agent and historical data from sales of lots in neighborhood.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ 80000 |
|---|---|---|
| Source of cost data  Marshall & Swift | Dwelling  3151  Sq. Ft. @ $ 189.95 | =$ 598532 |
| Quality rating from cost service  Vod   Effective date of cost data  Inspection | BsMt  Sq. Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | |
| Reproduction cost data was taken from Marshall & Swift | Garage/Carport  Sq. Ft. @ $ 24.63 | =$ 19039 |
| Residential Cost Handbook. Site improvements include | Total Estimate of Cost-New | =$ 637541 |
| landscaping septic and driveway. | Less  Physical  Functional  External | =$( 4025 ) |
| | Depreciation  4025 | |
| | Depreciated Cost of Improvements | =$ 632508 |
| | "As-is" Value of Site Improvements | =$ 5500 |
| Estimated Remaining Economic Life (HUD and VA only)  65      Years | Indicated Value by Cost Approach | =$ 743008 |

85,00
←98

19
5.7
←

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $  N/A     X Gross Rent Multiplier  N/A     = $ N/A     Indicated Value by Income Approach
Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes ☒ No   Unit type(s)  ☐ Detached ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project  The Point at Nonner
Total number of phases  10      Total number of units  1700      Total number of units sold  90%
Total number of units rented  Unknown     Total number of units for sale  77     Data source(s)  MLS
Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes ☒ No  If Yes, date of conversion.
Does the project contain any multi-dwelling units?  ☐ Yes ☒ No  Data source(s)  Inspection/Sales Center
Are the units, common elements, and recreation facilities complete?  ☒ Yes ☐ No  If No, describe the status of completion.
N/A

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes ☒ No  If Yes, describe the rental terms and options.
N/A

Describe common elements and recreational facilities
Golf course, pools, tennis club, lake access, community center &shops, fitness center.

F

Jan-23-2008  09:34am  From-                                    T-999  P.004/027  F-043

## Uniform Residential Appraisal Report

License03-2763-30080020154-0.
File #  004A901

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**G**

**Uniform Residential Appraisal Report**

License03-3795-000000813-0

File # 00x001

APPRAISER'S CERTIFICATION: The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

**H**

## Uniform Residential Appraisal Report

Loan#00-2783-000000001-0

File # 004A001

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable, and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Mark D Rotolo | Name |
| Company Name  Rotolo Appraisal Service | Company Name |
| Company Address  218 Williamson Rd, #15D | Company Address |
| Mooresville          NC  28117 | |
| Telephone Number | Telephone Number |
| Email Address | Email Address |
| Date of Signature and Report  January 11, 2008 | Date of Signature |
| Effective Date of Appraisal  1/5/2008 | State Certification # |
| State Certification #  A9039 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State  NC | |
| Expiration Date of Certification or License  6/30/2008 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect subject property |
| 110 Yale Loop | ☐ Did inspect exterior of subject property from street |
| Mooresville          NC  28117 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  740000 | ☐ Did inspect interior and exterior of subject property |
| LENDER/CLIENT | Date of Inspection |
| Name  Manager | |
| Company Name  Washington Mutual | COMPARABLE SALES |
| Company Address  1325 N Congress Ave #201 | ☐ Did not inspect exterior of comparable sales from street |
| West Palm Beach      FL  33401 | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Freddie Mac Form 70   March 2005                Page 6 of 6                Fannie Mae Form 1004   March 2005

## ADDITIONAL FIELD TEXT

File No. 004A601

| | |
|---|---|
| Borrower/Client Schell, Sidney | |
| Property Address 110 Yale Loop | |
| City Mooresville | County Iredell | State NC | Zip Code 28117 |
| Lender Manager | Washington Mutual |

**ANALYSIS CURRENT AGREE COMPS 1-3**
A search of the multiple listing service indicates the subject has not been listed for sale in the last twelve months. The subject property has not been transferred in the last three years. Comp sales are typical for the market.

**ADDITIONAL FEATURES**
The subject is new construction. The subject is similar in energy efficiency and features to homes in the neighborhood.

**COMMENT SALES COMPARE COMPS 1-3**
The three comparables analyzed here are recent closed sales located in the subject market area. They are the most similar and most recent sales available. All three are considered good indicators of value for the subject property. The adjustments made to the sales represent the appraiser's attempt to isolate and compensate for significantly dissimilar features or conditions. Most weight is given to the cost approach due to the subject new construction.

**CONDITION APPRAISAL**
This appraisal was prepared with the subject in 'as is' condition. No personal property was included in the estimate of value.

**FINAL RECONCILIATION**
The Sales Comparison Analysis is given the most weight since it best reflects the actions of buyers and sellers in the market. The Cost Approach supports the Sales Analysis but was given less weight overall. The Income Approach was not considered appropriate for this type of single family residential property. *** See Additional Comments ***

**APPARENT CONDITION DESCRIPTION**
Drainage and utility easements are typical for the area and don't adversely affect the subject's marketability or value. No adverse easements or encroachments were noted. Septic systems are typical for the subject neighborhood. *** See Additional Comments ***

**PHYSICAL DEFICIENCIES COMMENT**
There are no known or apparent adverse environmental conditions that would negatively impact the value or marketability of the subject property.

**SUBJECT LISTING COMMENT**
A search of the local multiple listing service indicates the subject property has not been listed for sale in the last twelve months. It is a model home sold by builder agent.

*[handwritten notes:]*

Usually same structure
Similar

(704) 663-0282   11/4/06

1. Says most weight given to cost approval because new construction. Also the appraisal credit given to sales comparison since reflects buys & sells in market.

2. There goes to be says comparable sales in last 6 month

3. Values stable over last year

4. Two appraisals. Did 2055 drive by? Of exterior disputed by homeowner as too also low. Who? Looked at interior & found better comps. Said removed comps 2 & 3 + kept 1. Then said comp #1 removed on one stated when listing realtor (Who?) Stated property sold for much less due to poor condition & functional obsolescence with floor plan — Send lead.

4. Don't understand cost appraisal valuation
See page 3

? 5. 5 & 6 comparable properties in past 12 month from 650,000 to 789,000

## TEXT ADDENDUM

File No. 004A601

| Borrower/Client | Scholl, Sidney | | | | |
|---|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | | |
| City | Mooresville | County | Iredell | State | NC | Zip Code | 28117 |
| Lender | Manager | | | Washington Mutual | |

**MARKET CONDITIONS**
The supply and demand for properties in this market area is near equilibrium but it is considered a buyers market with typical marketing times for most homes at three to six months with conventional, FHA, VA or owner financing.

**ADVERSE SITE CONDITIONS AND/OR EXTERNAL FACTORS**
The subject septic system does not adversely affect the value or marketability of the subject property. No determination was made concerning the subject septic system's adequacy or condition. The water source for the subject property is a community well; no determination was made by the appraiser as to the adequacy or potability of the water supply. Community and private wells are typical for the subject neighborhood and there is no adverse impact on the value and marketability of the subject property associated with this community water system.

**SALES COMPARISON APPROACH**
1. Due to a lack of more recent comparable sales in the subject market area, it was necessary to consider sales over six months old. The sales analyzed are less than a year old and property values have been relatively stable over the last year so no time adjustments were warranted. It was considered more appropriate to go back at time to find comparable sales than to leave the subject market area or use less similar properties that would require larger adjustments which might tend to weaken the market analysis. 2. Adjustments for significant differences in gross living area were made on the basis of $50 per square foot and rounded to the nearest hundred dollars.
3. Adjustments: outdoor BBQ/Outdoor fireplace/deck/porch/patio/security/irrigation/Audio-$2,000.
4. Due to a lack of recent comparable sales in the subject's immediate neighborhood, it was necessary to use sales which are over one mile away from the subject property. The sales considered are located in similar competing neighborhoods in the subject market area and are similar in style and market appeal. They are considered the best indicators of value for the subject property available at the time of the appraisal.
5. Effective age estimates made for the Comparables are based on field observations, assessor's records and conversations with parties familiar with the updating and maintenance of the improvements.

**RECONCILIATION**
Single family properties of this type are not typically valued based on their income potential. The Income Approach was not used in the valuation of the subject property because of a lack of sufficient recent sales with rental information to develop and adequately support a gross rent multiplier. The Cost Approach was given less weight due to the relative difficulty in accurately estimating accrued depreciation. The conclusions of the Sales Comparison Analysis give the best indication of the most probable price the subject property would bring on the open market. The Income Approach was not used in the valuation of the subject property because of a lack of sufficient recent sales with rental information to develop and support a gross rent multiplier. The Cost Approach was given less weight due to the relative difficulty in accurately estimating accrued depreciation. The conclusions of the Sales Comparison Analysis give the best indication of the most probable price the subject property would bring on the open market. Single family properties of this type are not typically valued based on their income potential. The Income Approach was not used in the valuation of the subject property because of a lack of sufficient recent sales with rental information to develop and adequately support a gross rent multiplier. The Cost Approach was given less weight due to the relative difficulty in accurately estimating accrued depreciation. The conclusions of the Sales Comparison Analysis give the best indication of the most probable price the subject property would bring on the open market.

**CONDITIONS OF APPRAISAL**
This appraisal was prepared with the subject in 'as is' condition. No personal property was included in the estimate of value.

**ADDITIONAL COMMENTS**
This appraisal is the second recently performed by appraiser on subject. First was a 2055 exterior that the estimated value was disputed by homeowner as too low and this report was requested. Upon inspection of interior the home was better constructed than anticipated and better comps were found to more adequately reflect the amenities and quality of the subject property. 2 of 3 comps were removed and replaced for the afore mentioned reason. Comp #1 on this report is the one that remained. Comp #1 on 2055 was removed even though on same street due to conversation with listing Realtor stating that comp sold for much less than typical for property with similar square footage due to poor condition of property and functional obsolescence with the floor plan on the second level.

K

USPAP COMPLIANCE ADDENDUM                            11/20/2002
                                                     File No.  108A211

## SUBJECT

Borrower  William & Barbara Garrison
Property Address  143 Twitty Ln
City  Statesville                    County  Iredel            State  NC           Zip Code  28677
Lender/Client  Paragon Mortgage, Inc. 249 Williamson Rd.

### PURPOSE OF THE APPRAISAL

### SCOPE OF THE APPRAISAL

### REPORT OF THE PRIOR YEAR SALES HISTORY FOR THE SUBJECT PROPERTY

Is the subject property currently listed?        ☐ Yes  ☐ No     List Price $ _____
Has the property sold during the prior year?     ☐ Yes  ☐ No     If yes, describe below:

### MARKETING TIME

What is your estimate of marketing time for the subject property? _____     Describe below the basis (rationale) for your estimate:

### NON-REAL PROPERTY TRANSFERS

Does the transaction involve the transfer of personal property, fixtures, or intangibles that are not real property?     ☐ Yes  ☐ No
If yes, provide description and valuation below:

### ADDITIONAL LIMITING CONDITIONS OR ADDITIONAL COMMENTS

### ADDITIONAL CERTIFICATION STATEMENTS OR ADDITIONAL COMMENTS

Date:  November 26, 2002          Appraiser(s):

                                   Mark D. Rohde

Date: _____            Review Appraiser(s):

L

Jan-23-2006  09:35am  From-                                        T-988  P.010/027  F-043

## Satisfactory Completion Certificate

File No. _190A408_____

On _August 17, 2004_____ the property situated at

Address _129 Cape Cod Way  Mooresville_____  City _____

County _Iredell_____  State _NC_____  Zip _28117_____

_L1159-PNT ON NORM-P11-M2-PB-42-43-44 DB/P 1339/626_____

Purchaser/Borrower _Scholl, Sidney_____

was appraised by me or _Mark D Rohde_____

The appraisal report was subject to:    ☑ satisfactory completion,    ☐ repairs, or _____

_____

I certify that I have reinspected subject property, the requirements or conditions set forth in the appraisal report have

been met, and any required repairs or completion items have been done in a workmanlike manner.

Itemized below are substantial changes from the data in the appraisal report, and these changes  ☐ do  ☑ do not

adversely affect any property ratings or final estimate of value in the report:

The subject appears to have been completed according to plans and specifications.

_September 10 2004_____                    _____
Date                                              Inspector/

FHLMC 442 Rev. 6/78

Jan-23-2008  09:35am   From-                                    T-999  P.011/027  F-043

## 2005 USPAP COMPLIANCE ADDENDUM

File No.

Borrower or Owner _____

Property Address _____

City _____ County _____ State _____ Zip Code _____

Lender or Client _____

**APPRAISER'S CERTIFICATION:**

The following Certification statements are in addition to and may supercede the signed Appraiser's Certification attached to this appraisal report. This Appraiser's Certification is compliant with the current edition of the Uniform Standards of Professional Appraisal Practice.

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

I have (or have not) made a personal inspection of the property that is the subject of this report. (If more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)

No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

**TYPE OF VALUE (PURPOSE OF THE APPRAISAL) AND DEFINITION OF VALUE:**

The purpose of this appraisal is to provide an opinion of the market value of the subject property, as defined in this report, as of the effective date of this report.

**INTENDED USE, AND INTENDED USER OF THE APPRAISAL:**

The intended use of the appraisal is to assist the client and any other intended users in the underwriting, approval, and funding of the mortgage loan. The intended users of this report are the stated client and any other institutions involved in the underwriting, approval, and funding of the mortgage loan. No one else, including the purchaser and seller, should rely on the opinion of value or any other conclusions contained in this appraisal report.

**ANALYSIS AND REPORT FORM:**

The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales, listings, and/or rentals within the subject market area.

The original source of the comparable data described in the Data Source section of the market grid along with the source of confirmation is provided, where available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report or used as a basis for the value conclusion. The extent of the analysis to this assignment is stated in the Appraiser's Certification included above and attached to this report.

**N**

Jan-23-2006  09:35am  From-                                          T-999  P.012/027  F-043

## 2005 USPAP COMPLIANCE ADDENDUM

File No.

Borrower or Owner _____

Property Address _____

City _____ County _____ State _____ Zip Code _____

Lender or Client _____

**DEFINITION OF INSPECTION:**

The term "Inspection", as used in this report, is not the same level of inspection that is required for a "Professional Home Inspection". The appraiser does not fully inspect the electrical system, plumbing system, mechanical systems, foundation system, floor structure, or subfloor. The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic evaluation of the subject property. If the client needs a more detailed inspection of the property, a home inspection, by a Professional Home Inspector, is suggested.

**DIGITAL SIGNATURES:**

The signature(s) affixed to this report, and certification, were applied by the original appraiser(s) or supervisory appraiser and represent their acknowledgements of the facts, opinions and conclusions found in the report. Each appraiser(s) applied his or her signature electronically using a password encrypted method. Hence these signatures have more safeguards and carry the same validity as the individual's hand applied signature. If the report has a hand-applied signature, this comment does not apply.

**OPINION OF MARKET VALUE VS ESTIMATE OF MARKET VALUE:**

The current Uniform Standards of Professional Practice defines the market value conclusion as an opinion of market value and not an estimate of market value.

**THREE YEAR SALES HISTORY FOR THE SUBJECT PROPERTY:**

The appraiser has complied with Standards Rule 1-5b and 2-2b(ix) requiring the appraiser to analyze and report all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal. If this information was available to the appraiser(s), it is reported in the Subject column of Sales Comparison Analysis section of the appraisal report.

**EXPOSURE PERIOD:**

By studying the sales of similar comparable residential properties with value ranges as identified in the Neighborhood section of this report and discussions with individuals knowledgeable of current neighborhood trends in the subject area, the appraiser feels that the exposure time for the subject property is equal to the indicated Marketing Time identified in the Neighborhood section of this appraisal report.

APPRAISER:                                          SUPERVISORY APPRAISER (ONLY IF REQUIRED):

Signature:                                          Signature: _____

Name: _____                           Name: _____

Date Signed: _____                    Date Signed: _____

State Certification #: _____          State Certification #: _____

or State License #: _____             or State License #: _____

State: _____                          State: _____

Expiration Date of Certification or License: _____  Expiration Date of Certification or License: _____

☐ Did    ☐ Did Not Inspect Property

O

Jan-23-2006  09:35am  From-                                    T-999  P.013/027  F-043

Loan#03-2763-00000
File No.  004A601

PROJECT ANALYSIS    ☐ CONDOMINIUM OR    ☐ PUD - ADDENDUM A TO FHLMC FORM 465 9/80

**INSTRUCTIONS**

The following outlines the appraisal documentation required on each Condominium or PUD Unit loan submitted to FHLMC. The individual Unit Appraisal Report and Project Analysis must be signed by an appraiser approved by the Seller/Servicer submitting the loan to the FHLMC It is preferred, but not required, that each of these forms be signed by the same appraiser PHLMC does not require the cost approach in the appraisal of an individual condominium or PUD unit, however, if the lender or appraiser desires, the Cost Approach Section may be completed.

APPRAISAL REPORT INDIVIDUAL CONDOMINIUM OR PUD UNIT    (HLMC Form 465/FNMA Form 1073)

This must be submitted with each individual loan and the date of the estimate of Market Value must be within ninety (90) days of the date of closing of the mortgage.

PROJECT ANALYSIS    (FHLMC Form 465 ADDENDUM A)

PART I. This must be submitted if less than 70% of the individual units in the project or section/phase have been sold. To establish this 70% requirement, under an option to purchase contract cannot be counted, and multiple sales is of sufficient size to contain any common sold. A section/phase is one established by the Condo/PUD documents and is of sufficient size to contain any common elements or recreational facilities, which are included in the sale price or appraised value of an individual unit. Subject section/phase may be combined with other completed, sold and occupied section (s) / phase(s) to meet this requirement, provided all are under a common Owners Association.

PART II. This must be submitted if the project is in the process of conversion or the conversion process has been completed less than two years.

ANALYSIS OF ANNUAL INCOME & EXPENSES - OPERATING BUDGET  (FHLMC Form 465 ADDENDUM B/FNMA Form 1073A, Page 1)

This must be submitted ONLY if the project or section/phase has not been operated and managed by the Owners Association for at least two years. The upper portion is to be completed in detail by the Developer, Owner Association of Management Agent. The completion of the lower portion is the responsibility of the Seller/Servicer. It can be prepared by a staff member of the Seller/Services, a property manager or an approved appraiser, provided the person who signs is qualified, in the opinion of the Seller/Servicer, to make the required analysis.

To facilitate the submission, the Seller/Servicer may submit a clearly reproduced signed copy of Addendum A and/or Addendum B, if required, provided each is dated within 12 months of the date of the estimate of Market Value of the Individual Unit If reproduced copies of the Addendum A and/or Addendum B are furnished the Appraiser, and submitted to FHLMC, the Appraiser who signs the Individual Condominium or PUD Unit Appraisal Report should note in the following Comments Section any significant changes or variances which are observed when making the inspection.

COMMENTS SECTION

Date  01-11-2006 _____    Signature(s) _____

PROJECT ANALYSIS

Part I must be completed if less than 70% of the individual units in the project or section/phase have been sold. To establish this 70% requirement, a sale under an option to purchase contract cannot be counted, and multiple sales to one owner must be counted as one sale. Part II must be completed if the project is in the process of conversion or the conversion process has been completed less than two years.

Project Name _____    Phase No. _____

Address or Location  110 Yale Loop    City  Mooresville    State  NC    Zip  28117

If the project is not completed, discuss the proposed overall development or conversion plan and stage of completion including the number of sections, units and recreational facilities per section and the estimated completion date of each section

Describe the common elements and recreational facilities, and comment on their adequacy, quality, and condition.

Are the recreational facilities available for use by individuals other than unit owners and guests? If yes, comment as to the effect on marketability.

Describe and comment on the adequacy of the following

| Storage space | |
| Laundry facilities | |
| Trash removal | |
| Parking facilities | |
| Soundproofing material | |

**P**

Jan-23-2006  09:35am   From-                                    T-999   P.014/027   F-043

Loan#03-2783-00000
File No. 004A601

**PROJECT ANALYSIS**

| Individual Unit Room Count<br>*Total Bedrooms Baths* | Livable Area<br>Sq. Ft. | Price Range | | Price Per Sq. Ft. | | Monthly<br>Assoc.Dues | Number of Units | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Planned | Sold | Completed |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | $ | to $ | $ | to $ | | | | |
| | | | | | TOTAL | | | | |

**PART II CONTINUED**

Discuss sales performance to date (per phase / section, if applicable)

Estimated absorption time, after completion, for _____ unsold units, at existing prices, in subject project/phase is _____ months.
Comment on any unit type(s) on which sales appear to be slow

Discuss project density as it compares to others in the area from a standpoint of marketability

State the approximate number of units currently for sale by developer in prior phases. If more than one prior phase, list for each phase

Discuss any rental or sales concessions being offered (if none known, so state)

If the developer(s) plans to retain any unsold units for rental, discuss number, voting rights and comparability of unit charges

Describe nearby competition including sale prices, rate of sales, sellout time, etc.

Describe potential for additional Condo/PUD units in nearby area, considering land availability, zoning, utilities, apartments subject to conversions, etc.

General comments including any probable changes in the economic base or neighborhood which would either favorable or unfavorably affect Condo/PUD sales

Date  01-11-2006                              Appraiser(s) Signature:

**PART III**

THIS SECTION MUST BE COMPLETED IF THE PROPERTY IS IN THE PROCESS OF CONVERSION OR RECENTLY CONVERTED

Itemize major alterations, modernization and repairs

Describe any incomplete items including estimated completion

Has the Appraiser reviewed engineering reports on the structural integrity of the building and the condition of the major physical components and systems of the project? _____ if yes, describe any unfavorable conditions indicated

How many of the units were sold to tenants? _____   Percentage of sales price discount to tenants _____ %
Describe other sales concessions to tenants

Estimated absorption time for _____ unsold units is _____ months. How many of the unsold units are rented? _____
General Comments

Date _____                              Appraiser(s) Signature

(Page 2)

Q

Operating Income Statement                                File No.

**One- to Four-Family Investment Property and Two- to Four-Family Owner-Occupied Property**

Property Address _____

City _____ County _____ State _____ Zip Code _____

General Instructions: This form is to be prepared jointly by the loan applicant, the appraiser, and the lenders underwriter. The applicant must complete the following schedule indicating each unit's rental status, lease expiration date, current rent, market rent, and the responsibility for utility expenses. Rental figures must be based on the rent for an "unfurnished" unit.

| | Currently Rented | Expiration Date | Current Rent Per Month | Market Rent Per Month | Utility Expense | Paid By Owner | Paid By Tenant |
|---|---|---|---|---|---|---|---|
| Unit No. 1 | Yes ___ No ___ | _____ | $ _____ | $ _____ | Electricity | ☐ | ☐ |
| Unit No. 2 | Yes ___ No ___ | _____ | $ _____ | $ _____ | Gas | ☐ | ☐ |
| Unit No. 3 | Yes ___ No ___ | _____ | $ _____ | $ _____ | Fuel Oil | ☐ | ☐ |
| Unit No. 4 | Yes ___ No ___ | _____ | $ _____ | $ _____ | Fuel (Other) | ☐ | ☐ |
| Total | | | $ _____ | $ _____ | Water/Sewer | ☐ | ☐ |
| | | | | | Trash Removal | ☐ | ☐ |

The applicant should complete all of the income and expense projections and for existing properties provide actual year-end operating statements for the past two years (for new properties the applicant's projected income and expenses must be provided). This Operating Income Statement and any previous operating statements the applicant provides must then be sent to the appraiser for review, comment, and/or adjustments next to the applicants figures (e.g., Applicant/Appraiser 2881300). If the appraiser is retained to complete the form instead of the applicant, the lender must provide to the appraiser the aforementioned operating statements, mortgage insurance premium, HOA dues, leasehold payments, subordinate financing, and/or any other relevant information as to the income and expenses of the subject property received from the applicant to substantiate the projections. The underwriter should carefully review the applicant's / appraiser's projections and the appraiser's comments concerning those projections. the underwriter should make any final adjustments that are necessary to more accurately reflect any income or expense items that appear unreasonable for the market. (Real estate taxes and insurance on these types of properties are included in PITI and not calculated as an annual expense item.) Income should be based on current rents, but should not exceed market rents. When there are no current rents because the property is proposed, new, or currently vacant, market rents should be used.

| Annual Income and Expense Projection for Next 12 months | | |
|---|---|---|
| | By Applicant/Appraiser | Adjustments by Lender's Underwriter |
| Income (Do not include income for owner-occupied units) | | |
| Gross Annual Rental (from unit(s) to be rented) | $ _____ | $ _____ |
| Other Income (include sources) | + _____ | + _____ |
| Total | $ _____ | $ _____ |
| Less Vacancy/Rent Loss | - _____ ( __ %) | - _____ ( __ %) |
| Effective Gross Income | $ _____ | $ _____ |
| | | |
| Expenses (Do not include expenses for owner-occupied units) | | |
| Electricity | _____ | _____ |
| Gas | _____ | _____ |
| Fuel Oil | _____ | _____ |
| Fuel          (Type - _____ ) | _____ | _____ |
| Water/Sewer | _____ | _____ |
| Trash Removal | _____ | _____ |
| Pest Control | _____ | _____ |
| Other Taxes or Licenses | _____ | _____ |
| Casual Labor | _____ | _____ |
| This includes the costs for public area cleaning, snow removal, etc., even though the applicant may not elect to contract for such services | | |
| Interior Paint/Decorating | _____ | _____ |
| This includes the costs of contract labor and materials that are required to maintain the interiors of the living units. | | |
| General Repairs/Maintenance | _____ | _____ |
| This includes the costs of contract labor and materials that are required to maintain the public corridors, stairways, roofs, mechanical systems, grounds, etc. | | |
| Management Expenses | _____ | _____ |
| These are the customary expenses that a professional management company would charge to manage the property. | | |
| Supplies | _____ | _____ |
| This includes the costs of items like light bulbs, janitorial supplies, etc. | | |
| Total Replacement Reserves - See Schedule on Pg. 2 | _____ | _____ |
| Miscellaneous | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| | _____ | _____ |
| Total Operating Expenses | $ _____ | $ _____ |

Page 1 of 2

**R**

Jan-23-2006  09:36am  From-                                    T-999  P.016/027  F-043

File No. _____

### Replacement Reserve Schedule

Adequate replacement reserves must be calculated regardless of whether actual reserves are provided for on the owners operating statements or are customary in the local market. This represents the total average yearly reserves. Generally, all equipment and components that have a remaining life of more than one year-such as refrigerators, stoves, clothes washers/dryers, trash compactors, furnaces, roofs, and carpeting, etc. - should be expensed on a replacement cost basis -

| Equipment | Replacement Cost | Remaining Life | | By Applicant/ Appraiser | Lender Adjustments |
|---|---|---|---|---|---|
| Stoves/Ranges | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| Refrigerator | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| Dishwashers | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| A/C Units | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| C. Washer/Dryers | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| HW Heaters | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| Furnace(s) | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| (Other) _____ | @ $ _____ | ea. / _____ Yrs. x | Units = $ _____ | $ _____ |
| Roof | @ $ _____ | ea. / _____ Yrs. x One Bldg. = | $ _____ | |

Carpeting (Wall to Wall)                          Remaining Life

| (Units | _____ Total Sq. Yds. Q $ _____ Per Sq. Yd. / _____ Yrs * | $ _____ | $ _____ |
|---|---|---|---|
| (Public Areas) | _____ Total Sq. Yds. Q $ _____ Per Sq. Yd. / _____ Yrs * | $ _____ | $ _____ |

Total Replacement Reserves. (Enter on Pg. 1)                    $ _____    $ _____

### Operating Income Reconciliation

$ _____  - $ _____  = $ _____  / 12  * $ _____
Effective Gross Income    Total Operating Expenses    Operating Income    Monthly Operating Income

$ _____  - $ _____  = $ _____
Monthly Operating Income    Monthly Housing Expense    Net Cash Flow

(Note: Monthly Housing Expense includes principal and interest on the mortgage, hazard insurance premiums, real estate taxes, mortgage insurance premiums, HOA dues, leasehold payments, and subordinate financing payments.)

Underwriters instructions for 2-4 Family Owner-Occupied Properties

If Monthly Operating Income is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Monthly Operating Income is a negative number, it must be included as a liability for qualification purposes.

The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total Monthly Housing Expense for the subject property to the borrowers stable monthly income.

Underwriter's instructions for 1-4 Family Investment Properties

If Net Cash Flow is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Net Cash Flow is a negative number, it must be included as a liability for qualification purposes.

The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total monthly housing expense for the borrower's primary residence to the borrowers stable monthly income.

Appraiser's Comments (including sources for data and rationale for the projections)




_____                 _____                 _____
Appraiser Name                             Appraiser Signature                        Date

Underwriter's Comments and Rationale for Adjustments




_____                 _____                 _____
Underwriter Name                           Underwriter Signature                      Date

S _____

| Part 3: Comprehensive Valuation Package **Homebuyer Summary** | **Department of Housing and Urban Development** Office of Housing Federal Housing Commissioner | OMB Approval No. 2302-0538 (exp. 06/30/00) |
|---|---|---|

Case Number: _____
File Number: _____

Property Address: _____ City: _____ State: _____ Zip Code: _____

| **Important** | **NOTICE TO THE HOMEBUYER** | **Read Carefully** |
|---|---|---|

As part of our job insuring the mortgage for the lender, the FHA requires us to conduct an appraisal to:

- estimate the value of your potential new home
- make sure it meets minimal FHA standards
- ensure that it will be marketable

*Appraisals are different from home inspections. Home inspections give more detailed information about your potential new home.*

This report is a summary of the observations of an appraiser who visited the property. If there was a problem, the appraiser answered "YES" under "Problem".

If any condition is marked [yes], this means that the property you want to buy does not currently meet FHA's Minimum Property Standards. Until this condition is resolved, your lender may not provide you with an FHA insured loan consistent with FHA procedures.

You should speak to your lender about how this situation needs to be handled. You should also make sure that you are confident that the physical condition of this property meets all of your expectations.

For a copy of the full appraisal, contact your lender.

If you have any questions, call us at 1-800-569-4287.

| Physical Condition | Problem (Y) | Comments |
|---|---|---|
| Site Hazards | . . | |
| Soil Contamination | . . | |
| Grading and Drainage Problems | . . | |
| Well, Individual Water Supply and Septic Problems | . . | |
| Wood Destroying Insects | . . | |
| Private Road Access and Maintenance Problems | . . | |
| Structural Deficiencies | . . | |
| Foundation Deficiencies | . . | |
| Roofing Deficiencies | . . | |
| Mechanical Systems Problems | . . | |
| General Health and Safety Deficiencies | . . | |
| Deteriorated Paint | . . | |
| Manufactured Housing | . . | |

The conditions listed above are reflected on the Valuation Conditions Form (Part 2 of the Comprehensive Valuation Package) of this appraisal. **The lender is required to transmit this** Notice to the Homebuyer **form to the buyer at least five business days prior to the loan closing.**

| FHA Roster Appraiser Signature     Mark D Rohde | ID Number | Valuation Date |
|---|---|---|

Homebuyer acknowledges receipt of Part 3: Summary:

X _____    Date Received _____

X _____    Date Received _____

Homebuyer(s) Signature(s):

Form HUD-92564-HS (07/2000)

Jan-23-2008  09:36am  From-                                          T-929  P.018/027  F-043

## APPRAISER'S MANUFACTURED HOUSING CHECKLIST

Borrower / Client: _____
Property Address: _____ City _____ St _____ Zip Code _____
HUD Tag (ID) Number(s): _____ Manufactured Date: _____
Serial Number(s): _____ Manufacturer: _____

### FOUNDATION

I. Please mark an X in the appropriate box to describe the subject's foundation.

Permanently Affixed on a Concrete/Masonry Perimeter with Concrete/Masonry Footings:
☐ Yes  ☐ No  ☐ Footings located below the frost line  ☐ No frost line

Permanently Affixed on Pier & Post with Concrete/Masonry Footings:
☐ Yes  ☐ No  ☐ Footings located below the frost line  ☐ No frost line

Not Permanently Affixed:
☐ Blocks  ☐ Pier and Pad  ☐ Wood and Concrete/Masonry  ☐ Other _____

### GENERAL INFORMATION

II. All questions must be answered. Please mark an X in the appropriate box for the subject. Any "NO" answers require an explanation to be provided as an addendum to the checklist.

1. Subject has been converted to real property as evidenced by (e.g., 433A in California, Manufactured Housing Application in Washington, Conversion Certificate in Nevada, etc.):
☐ Yes  ☐ No    If "Yes", recording # and date of document: _____

2. Subject foundation has been designed by an engineer.
☐ Yes  ☐ No  ☐ Unknown  ☐ See Engineer Certification Attached

3. Foundation appears to be suitable for the soil conditions of the site.
☐ Yes  ☐ No  ☐ Unknown

4. Post and piers appear to be placed according to manufacturer recommendations.
☐ Yes  ☐ No  ☐ Unknown

5. Foundation system is typical and acceptable in the subject's marketplace.
☐ Yes  ☐ No

6. All wheels, axles, trailer hitches and running gear removed.
☐ Yes  ☐ No

7. The subject is considered a "double-wide" manufactured unit.
☐ Yes  ☐ No

8. The subject manufactured home meets local zoning.
☐ Yes  ☐ No  ☐ No zoning

9. The subject has sufficient square footage, room size, storage, adequacy of roof pitch, and overhangs to be acceptable to typical buyers in the subject's market area.
☐ Yes  ☐ No

10. Materials and construction of the subject are acceptable in the subject's market area.
☐ Yes  ☐ No

11. Comment on the marketability of manufactured housing units in comparison to the marketability of site-built housing in the subject's market area.

APPRAISER'S CERTIFICATION: I certify that I have inspected the above referenced property and foundation system.

Appraiser Signature _____    Inspection Date _____

Print Name _____    Date Report Signed _____

State Certification # _____ State _____    Expiration Date of Cert/License: 6/30/2006

State License # _____ State _____

U

# INVOICE

Loan#03-2783-000000013-0

File No. _____ 004A601

Invoice #    149A509 _____

Invoice Date   09-10-1904 _____

Fee      250.00 _____

Due Date   _____

Lender or Client:   Franklin Bank, SSB _____

          1000 North Halsted, #203 _____

          Chicago     Il   60622

Borrower:   Borrower: Cassidy, Sean _____

          129 Cape Cod Way _____

          Mooresville     NC   28117

| Item | Cost |
|------|------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **Total Amount Due** | 0.00 |

Terms

Please remit payment to: _____

          Rohde Appraisal Service

          219 Williamson Rd. #1102

          Mooresville     NC   28117

**Thank you**

V

Case No. 01/12/04

File No. 008A401

| FEDERAL EMERGENCY MANAGEMENT AGENCY STANDARD FLOOD HAZARD DETERMINATION | See The Attached Instructions | O.M.B. No. 3067-0264. Expires October 31, 2005 |
|---|---|---|

**SECTION I - LOAN INFORMATION**

| 1. LENDER NAME AND ADDRESS | 2. COLLATERAL (Building / Mobile Home / Personal Property) PROPERTY ADDRESS (Legal Description may be attached) |
|---|---|
| Washington Mutual 1325 N. Congress Ave., #201 West Palm Beach          FL | 5315 Hughes Dr Charlotte                NC  28213 |

| 3. LENDER I.D. NO. | 4. LOAN IDENTIFIER | 5. AMOUNT OF FLOOD INSURANCE REQUIRED $ |
|---|---|---|

**SECTION II**

**A. NATIONAL FLOOD INSURANCE PROGRAM (NFIP) COMMUNITY JURISDICTION**

| 1. | NFIP Community Name | 2. | County (ies) | 3. State | 4. | NFIP Community Number |
|---|---|---|---|---|---|---|

**B. NATIONAL FLOOD INSURANCE PROGRAM (NFIP) DATA AFFECTING BUILDING/MOBILE HOME**

| 1. | NFIP Map Number or Community-Panel Number (Community name if not the same as "A") | 2. NFIP Map Panel Effective/ Revised Date | 3. LOMA/LOMR ☐ Yes  Date | 4. Flood Zone | 5. No NFIP Map |
|---|---|---|---|---|---|

**C. FEDERAL FLOOD INSURANCE AVAILABILITY (Check all that apply)**

1. ☐ Federal Flood Insurance is available (community participates in NFIP)     ☐ Regular Program   ☐ Emergency Program of NFIP

2. ☐ Federal Flood Insurance is not available because community is not participating in the NFIP

3. ☐ Building/Mobile Home is in a Coastal Barrier Resources Area (CBRA) or Otherwise Protected Area (OPA), Federal Flood Insurance may not be available.

CBRA/OPA designation date: _____

**D. DETERMINATION**

**IS BUILDING/MOBILE HOME IN SPECIAL FLOOD HAZARD AREA (ZONES CONTAINING THE LETTERS "A" OR "V")?          ☐ YES     ☐ NO**

If yes, flood insurance is required by the Flood Disaster Protection Act of 1973.

If no, flood insurance is not required by the Flood Disaster Protection Act of 1973.

E. COMMENTS (Optional):

This determination is based on examining the NFIP map, any Federal Management Agency revisions to it, and any other information needed to locate the building / mobile home on the NFIP map.

**F. PREPARER'S INFORMATION**

| Name, Address, Telephone Number (if other than Lender) | DATE OF DETERMINATION |
|---|---|
| Name:    Rohde Appraisal Service Address:  219 Williamson Rd. #1102           Mooresville          NC  28117 Telephone Number:  704-663-0282 Date Signed:  January 11, 2006 | |

FEMA form 81-93, OCT 02

W

File No.

## F.I.R.R.E.A. ADDENDUM

Borrower or Owner _____

Property Address _____

City _____ County _____ State _____ Zip Code _____

Lender/Client _____

### Purpose of the Appraisal

### Scope of the Appraisal

### Report of the prior year sales history for the subject property

Is the subject property currently listed?      ☐ Yes  ☐ No    List Price $ _____

Has the property sold during the prior year?   ☐ Yes  ☐ No    If yes, describe below:

### Marketing Time

What is your estimate of marketing time for the subject property? _____ Describe below the basis (rationale) for your estimate:

### Non-real property transfers

Does the transaction involve the transfer of personal property, fixtures, or intangibles that are not real property?  ☐ Yes  ☐ No

If yes, provide description and valuation below:

### Additional Comments

### Additional Certification

1. The acceptance of this appraisal assignment by the appraiser was not based on a requested minimum valuation, a specified valuation, or an approval of the loan.

2. The appraiser certifies that the compensation for this appraisal is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

3. This appraisal has been prepared to conform with the Uniform Standards of Professional Appraisal practice ("USPAP") adopted by the Appraisal Standards Board of the Appraisal foundation, except the Departure Provision, unless otherwise stated below.

4. The appraiser has disclosed within this appraisal report, or below, all steps taken that were necessary or appropriate to comply with the Competency provision of the USPAP.

Date: _____  Appraiser(s): _____

Date: _____  Review Appraiser(s): _____

**X**

Jan-23-2006  09:36am  From-                                                T-989  P.022/027  F-043

SUBJECT PHOTOGRAPH ADDENDUM



| | | | |
|---|---|---|---|
| Borrower/Client | Scholl, Sidney | | File No. 004A601 |
| Property Address | 110 Yale Loop | | |
| City Mooresville | County Iredell | State NC | Zip Code 28117 |
| Lender Manager | | Washington Mutual | |



FRONT OF
SUBJECT PROPERTY



REAR OF
SUBJECT PROPERTY



STREET SCENE

Y

Jan-23-2008 09:36am From-                                    T-999  P.025/027  F-043

ADDITIONAL PHOTOGRAPH ADDENDUM

File No. 004A601

| Borrower/Client | Scholl, Sidney | | | | |
|---|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | | |
| City Mooresville | | County | State NC | Zip Code 28117 | |
| Lender | Manager | | Washington Mutual | | |



110 YALE LOOP
KITCHEN



110 YALE LOOP
LIVING ROOM



110 YALE LOOP
MAST BATH

Z

Jan-23-2006  09:37am  From-                                    T-999  P.024/027  F-043

## COMPARABLES PHOTOGRAPH ADDENDUM

File No. 004A601

| | | | | |
|---|---|---|---|---|
| Borrower/Client | Scholl, Sidney | | | |
| Property Address | 110 Yale Loop | | | |
| City | Mooresville | County | Iredell | State NC  Zip Code 28117 |
| Lender | Manager | | Washington Mutual | |



Comparable Sale
108 Brawley Harbor
Mooresville 13
Date of Sale: 8/17/2005
Sale Price: 688000
Sq. Ft.: 3247
$ / Sq. Ft.: 210.96



Comparable Sale
1709 Brawley Scho
Mooresville 13/
Date of Sale: 12/14/2005
Sale Price: 719784
Sq. Ft.: 3794
$ / Sq. Ft.: 189.72

As/C



Comparable Sale
106 White Crest
Mooresville 13/
Date of Sale: 9/16/2005
Sale Price: 778000
Sq. Ft.: 3868
$ / Sq. Ft.: 201.14

**AA**

Jan-23-2006  09:37am  From-                                          T-999  P.025/027  F-043

## LOCATION MAP ADDENDUM

Fle No. 004A601

| Borrower/Client | Scholl, Sidney | | | | |
|---|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | | |
| City | Mooresville | County | Iredell | State | NC | Zip Code | 28117 |
| Lender | Manager | | Washington Mutual | | |



**BB**

Jan-23-2006  09:37am  From-                                    T-999  P.026/027  F-043



CC

Jan-23-2006  09:37am  From-                    T-989  P.027/027  F-043

1/11/2006 1:37:31 PM

**DD**

**FROM:**
Jerry Gill
Mark IV Appraisals, Inc
4216 N Portland, Ste 103
Oklahoma City, OK 73112

Telephone Number: 604-0725        Fax Number: 405-604-0727

**INVOICE**

| INVOICE NUMBER |
| --- |
| 070149JG |

| DATE |
| --- |
| February 1, 2007 |

| REFERENCE |
| --- |

**TO:**
Sidney Scholl
Sidney Scholl

.

Telephone Number: 707-939-9310 (Cell)      Fax Number:
Alternate Number:                           E-Mail:

Internal Order #:
Lender Case #:
Client File #:
Main File # on form:    070149JG
Other File # on form:   Summary Appraisal
Federal Tax ID:
Employer ID:

## DESCRIPTION

|  |  |  |  |
| --- | --- | --- | --- |
| Lender: TBD | | Client: Sidney Scholl | |
| Purchaser/Borrower: Casey & Kara Jones | | | |
| Property Address: 16424 Ernest Court | | | |
| City: Edmond | | | |
| County: Oklahoma | | State: OK | Zip: 73003 |
| Legal Description: Lot 4, Block 11, Regency Pointe Addition Section 1 | | | |

## FEES

| | AMOUNT |
| --- | --- |
| Single Family Residential | 200.00 |
| **SUBTOTAL** | 200.00 |

## PAYMENTS

| | AMOUNT |
| --- | --- |
| Check #:       Date:       Description: | |
| Check #:       Date:       Description: | |
| Check #:       Date:       Description: | |
| **SUBTOTAL** | |
| **TOTAL DUE** | $    200.00 |

**A**

Mark IV Appraisals, Inc.

File No. 070149JG Page #2

Summary Appraisal

## Uniform Residential Appraisal Report
File # 070149JG

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 16424 Ernest Court | City Edmond | State OK | Zip Code 73003 |

Borrower Casey & Kara Jones　Owner of Public Record Sidney Scholl　County Oklahoma

Legal Description Lot 4, Block 11, Regency Pointe Addition Section 1

Assessor's Parcel # 205291700　Tax Year 2005　R.E. Taxes $ 3,234.88

Neighborhood Name Regency Pointe Addition　Map Reference OC1/224/111　Census Tract NA

Occupant ☐ Owner ☐ Tenant ☒ Vacant　Special Assessments $　☒ PUD　HOA $ 400　☒ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Listing purposes only

Lender/Client TBD　Address PMB 311,19119 Sonoma Highway, Sonoma, CA 95476-5413

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). MLS

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $　Date of Contract　Is the property seller the owner of public record? ☐ Yes ☐ No　Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE | AGE | One-Unit 100 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $ (000) | (yrs) | 2-4 Unit % |
| Growth ☒ Rapid ☐ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 350 Low New | | Multi-Family % |
| Neighborhood Boundaries　Bounded on the North by West 15th Street, on the South by West 33rd Street, | | 750 High 1 | | Commercial % |
| on the West by Portland Avenue and on the East by May Avenue, in Southwest Edmond. | | 450 Pred. 1 | | Other % |

Neighborhood Description　A new market area of quality homes in mostly new condition. Good access to all amenities, schools and good access to a crosstown expressway and about 5 miles to Downtown Edmond.

Market Conditions (including support for the above conclusions)　The metropolitan Oklahoma City area has been favorably affected with the advent of lower interest rates over the past 4-5 years, ranging from 4.5 to 6.5 percent giving a very volatile market. All forms of financing is available with conventional lending being the most used.

| | | | | |
|---|---|---|---|---|
| Dimensions 95 x 120 | Area 11,400 Sq.Ft. | Shape Rectangular | View Residential | |

Specific Zoning Classification Single Family Residential　Zoning Description

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley Greenbelt | | ☒ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No　FEMA Flood Zone X　FEMA Map # 40109C0064G　FEMA Map Date 7/2/2002

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☐ No  If Yes, describe
No apparent adverse easements or encroachments observed.

| General Description | Foundation | Exterior Description　materials/condition | Interior　materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | Foundation Walls Concrete/Good | Floors C Tile/Cpt/Good |
| # of Stories 2 | ☐ Full Basement ☐ Partial Basement | Exterior Walls Brick Ven/Good | Walls Drywall/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area None sq.ft. | Roof Surface Composition/Good | Trim/Finish Stained/Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | Basement Finish % | Gutters & Downspouts Metal/Good | Bath Floor CTile/Good |
| Design (Style) 2 Sty Brk Ven | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type Vinyl/Good | Bath Wainscot Painted/Good |
| Year Built 2005 | Evidence of ☐ Infestation | Storm Sash/Insulated IG Glass | Car Storage ☐ None |
| Effective Age (Yrs) 1 | ☐ Dampness ☐ Settlement | Screens Vinyl/Good | ☒ Driveway # of Cars 2 |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities ☐ Woodstove(s) # | Driveway Surface Concrete |
| ☒ Drop Stair ☐ Stairs | ☐ Other Fuel Gas | ☒ Fireplace(s) # 1 ☐ Fence | ☒ Garage # of Cars 2 |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck Cvd ☐ Porch Covered | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☐ Pool ☐ Other | ☐ Att. ☐ Det. ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains:　9 Rooms　5 Bedrooms　4/1 Bath(s)　4,143 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).　Vinyl Windows, and ceiling Fans. Also a 282' guest house included in total square footage.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).　Fairly new construction with very high quality features, trim, ceramic and slate tile, cabinets, fixtures and appliances and still in like new condition.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

Freddie Mac Form 70 March 2005　　Page 1 of 6　　Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**B**

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

There are _____ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ _____ to $ _____

There are 6 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 415,000 to $ 652,000

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 16424 Ernest Court<br>Edmond, OK 73003 | 16416 Ernest Court<br>Edmond | | 17205 Fox Prowl<br>Edmond | | 3324 NW 172nd Street<br>Edmond | |
| Proximity to Subject | | 0.01 miles SE | | 0.69 miles N | | 0.69 miles N | |
| Sale Price | $ | | $ 415,000 | | $ 645,000 | | $ 652,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 121.49 sq.ft. | | $ 146.59 sq.ft. | | $ 151.63 sq.ft. | |
| Data Source(s) | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | | | | | | |
| Concessions | | Conventional | | Conventional | | Conventional | |
| Date of Sale/Time | | None Noted | | None Noted | | None Noted | |
| | | 5/8/2006 | | 12/27/2006 | | 5/24/2005 | |
| Location | SW Edmond | Same Inferior | +5,000 | Some Superior | -20,000 | Some Superior | -20,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 11,400 Sq.Ft. | 10,320 | | 12,740 | | 12,480 | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | 2 Sty Brk Ven | 2 Sty Brk Ven | | 2 Sty Brk Ven | | 2 Sty Brl Ven | |
| Quality of Construction | Excellent | Excellent | | Excellent | | Excellent | |
| Actual Age | 2 | 2 | | 2 | | 2 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total \| Bdrms. \| Baths | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | |
| Room Count | 9 \| 5 \| 4.1 | 8 \| 3 \| 3.1 | +1,000 | 10 \| 4 \| 3 | +1,500 | 9 \| 4 \| 3.1 | +1,000 |
| Gross Living Area | 4,143 sq.ft. | 3,416 sq.ft. | +39,985 | 4,400 sq.ft. | -14,135 | 4,300 sq.ft. | -8,635 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Cent. | Cent.Cent. | | Cent.Cent | | Cent.Cent. | |
| Energy Efficient Items | Vinyl/Winds | StDrs/Thrml/Wind | | StDrs/Thrml/Wnd | | StrnDrs/Thrml/W | |
| Garage/Carport | 2 Car Att Gar | 3 Car Att Gar | -2,000 | 3 Car Att Gar | -2,000 | 3 Car Att Gar | -2,000 |
| Porch/Patio/Deck | CovPch/CovPat | CovPch/CovPat | | Cov Pch/Cov Pa | | CovPch/CovPat | |
| Kitchen Equipment | RO DW Disp Mv | RO DW Disp Mv | | RO DW Disp Mv | | RO DW Disp Mv | |
| Other | GstHse/SerQtrs | None | +5,000 | None | +5,000 | None | +5,000 |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 48,985 | ☐ + ☒ - $ | -29,635 | ☐ + ☒ - $ | -24,635 |
| Adjusted Sale Price | | Net Adj. % | | Net Adj. % | | Net Adj. % | |
| of Comparables | | Gross Adj. % $ | 463,985 | Gross Adj. % $ | 615,365 | Gross Adj. % $ | 627,365 |
| ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain | | | | | | | |

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 9/23/2004 & 9/26/2005 | No other deed filings | No other deed filings | No other deed filings |
| Price of Prior Sale/Transfer | $38,000 & $495,000 | found within past 12 months | found within past 12 months | found within past 12 months |
| Data Source(s) | Okla County Assessor | Okla County Assessor | Okla County Assessor | Okla County Assessor |
| Effective Date of Data Source(s) | February 1, 2007 | February 1, 2007 | February 1, 2007 | February 1, 2007 |

Analysis of prior sale or transfer history of the subject property and comparable sales     Sale now of lot only was 9/23/2004, Sale 9/26/2005 was was original
purchase price by current owner.

Summary of Sales Comparison Approach     Only one sale found in subject's immediate addition, but quite a bit smaller than subject. All comparable sales
as close in size, style, quality and proximity as available. $55.00 adjustment was given for square footage. All comparables are within Edmond,
OK, and are impacted by same market forces as subject neighborhood. Most weight given to sale #1 due to proximity to subject. Sales #2 and
#3 in gated community with golf course, pool etc.reason for adjustment in location. Sale #1 in same addition but subject backs up to
pond with fountain and sale #1 is in an interior lot with not near the same view . reason for adjustment in location here.  Appraiser felt the sales
used were the closest in size and quality etc.

Indicated Value by Sales Comparison Approach $ 583,000

Indicated Value by: Sales Comparison Approach $ 583,000   Cost Approach (if developed) $ 654,956   Income Approach (if developed) $

Subject property is new construction with quality materials and fits well in this suburban neighborhood. The Cost Approach represents the upper
limit of value, but the appraiser feels the Sales Comparison Approach the indicator of value since it represents the Direct Market Approach. The
Income Approach is not considered here since it is not a factor in this neighborhood.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  All Cash "As Is" for loan purposes
only. The digital signature is the exact replica(s) of the appraiser(s) below
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 583,000 , as of February 1, 2007 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                 Page 2 of 6                 Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**C**

# Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

**ADDITIONAL COMMENTS**

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Lot sales in this area have been sold in the

amount of $52,000 for most lots recently so actual cost of lot used for site value.

**COST APPROACH**

| | | | |
|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 52,000 |
| Source of cost data  Marshall & Swift Residential Handbook | DWELLING    4,143  Sq.Ft. @ $  142.60 | =$ | 590,792 |
| Quality rating from cost service  Excellent  Effective date of cost data  12/01/2006 | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ | |
| | Garage/Carport    425  Sq.Ft. @ $  47.93 | =$ | 20,370 |
| Cost estimates from Marshall and Swift Residential Handbook | Total Estimate of Cost-New | =$ | 611,162 |
| | Less    Physical    Functional    External | | |
| | Depreciation    10,206 | =$( | 10,206) |
| The appraiser feels the Sales Comparison Approach is the best indicator | Depreciated Cost of Improvements | =$ | 600,956 |
| of value. | "As-is" Value of Site Improvements | =$ | 2,000 |
| Estimated Remaining Economic Life (HUD and VA only)    59  Years | INDICATED VALUE BY COST APPROACH | =$ | 654,956 |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

**INCOME**

| | | |
|---|---|---|
| Estimated Monthly Market Rent $    NA    X Gross Rent Multiplier    NA    = $ | | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | | |

**PROJECT INFORMATION FOR PUDs (if applicable)**

**PUD INFORMATION**

Is the developer/builder in control of the Homeowners' Association (HOA)? ☒ Yes ☐ No    Unit type(s) ☒ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**D**

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**E**

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

**F**

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER    Jerry Gill | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Jerry Gill_ | Signature _____ |
| Name  Jerry Gill | Name _____ |
| Company Name  Mark IV Appraisals, Inc | Company Name _____ |
| Company Address  4216 N Portland, Ste 103, | Company Address _____ |
| Oklahoma City, OK 73112 | |
| Telephone Number  405-604-0725 | Telephone Number _____ |
| Email Address  markivappraisals@coxinet.net | Email Address _____ |
| Date of Signature and Report  February 01, 2007 | Date of Signature _____ |
| Effective Date of Appraisal  February 1, 2007 | State Certification # _____ |
| State Certification #  10306CRA | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  Oklahoma | |
| Expiration Date of Certification or License  December 31, 2009 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED

16424 Ernest Court

Edmond, OK 73003

APPRAISED VALUE OF SUBJECT PROPERTY $    583,000

LENDER/CLIENT

Name _____

Company Name  TBD

Company Address  PMB 311, 19119 Sonoma Highway, Sonoma, CA 95476-5413

Email Address  sidney_scholl@sonic.net

SUBJECT PROPERTY

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
    Date of Inspection _____
☐ Did inspect interior and exterior of subject property
    Date of Inspection _____

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
    Date of Inspection _____

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**G**

## Subject Photo Page

| Borrower/Client | Casey & Kara Jones | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | | | |
| City | Edmond | County | Oklahoma | | State | OK | Zip Code 73003 |
| Lender | TBD | | | | | | |



**Subject Front**

16424 Ernest Court
Sales Price
Gross Living Area     4,143
Total Rooms          9
Total Bedrooms       5
Total Bathrooms      4.1
Location             SW Edmond
View                 Residential
Site                 11,400 Sq.Ft.
Quality              Excellent
Age                  2



**View from Back Yard**



**Subject Street**

Form PICPIX.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**H**

## Subject Interior Photo Page

| Borrower/Client | Casey & Kara Jones | | | | |
|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | |
| City | Edmond | County Oklahoma | | State OK | Zip Code 73003 |
| Lender | TBD | | | | |



**Subject Living Room**

| | |
|---|---|
| 16424 Ernest Court | |
| Sales Price | |
| Gross Living Area | 4,143 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.1 |
| Location | SW Edmond |
| View | Residential |
| Site | 11,400 Sq.Ft. |
| Quality | Excellent |
| Age | 2 |



**Subject Kitchen to Liv Room**



**Master Bathroom**

## Subject Interior Photo Page

| Borrower/Client | Casey & Kara Jones | | | | |
|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | TBD | | | | |



**Subject Staircase**

| | |
|---|---|
| 16424 Ernest Court | |
| Sales Price | |
| Gross Living Area | 4,143 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.1 |
| Location | SW Edmond |
| View | Residential |
| Site | 11,400 Sq.Ft. |
| Quality | Excellent |
| Age | 2 |



**Theater Room Wet Bar**



**Inside Courtyard**

J

## Comparable Photo Page

| Borrower/Client | Casey & Kara Jones | | | | |
|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | TBD | | | | |



### Comparable 1

16416 Ernest Court

| Prox. to Subject | 0.01 miles SE |
|---|---|
| Sale Price | 415,000 |
| Gross Living Area | 3,416 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.1 |
| Location | Same Inferior |
| View | Residential |
| Site | 10,320 |
| Quality | Excellent |
| Age | 2 |



### Comparable 2

17205 Fox Prowl

| Prox. to Subject | 0.69 miles N |
|---|---|
| Sale Price | 645,000 |
| Gross Living Area | 4,400 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3 |
| Location | Some Superior |
| View | Residential |
| Site | 12,740 |
| Quality | Excellent |
| Age | 2 |



### Comparable 3

3324 NW 172nd Street

| Prox. to Subject | 0.69 miles N |
|---|---|
| Sale Price | 652,000 |
| Gross Living Area | 4,300 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | Some Superior |
| View | Residential |
| Site | 12,480 |
| Quality | Excellent |
| Age | 2 |

**K**

## Building Sketch (Page - 1)

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | Casey & Kara Jones | | | | |
| Property Address | 16424 Ernest Court | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | TBD | | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2070.8 | 2070.8 |
| GLA2 | Second Floor | 1790.1 | 1790.1 |
| GAR | Garage | 424.6 | 424.6 |
| OTR | Guest House | 282.0 | 282.0 |
| | Net LIVABLE Area | (Rounded) | 3861 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| **First Floor** | |
| 3.0 x 10.2 | 30.6 |
| 18.0 x 51.0 | 918.0 |
| 0.5 x 0.2 x 12.3 | 1.2 |
| 15.0 x 31.6 | 474.0 |
| 11.0 x 30.4 | 334.4 |
| 12.3 x 22.0 | 270.6 |
| 2.0 x 21.0 | 42.0 |
| **Second Floor** | |
| 4.3 x 4.5 | 19.4 |
| 6.0 x 6.5 | 39.0 |
| 0.5 x 0.0 x 0.1 | 0.4 |
| 18.3 x 48.0 | 876.0 |
| 7.5 x 8.0 | 60.0 |
| 3.0 x 10.3 | 30.8 |
| 0.4 x 31.0 | 10.9 |
| 7.0 x 12.0 | 84.0 |
| 5.0 x 15.0 | 75.0 |
| 4.4 x 14.5 | 63.1 |
| 8.5 x 32.6 | 277.1 |
| 8.5 x 30.0 | 254.6 |
| 19 Items (Rounded) | 3861 |

L

File No. 070143JG| Page #13

**Location Map**

| Borrower/Client | Casey & Kara Jones | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code | 73003 |
| Lender | TBD | | | | | |



File No. 07014SJG   Page #14

**Flood Map**

| Borrower/Client | Casey & Kara Jones | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 16424 Ernest Court | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003 |
| Lender | TBD | | | | | |



**N**

**FROM:**

Jerry Gill
Mark IV Appraisals, Inc
4216 N Portland, Ste 103
Oklahoma City, OK 73112

Telephone Number: 604-0725     Fax Number: 604-0727

**TO:**

Sidney Scholl
PMB 311,19229 Sonoma Highway,
Sonoma, CA 95476-5413

Telephone Number:     Fax Number:
Alternate Number:     E-Mail:

# INVOICE

| INVOICE NUMBER |
| --- |
| 070149JG |

| DATE |
| --- |
| January 30, 2007 |

**REFERENCE**

Internal Order #:
Lender Case #:
Client File #:
Main File # on form:  070149JG
Other File # on form:  Summary Appraisal
Federal Tax ID:
Employer ID:

## DESCRIPTION

Lender: Sidney School     Client: Sidney School
Purchaser/Borrower: TBD
Property Address: 1009 W B Meyer Pkwy
City: Edmond
County: Oklahoma     State: OK     Zip: 73003-2970
Legal Description: Lot 11, Block 14 Oaktree Park 3rd Amended Addition

| FEES | AMOUNT |
| --- | --- |
| Single Family Residential | 400.00 |
| Discount for previous appraisal | -200.00 |
| | |
| **SUBTOTAL** | 200.00 |

| PAYMENTS | AMOUNT |
| --- | --- |
| Check #:      Date:      Description: | |
| Check #:      Date:      Description: | |
| Check #:      Date:      Description: | |
| **SUBTOTAL** | |
| **TOTAL DUE** | $ 200.00 |

**A**

| Borrower/Client | TBD | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | File No. | 070149JG |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003-2970 |
| Lender | Sidney School | | | | |

## TABLE OF CONTENTS



Invoice ............................................................................................... 1
URAR ................................................................................................. 2
Additional Comparables 4-6 .................................................................. 8
Subject Photos .................................................................................... 9
Subject Photos Interior ....................................................................... 10
Subject Photos Interior ....................................................................... 11
Comparable Photos 1-3 ........................................................................ 12
Comparable Photos 4-6 ........................................................................ 13
Building Sketch (Page - 1) ..................................................................... 14
Location Map ...................................................................................... 15
Flood Map .......................................................................................... 16

**B**

Mark IV Appraisals, Inc.                                                File No. 07014SJG Page #2

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070143JG

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 1009 W B Meyer Pkwy | City Edmond | State OK | Zip Code 73003-2970 |

Borrower TBD  Owner of Public Record Sidney Scholl  County Oklahoma

Legal Description Lot 11, Block 14 Oaktree Park 3rd Amended Addition

Assessor's Parcel # R204441440  Tax Year 2004  R.E. Taxes $ 30.17

Neighborhood Name Oaktree Park Addition  Map Reference 36470  Census Tract 1082.13

Occupant ☐ Owner ☐ Tenant ☒ Vacant  Special Assessments $ 0.00  ☒ PUD  HOA $ 480  ☒ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Listing purposes only

Lender/Client Sidney Scholl  Address PMB 311,19229 Sonoma Highway, Sonoma, CA 95476-5413

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). MLS

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | | | PRICE | AGE | One-Unit | 100 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | | | $ (000) | (yrs) | 2-4 Unit | % |
| Growth ☒ Rapid ☐ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | | | 275 Low | New | Multi-Family | % |
| Neighborhood Boundaries Bounded by Waterloo Road on the North, by Covell Road on the South, Santa | | | | | | 650 High | 15 | Commercial | % |
| Fe Avenue on the West and Bryant Avenue on the East in Northwest Edmond. | | | | | | 450 Pred. | 5 | Other | % |

Neighborhood Description  A good market area of quality homes in mostly good condition. Good access to all amenities, schools and shops. About 4 miles to Downtown Edmond.

Market Conditions (including support for the above conclusions)  The metropolitan Oklahoma City area has been favorably affected with the advent of lower interest rates over the past 4-5 years, ranging from 4.5 to 6.5 percent giving a very volatile market. All forms of financing is available with conventional lending being the most used.

| | | | | |
|---|---|---|---|---|
| Dimensions 125 x 154 | Area 18,642 Sq.Ft. | Shape Rectangular | View Residential | |

Specific Zoning Classification Single Family Residential  Zoning Description R-1

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | | ☒ |
| Gas | ☐ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 40109C0080G  FEMA Map Date 7/2/2002

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe
No apparent adverse easements or encroachments observed.

| General Description | | Foundation | | Exterior Description  materials/condition | Interior  materials/condition | |
|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls Concrete | Floors CTile/Cpt/Good | |
| # of Stories 2 | ☐ Full Basement ☐ Partial Basement | | Exterior Walls Brick | Walls Drywall/Good | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area None sq.ft. | | Roof Surface Composition | Trim/Finish Stained/Good | |
| ☒ Existing ☐ Proposed ☐ Under Const | Basement Finish % | | Gutters & Downspouts Metal | Bath Floor C Tile/Good | |
| Design (Style) 2 Sty Brk Ven | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type Vinyl | Bath Wainscot Painted/Good | |
| Year Built 2005 | Evidence of ☐ Infestation | | Storm Sash/Insulated IG Glass/Thermal | Car Storage ☐ None | |
| Effective Age (Yrs) 1 | ☐ Dampness ☐ Settlement | | Screens Aluminum | ☒ Driveway  # of Cars 3 | |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities | ☒ Woodstove(s) # | Driveway Surface Concrete | |
| ☒ Drop Stair ☐ Stairs | ☐ Other | Fuel Gas | ☒ Fireplace(s) # 1 ☐ Fence | ☒ Garage  # of Cars 3 | |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck Cov. | ☒ Porch Covered ☐ Carport  # of Cars | |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☐ Pool | ☐ Att. ☒ Det. ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 10 Rooms  4 Bedrooms  3 1 Bath(s)  4,203 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).  Thermal windows, storm doors and ceiling fans.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.)  Home is fairly new construction and still like new condition, located in a neighborhood of like properties.  No repairs noted or required.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

Freddie Mac Form 70 March 2005                    Page 1 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc — 1-800-ALAMODE

C

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)    13:52 01/18/08GMT-05 Pg 05-18

File No. 070149JG  Page #3

## Uniform Residential Appraisal Report
Summary Appraisal Report
File # 070149JG

| | | |
|---|---|---|
| There are | 7 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 449,900    to $ 619,000 |
| There are | 7 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 575,000    to $ 625,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1009 W B Meyer Pkwy | 3713 Creek Bend Road | | 3720 Creek Bend Road | | 3801 Creek Bend Road | |
| | Edmond, OK 73003-2970 | Edmond | | Edmond | | Edmond | |
| Proximity to Subject | | 0.68 miles SW | | 0.66 miles SW | | 0.5 miles SW | |
| Sale Price | $ | | $ 597,482 | | $ 606,334 | | $ 625,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 153.63 sq.ft. | | $ 137.21 sq.ft. | | $ 143.68 sq.ft. | |
| Data Source(s) | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | | MLS & Oklahoma Cnty Ct Hse | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conventional | | Conventional | | Conventional | |
| | | None | | None | | None | |
| Date of Sale/Time | | 10/5/2006 | | 11/29/2006 | | 12/22/2006 | |
| Location | NW Edmond | Same | | Same | | Same | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 18,942 Sq Ft. | 28,800 | -1,000 | 19,000 | | 33,350 | -1,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | 2 Sty Brk Ven | 2 Sty Brk Ven | | 2 Sty Brk Ven | | 2 Sty Brk Ven | |
| Quality of Construction | Excellent | Excellent | | Excellent | | Excellent | |
| Actual Age | 1 | 0 | | 0 | | 0 | |
| Condition | Good/New | Good/New | | Good/New | | Good/New | |
| Above Grade | Total\|Bdrms\|Baths | Total\|Bdrms\|Baths | | Total\|Bdrms\|Baths | | Total\|Bdrms\|Baths | |
| Room Count | 10 \| 4 \| 3.1 | 9 \| 4 \| 3.1 | | 9 \| 4 \| 3.1 | -1,000 | 10 \| 4 \| 3.1 | |
| Gross Living Area | 4,203 sq.ft. | 3,889 sq.ft. | +14,130 | 4,419 sq.ft. | -9,720 | 4,350 sq.ft. | -6,615 |
| Basement & Finished Rooms Below Grade | None | None | | None | | None | |
| | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Cent | Cent.Cent | | Cent.Cent | | Cent.Cent | |
| Energy Efficient Items | Vinyl Windows | Vinyl Windows | | Vinyl Windows | | Vinyl Windows | |
| Garage/Carport | 3 Car Att Gar | 3 Car Att Gar | | 3 Car Att Gar | | 3 Car Att Gar | |
| Porch/Patio/Deck | Cov Pch/CovPat | Cov Pch/CovPat | | Cov Pch/CovPat | | Cov Pch/CovPat | |
| Kitchen Equipment | R/O DW MW | R/O DW MW | | R/O DW MW | | R/O DW MW | |
| Other | None | Inground Pool | -7,500 | None | | None | |
| Net Adjustment (Total) | | ☒ + ☐ - | 5,630 | ☐ + ☒ - | -10,720 | ☐ + ☒ - | -7,615 |
| Adjusted Sale Price of Comparables | | Net Adj. % | | Net Adj. % | | Net Adj. % | |
| | | Gross Adj. % | $ 603,112 | Gross Adj. % | $ 595,614 | Gross Adj. % | $ 617,385 |

☒ I did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Okla County Assessors Ofc.
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) Oklahoma County Assessor Ofc
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 1/4/2005 | No other deed filings | No other deed filings | 1/30/2006 |
| Prior of Prior Sale/Transfer | $52,000 | within past 12 months | found within 12 months | $65,000 |
| Data Source(s) | Okla Cnty Ct Hse | Okla Cnty Ct Hse | Okla Cnty Ct Hse | Okla Cnty Ct Hse |
| Effective Date of Data Source(s) | 1/30/2007 | 1/30/2007 | 1/30/2007 | 1/30/2007 |

Analysis of prior sale or transfer history of the subject property and comparable sales    Lot sale only in subject and in sale #3

Summary of Sales Comparison Approach    A number of homes being built in this addition, but most are custom and some new sales, but none of subject's size sales or style discovered in subject's immediate addition.  All sales discovered in subject's immediate area and 4 are in similar additions while two are in a golf course gated addition (reason for adjustment here) and all similar in quality, condition and effective age, so no adjustment given for difference in actual age.  $45.00 used as adjustment for square footage.

Indicated Value by Sales Comparison Approach $ 596,000

| | | |
|---|---|---|
| Indicated Value by: Sales Comparison Approach $ 596,000 | Cost Approach (if developed) $ 657,132 | Income Approach (if developed) $ |

Subject property is in very good condition with quality materials and located in the same addition as the comparable sales. The cost approach indicates the highest value, but the appraiser feel the sales comparison approach best supports the value. The income approach is not considered in this assignment.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair. All cash "As Is", for loan purposes only.  The digital signatures below are exact replica(s) of the appraiser(s) listed below.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 596,000 , as of   January 30, 2007 , which is the date of inspection and the effective date of this appraisal.

| Freddie Mac Form 70 March 2005 | Page 2 of 6 | Fannie Mae Form 1004 March 2005 |
|---|---|---|

form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1 800-ALAMODE

**D**

Fm:Chris Moore; CENTURY 21 Goodyear Green To:Sidney Scholl (17079335560)    13:52 01/16/08GMT-05 Pg 06-18

Prt No. 070149JG| Page #4

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

Since comparable sales out of the area are sometimes necessary, the ones used are in the same market area with similar amenities and quality features similar to expressways, schools, shops etc., the appraiser considers this defines the neighborhood boundaries.

While this home is not the largest in the addition, it has all the same amenities and quality features similar to those here. The solid core doors beautiful trim, light fixtures, plumbing fixtures,carpet, hardwood floors in some rooms, ceramic tile in entry, granite cabinet tops in kitchen and baths, stainless steel appliances are all of the highest quality found in even more expensive homes

Also the driveway and porch is of beautiful colored cobblestone

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Lot sales in this area have been sold in the
amount of $52,000 for most lots recently and this was the cost of subject's lot.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 52,000 |
|---|---|---|---|---|
| Source of cost data  Marshall & Swift Residential Handbook | DWELLING | 4,203  Sq.Ft. @ $ 139.37 | =$ | 585,772 |
| Quality rating from cost service  V Good  Effective date of cost data 12/1/2006 | | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ | |
| 50 Years. The cost factors are based on data obtained from the | Garage/Carport | 994  Sq.Ft @ $ 27.77 | =$ | 27,603 |
| Residential cost handbook by Marshall & Swift and/ or known local | Total Estimate of Cost New | | =$ | 613,375 |
| building costs. Physical depreciation (if any) has been calculated by the | Less | Physical | Functional | External | | | |
| Age /Life Method, which is based on a percentage of estimated total | Depreciation | 10,243 | | | =$( | 10,243) |
| economic life of the improvements. No functional or economic | Depreciated Cost of Improvements | | | =$ | 603,132 |
| obsolescence was observed. | "As-is" Value of Site Improvements | | | =$ | 2,000 |
| Estimated Remaining Economic Life (HUD and VA only)  59 Years | INDICATED VALUE BY COST APPROACH | | | =$ | 657,132 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $  NA  X  Gross Rent Multiplier  NA  = $ | | | Indicated Value by Income Approach | |
|---|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☒ No    Unit type(s)  ☒ Detached  ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

| Legal Name of Project | | | |
|---|---|---|---|
| Total number of phases | Total number of units | Total number of units sold | |
| Total number of units rented | Total number of units for sale | Data source(s) | |
| Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion. | | | |
| Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source | | | |
| Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No. If No, describe the status of completion. | | | |

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No. If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Freddie Mac Form 70 March 2005                    Page 5 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**E**

File No. 070149JG Page #5

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1 800 ALAMODE

F

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353580)     13:52 01/16/08GMT-05 Pg 08-18

File No 070149JG Page #6

### Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**G**

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)　　　　13:52 01/16/08GMT-05 Pg 09-18

Elk No. 070149JG Page #7

## Uniform Residential Appraisal Report

Summary Appraisal
File # 070149JG

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Jerry Gill | |
| Signature | Signature |
| Name　Jerry Gill | Name |
| Company Name　Mark IV Appraisals, Inc | Company Name |
| Company Address　4216 N Portland, Ste 103, | Company Address |
| Oklahoma City, OK 73112 | |
| Telephone Number　405-604-0725 | Telephone Number |
| Email Address　markivappraisals@coxinet.net | Email Address |
| Date of Signature and Report　January 31, 2007 | Date of Signature |
| Effective Date of Appraisal　January 30, 2007 | State Certification # |
| State Certification #　10308CRA | or State License # |
| or State License # | State |
| or Other (describe)　　　　　State # | Expiration Date of Certification or License |
| State　Oklahoma | |
| Expiration Date of Certification or License　12/31/2009 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED
1009 W B Meyer Pkwy
Edmond, OK 73003-2970
APPRAISED VALUE OF SUBJECT PROPERTY $　598,000
LENDER/CLIENT
Name　Sidney Scholl
Company Name　TBD
Company Address　PMB 311,19229 Sonoma Highway, Sonoma, CA
CA 95476-5413
Email Address　sidney_scholl@coxinet.net

SUBJECT PROPERTY

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
　　Date of Inspection
☐ Did inspect interior and exterior of subject property
　　Date of Inspection

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
　　Date of Inspection

Freddie Mac Form 70 March 2005　　　　Page 6 of 6　　　　Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**H**

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)    13:52 01/16/08GMT-05 Pg 10-18

File No. 070149JG  Page #8

## Uniform Residential Appraisal Report
Summary Appraisal
File # 070149JG

| FEATURE | SUBJECT | COMPARABLE SALE #4 | +(-) $ Adjustment | COMPARABLE SALE #5 | +(-) $ Adjustment | COMPARABLE SALE #6 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 1009 W B Meyer Pkwy Edmond, OK 73003-2970 | 5701 Oak Tree Road Edmond, OK 73003 | | 1809 Oak Forest Drive Edmond, OK 73003 | | 3500 Redmont Trace Edmond, OK 73003 | |
| Proximity to Subject | | 0.89 miles NW | | 1.14 miles NW | | 1.91 miles SE | |
| Sale Price | $ | $ 625,000 | | $ 575,000 | | $ 597,500 | |
| Sale Price/Gross Liv Area | sq ft | 136.52 sq ft | | 138.39 sq ft | | 140.29 sq ft | |
| Data Source(s) | | MLS & Okla Cnty Ct hse | | MLS & Okla Cnty Ct hse | | MLS & Okla Cnty Ct hse | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Cash None Noted | | Conventional None Noted | | Conventional None Noted | |
| Date of Sale/Time | | 5/22/2006 | | 5/31/2006 | | 9/27/2006 | |
| Location | NW Edmond | Golf Course Lot | -5,000 | Golf Course Lot | -5,000 | Same | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 18,942 Sq Ft | 16,900 | | 20,250 | | 27,330 | -1,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | 2 Sty Brk Ven | 2 Sty Brk Ven | | 2 Sty Brk Ven | | 2 Sty Brk Ven | |
| Quality of Construction | Excellent | Excellent | | Excellent | | Excellent | |
| Actual Age | 1 | 14 | | 9 | | 1 | |
| Condition | Good/New | Good | | Good | | Good/New | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 10 4 3 1 | 10 4 3 1 | | 9 4 4 | -500 | 11 4 4 | -500 |
| Gross Living Area | 4,203 sq ft | 4,578 sq ft | -16,875 | 4,155 sq ft | +2,160 | 4,258 sq ft | -2,520 |
| Basement & Finished Rooms Below Grade | None None | None None | | None None | | None None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent Cent | Cent Cent | | Cent Cent | | Cent Cent | |
| Energy Efficient Items | Vinyl Windows | Vinyl Windows | | Vinyl Windows | | Vinyl Windows | |
| Garage/Carport | 3 Car Att Gar | 3 Car Att Gar | | 3 Car Att Gar | | 3 Car Att Gar | |
| Porch/Patio/Deck | Cov Pch/CovPat | Cov Pch/CovPat | | Cov Pch/CovPat | | Cov Pch/CovPat | |
| Kitchen Equipment | R/O DW MW | R/O DW MW | | R/O DW MW | | R/O DW MW | |
| Other | None | Inground Pool | -7,500 | None | | None | |
| Net Adjustment (Total) | | + ☒ | -29,375 | ☐ + ☒ | -3,340 | + ☒ | -4,020 |
| Adjusted Sale Price of Comparables | | Net Adj.    % Gross Adj.    % | 595,625 | Net Adj.    % Gross Adj.    % | 571,660 | Net Adj.    % Gross Adj.    % | 593,480 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 1/4/2005 | No other deed filings | No other deed filings | No other deed filings |
| Price of Prior Sale/Transfer | $52,000 | Within past 12 Months | Within past 12 Months | Within past 12 Months |
| Data Source(s) | Okla Cnty Ct Hse | Okla Cnty Ct hse | Okla Cnty Ct hse | Okla Cnty Ct Hse |
| Effective Date of Data Source(s) | 1/30/2007 | 1/30/2007 | 1/30/2007 | 1/30/2007 |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

Freddie Mac Form 70 March 2005

Fannie Mae Form 1004 March 2005

Form 1004 (AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

I

## Subject Photo Page

| Borrower/Client | TBD | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003-2970 |
| Lender | Sidney School | | | | | |



### Subject Front

1009 W B Meyer Pkwy
Sales Price
Gross Living Area    4,203
Total Rooms    10
Total Bedrooms    4
Total Bathrooms    3.1
Location    NW Edmond
View    Residential
Site    18,942 Sq.Ft.
Quality    Excellent
Age    1



### Subject Rear



### Subject Street

J

Case 3:08-cv-03977-JCS   Document 1-8   Filed 08/20/2008   Page 11 of 17
Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)   13:52 01/16/08GMT-05 Pg 12-18

File No. 070149JG| Page #10

## Subject Interior Photo Page

| Borrower/Client | TBD | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003-2970 |
| Lender | Sidney Scholl | | | | |



**Subject Living Room**

| | |
|---|---|
| 1009 W B Meyer Pkwy | |
| Sales Price | |
| Gross Living Area | 4,203 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | NW Edmond |
| View | Residential |
| Site | 18,942 Sq.Ft |
| Quality | Excellent |
| Age | 1 |



**Dining Room**



**Subject Kitchen**

### Subject Interior Photo Page

| Borrower/Client | TBD | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | |
| City | Edmond | County Oklahoma | | State OK | Zip Code 73003-2970 |
| Lender | Sidney Scholl | | | | |



**View of Entry from upstairs**

1009 W B Meyer Pkwy
Sales Price
Gross Living Area    4,203
Total Rooms    10
Total Bedrooms    4
Total Bathrooms    3.1
Location    NW Edmond
View    Residential
Site    18,942 Sq.Ft.
Quality    Excellent
Age    1



**Master Bath**



**Upstairs sitting area**

Form PICPIX.SI — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**L**

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)    13:52 01/16/08GMT-05 Pg 14-18

File No. 070145JCS Page #12

## Comparable Photo Page

| Borrower/Client | TBD | | | | |
|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003-2970 |
| Lender | Sidney School | | | | |



### Comparable 1

3713 Creek Bend Road

| | |
|---|---|
| Prox. to Subject | 0.66 miles SW |
| Sale Price | 597,482 |
| Gross Living Area | 3,889 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | Same |
| View | Residential |
| Site | 28,800 |
| Quality | Excellent |
| Age | 0 |



### Comparable 2

3720 Creek Bend Road

| | |
|---|---|
| Prox. to Subject | 0.66 miles SW |
| Sale Price | 606,334 |
| Gross Living Area | 4,419 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | Same |
| View | Residential |
| Site | 19,090 |
| Quality | Excellent |
| Age | 0 |



### Comparable 3

3801 Creek Bend Road

| | |
|---|---|
| Prox. to Subject | 0.6 miles SW |
| Sale Price | 625,000 |
| Gross Living Area | 4,350 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | Same |
| View | Residential |
| Site | 33,350 |
| Quality | Excellent |
| Age | 0 |

M

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)    13:52 01/16/08GMT-05 Pg 15-18

File No. 070145GJ Page #13

## Comparable Photo Page

| Borrower/Client | TBD | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | |
| City | Edmond | | County Oklahoma | | State OK | Zip Code 73003-2970 |
| Lender | Sidney School | | | | | |



### Comparable 4

5701 Oak Tree Road
| | |
|---|---|
| Prox. to Subject | 0.89 miles NW |
| Sales Price | 625,000 |
| Gross Living Area | 4,578 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | Golf Course Lot |
| View | Residential |
| Site | 16,800 |
| Quality | Excellent |
| Age | 14 |



### Comparable 5

1809 Oak Forest Drive
| | |
|---|---|
| Prox. to Subject | 1.14 miles NW |
| Sales Price | 575,000 |
| Gross Living Area | 4,155 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Golf Course Lot |
| View | Residential |
| Site | 20,250 |
| Quality | Excellent |
| Age | 9 |



### Comparable 6

3500 Redmond Trace
| | |
|---|---|
| Prox. to Subject | 1.91 miles SE |
| Sales Price | 597,500 |
| Gross Living Area | 4,269 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Same |
| View | Residential |
| Site | 27,330 |
| Quality | Excellent |
| Age | 1 |

N

**Building Sketch (Page - 1)**

| Borrower/Client | TBD | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003-2970 |
| Lender | Sidney Scholl | | | | | |



Comments

| | AREA CALCULATIONS SUMMARY | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2451.6 | 2451.6 |
| GLA2 | Second Floor | 1751.0 | 1751.0 |
| GAR | Garage | 260.3 | |
| | Garage | 734.1 | 994.5 |
| | | | |
| | Net LIVABLE Area | (Rounded) | 4203 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 14.0 x 36.7 | 513.8 |
| 30.2 x 45.3 | 1366.6 |
| 5.0 x 23.7 | 118.5 |
| 8.2 x 52.6 | 435.9 |
| 0.8 x 13.8 | 11.0 |
| 1.0 x 7.8 | 7.8 |
| 0.5 x 3.0 x 1.0 | 1.5 |
| 0.5 x 3.0 x 1.0 | 1.5 |
| Second Floor | |
| 4.0 x 8.0 | 32.0 |
| 12.0 x 15.0 | 180.0 |
| 9.0 x 27.0 | 243.0 |
| 12.0 x 19.5 | 234.0 |
| 6.0 x 19.0 | 114.0 |
| 14.0 x 31.0 | 434.0 |
| 6.5 x 13.0 | 84.5 |
| 4.0 x 15.0 | 60.0 |
| 4.7 x 8.5 | 40.0 |
| 6.5 x 50.7 | 329.6 |
| 18 Items | (Rounded) 4203 |

Fm:Chris Moore, CENTURY 21 Goodyear Green To:Sidney Scholl (17079353560)    13:52 01/16/08GMT-05 Pg 17-18

File No. 070149JIG  Page #15

**Location Map**

| Borrower/Client | TBD | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code | 73003-2970 |
| Lender | Sidney Scholl | | | | | | |



Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

P

File No. 07014506 Page #16

**Flood Map**

| Borrower/Client | TBD | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1009 W B Meyer Pkwy | | | | | | |
| City | Edmond | | County | Oklahoma | State | OK | Zip Code | 73003-2970 |
| Lender | Sidney School | | | | | | |



Form MAP.FLOOD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Q

# UNIFORM RESIDENTIAL APPRAISAL REVIEW FORM · File No. c710102

Lending Institution Rose Simmons % John Gile Company
Lender's Address 320 N. Broadway, Edmond, Ok 73034
Name of Borrower Sidney Scholl
Property Address 1009 W. B. Meyer Parkway, Edmond, Ok 73003
Loan Number
Appraised Value $ 567,000
Lender's Appraiser Jerry Gill                                    Date Sept. 20, 2005
Appraiser's Address 4216 N. Portund, Suite 103, Okla. City, Ok 73112    Phone
Review Appraiser Lary Wadley                                     Phone 405-749-7158
Reviewer's Address P. O. Box 436, Edmond, Ok 73083

## FORMAT AND PRESENTATION | LENDER SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 1. | Is the Appraisal format in conformance with company appraisal requirements? | ☒ | ☐ | ☐ | 2. | Is the lender section of the report complete and accurate? | ☒ | ☐ | ☐ |

## NEIGHBORHOOD SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 3. | Does the neighborhood section provide the reviewer an adequate understanding with respect to locational factors, growth rate, and economic trends, property values, housing supply, marketing time, land use, price ranges, convenience to employment and amenities, adequacy of utilities and recreational facilities, property compatibility, appearance of properties, detrimental conditions and marketability? | ☐ | ☒ | ☐ | 5. | Are comments in the neighborhood section relevant and do they give insight into those conditions which positively and negatively affect the appraised properties value and marketability? | ☐ | ☒ | ☐ |
| | | | | | 6. | Have all fair and poor ratings in the neighborhood section been explained? | ☐ | ☐ | ☒ |
| | | | | | 7. | If marketing time is over six months, has the appraiser commented on the reason for slow market conditions in the subject area? | ☐ | ☐ | ☒ |
| 4. | Does the appraisal report enable the reviewer to spot healthy growth patterns or trends that may indicate a deteriorating neighborhood with limited market appeal? | ☐ | ☒ | ☐ | 8. | If the market is slow, has the appraiser indicated whether or not this has resulted in a decline in values? | ☐ | ☐ | ☒ |
| | | | | | 9. | Is the neighborhood section of the report complete and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments

There are minimal comments on the neighborhood and market area of the subject. It has little information about the subject's subdivision.

## SITE SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 10. | Has the appraiser commented on unfavorable site factors? | ☐ | ☐ | ☒ | 13. | Does the appraiser indicate the subject's zoning and whether or not the subject conforms with present zoning requirements? | ☒ | ☐ | ☐ |
| 11. | Does the appraiser indicate whether or not the subject property meets all the criteria for a desirable lot in the area? | ☐ | ☒ | ☐ | 14. | Has the appraiser accurately indicated the dimensions and size of the subject lot? | ☒ | ☐ | ☐ |
| 12. | Has the appraiser addressed and commented on problems relating to poor drainage, flood conditions, adverse easements, encroachments or other detrimental factors? | ☐ | ☐ | ☒ | 15. | Does the appraiser report reveal whether or not site improvements and services to the site are adequate and acceptable in the market place? | ☒ | ☐ | ☐ |
| | | | | | 16. | Is the site section of the appraisal report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments

Adequate comments on site.

## IMPROVEMENTS SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 17. | If the subject property is a condominium, are the project improvements and project units sections complete and accurate? | ☐ | ☐ | ☒ | | amenities, limit the value and market appeal of the subject? | ☐ | ☐ | ☒ |
| 18. | Did the appraiser comment on physical and functional inadequacies and indicate whether or not repairs and modernization are needed? | ☐ | ☐ | ☒ | 25. | If there is evidence of dampness, termites or settlement, did the appraiser comment on these factors? | ☐ | ☐ | ☒ |
| 19. | Has the appraiser explained fair and poor improvement ratings? | ☐ | ☐ | ☒ | 26. | Has the appraiser provided the reviewer with a clear and accurate understanding of the physical and functional attributes of the subject property? | ☒ | ☐ | ☐ |
| 20. | Does the appraiser indicate whether or not factors receiving poor or fair ratings, adversely affect property's marketability? | ☐ | ☐ | ☒ | 27. | Is the property rating section accurate as well as consistent with other data contained in the report? | ☒ | ☐ | ☐ |
| 21. | Have factor's relating to age, condition, quality or construction, finish and equipment, as well as use and utility been properly handled? | ☒ | ☐ | ☐ | 28. | Has the appraiser presented information on construction features in a manner that gives an accurate and adequate view of the subject property? | ☐ | ☒ | ☐ |
| 22. | Has the appraiser given serious attention to structural problems? | ☐ | ☐ | ☒ | 29. | Has information relating to the improvement been well handled? | ☐ | ☒ | ☐ |
| 23. | Did the appraiser comment on unusual layouts, peculiar floor plans, inadequate equipment and amenities? | ☐ | ☐ | ☒ | 30. | In the reviewer's opinion, is the descriptive section of the appraisal report (page one) acceptable? | ☒ | ☐ | ☐ |
| 24. | Has the appraiser indicated whether or not factors relating to unusual layouts, peculiar floor plans, inadequate equipment and | ☐ | ☐ | ☒ | 31. | Has the appraiser required all needed repairs? | ☐ | ☐ | ☒ |
| | | | | | 32. | Is the improvement section of the report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments

The improvement section is complete but there is minimal information for the reader to determine the quality and amenities of the property.

## COST SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 33. | Are the appraiser's measurements for gross living area correct? | ☒ | ☐ | ☐ | | depreciation appear reasonable in light of subject's age, condition, state of modernization, size utility and location? | ☒ | ☐ | ☐ |
| 34. | Has the appraiser commented on functional and economic obsolescence? | ☐ | ☐ | ☒ | 37. | Is the estimate of land value appropriate? | ☒ | ☐ | ☐ |
| 35. | In estimating reproduction costs, has the appraiser used cost figures that are appropriate for the local market? | ☒ | ☐ | ☐ | 38. | Are the appraiser's mathematical calculations accurate? | ☒ | ☐ | ☐ |
| 36. | Do figures for physical, functional and economic | | | | 39. | Is the budget analysis section accurate and complete (if condo)? | ☐ | ☐ | ☒ |
| | | | | | 40. | Is the cost section complete and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments

The cost for this addition appears to be quite high. This may be an overimproved home for the addition.

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North Nokomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent, however, the National Association of Review Appraisers and Mortgage Underwriters must be acknowledged and credited. Manufacturing and software 604 334 4334 www.adrwm.org

Wadley Appraisal Company

**A**

- File No. C710102

## FEDERAL REGULATORY REQUIREMENTS

*Federal Regulatory Agencies have required that the following information be included in an Appraisal Report:*

a) Uniform Standards of Professional Appraisal Practice have been followed and complied with.
b) The Market Value conclusion is the most probable price the property should bring.
c) The format or forms used allow the reader to understand all conclusions and analysis procedures and all supporting documentation used to arrive at the value conclusion.
d) Prior Sales are with 1 year on 1-4 family residential, within 3 years on all other properties.
e) Analysis on current revenues, expenses, and vacancies for continuing income-producing properties.

f) Marketing time is reasonably estimated, cash flow discounted for marketing time over 12 months.
g) Current market trends affecting value are analyzed.
h) Analysis of appropriate deductions and discounts for proposed construction, partially leased or leased other than market rent, or tract developments with unsold units.
i) No direction was given to influence the appraiser.
j) A legal description is included.
k) Any items not real property that impact the market value are identified and valued.
l) A reasonable valuation method explains approaches to market values used and not used.

## MARKET ANALYSIS SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 41. | Has the appraiser selected his or her comparables from the subject neighborhood? | ☐ | ☒ | ☐ | 54. | Are the appraiser's mathematics calculations accurate? | ☒ | ☐ | ☐ |
| 42. | If not, has the appraiser explained why comparables were selected from a different neighborhood? | ☐ | ☒ | ☐ | 55. | Does the appraiser's final value conclusion relate the comparables? | ☒ | ☐ | ☐ |
| 43. | In your opinion is the comparable really similar with respect to location, site, design and style, quality and amenities, as well as size and utility? If no, Comp # all needs to be replaced. | ☐ | ☒ | ☐ | 56. | Has the appraiser selected good market data and handled it well? | ☐ | ☒ | ☐ |
| | | | | | 57. | Has the appraiser commented on the subject's marketability? | ☐ | ☒ | ☐ |
| 44. | Are all of the comparables recent sales of similar properties from the subject neighborhood? | ☐ | ☒ | ☐ | 58. | Does the appraiser's marketability information appear to be accurate? | ☐ | ☒ | ☐ |
| 45. | If the comparables are over three months old, has the appraiser explained why he or she failed to use recent sales? | ☐ | ☐ | ☒ | 59. | Has the appraiser avoided the appearance of backing into any or all of the approaches to value? | ☐ | ☐ | ☐ |
| 46. | Are room counts and square foot areas of the subject and comparables similar? | ☒ | ☐ | ☐ | 60. | Is there clarity with respect to the appraiser's reasoning? | ☒ | ☐ | ☐ |
| 47. | Do the sale prices of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 61. | Can you read the appraisal report, step by step, and arrive at the same conclusion of value as the appraiser? | ☐ | ☒ | ☐ |
| 48. | Do the prices per square foot of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 62. | Does the appraiser appear to be an individual offering an independent and impartial third party opinion of value rather than an advocate? | ☐ | ☒ | ☐ |
| 49. | Has the appraiser bracketed his or her sales data (before making adjustment)? | ☐ | ☒ | ☐ | 63. | Are all required photographs attached and do they adequately show the subject and surrounding properties? | ☒ | ☐ | ☐ |
| 50. | Do time adjustments, for date of sale, appear reasonable in light of market trends and current market conditions? | ☒ | ☐ | ☐ | 64. | Is any other needed illustrative material attached and properly complete? | ☐ | ☒ | ☐ |
| 51. | Has the appraiser avoided numerous adjustments? | ☐ | ☐ | ☒ | 65. | If the appraiser is using computer generated data, are the facts and comments in the report accurate and applicable to the subject and comparable opinion? | ☐ | ☒ | ☐ |
| 52. | Has the appraiser adjusted all comparables in a reasonable and consistent manner? | ☒ | ☐ | ☐ | 66. | Does it appear that the appraiser has clearly thought through this process rather than using a computer as a substitute? | ☐ | ☐ | ☒ |
| 53. | Are total gross adjustments exceeding 25% of the comparable sales price and individual line adjustments exceeding 10% of the comparable sales price adequately explained and justified? | ☒ | ☐ | ☐ | 67. | Is the market analysis section complete and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments

The comparables are from a subdivision that is much more expensive than the subject's addition.    See the addendum on comparables.

## INCOME APPROACH SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 68. | Has the income approach been completed? | ☐ | ☐ | ☒ | 70. | Is supporting data valid and correctly analyzed? | ☐ | ☐ | ☒ |
| 69. | Has supporting data been submitted? | ☐ | ☐ | ☒ | | | | | |

Reviewer's Comments

The income approach is not relevant.

## RECONCILIATION SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 71. | In your opinion, has the appraiser proven his or her case? | ☐ | ☒ | ☐ | 75. | Is the final estimate value weighted by the most appropriate approach to value? | ☒ | ☐ | ☐ |
| 72. | Do you concur with the value conclusion of the appraiser, based upon data contained within the report? | ☐ | ☒ | ☐ | 76. | Is the appraiser's value conclusion reasonable? | ☐ | ☒ | ☐ |
| | | | | | 77. | Has the appraiser signed the report and typed his or her name under the signature? | ☒ | ☐ | ☐ |
| 73. | Are the appraiser's comments and final reconciliation of value adequate and does the appraisal give insight into the value and marketability of the subject property? | ☐ | ☒ | ☐ | 78. | Is there a phone number on the report and/or cover letter which would enable the reviewer to contact the appraiser and clarify a questionable appraisal report? | ☐ | ☒ | ☐ |
| 74. | Is it clear which approach value was given the most weight in the final estimate of value? | ☐ | ☒ | ☐ | | | | | |

Reviewer's Comments

The valuation is based on comparables from an subdivision that should not have been used for comparables.

## REVIEWER'S SUMMARY

Appraisal report was: ☐ Good  ☒ Fair  ☐ Poor

Recommendation: ☐ Accept as is  ☐ Accept when revised - See item # _____
☒ Have another appraisal prepared by someone else  ☐ Other

Comments  Another valuation is recommended since the comparables were from a noncomparable subdivision.

Field Review was made  ☐ Yes  ☒ No    Sales Price $594590    Appraiser's Value $ 397000

Reviewer's Signature _____  Lary Wadley    Title _____    Date of Review 10/04/2007

Reviewer's Signature *Lary Wadley*    Title _____    Date of Review 10/04/2007

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North Nokomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent, however, the "National Association of Review Appraisers and Mortgage Underwriters" must be acknowledged and credited.

Wadley Appraisal Company

**B**

COMPARABLE PROPERTIES:

The comparables were from a more expensive addition than the subject's addition. There were plenty of sales in the Oak Tree Park addition to use for comparable sales. The estimated value range for the subject from comparables from the Oak Tree Park addition as of the date of the appraisal would most likely be $425,000 to $445,000. The comparables used from another subdivision have overestimated the subject's value.

**C**

File Number

## Review Analysis
## Purpose, Scope & Limiting Conditions

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale so of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

### PURPOSE OF THE REVIEW ANALYSIS

The purpose of review analysis is to:

[X] Render an opinion as to the adequacy and appropriateness of an original appraisal made by another appraiser based upon standards set forth by USPAP, FNMA, FHLMC, and Valuation Information Technology, Inc.

[ ] Prevent and detect deficiencies that would materially increase risk to Valuation Information Technology, Inc.

[ ] Provide a basis for positive feedback to the original appraiser in order to eliminate deficiencies and increase the quality of appraisal reports completed for Valuation Information Technology, Inc.

### SCOPE OF REVIEW ANALYSIS

The scope of the review includes:

[X] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, verification of neighborhood, site and improvement data, verification of the factual data of the comparables, verification of all math calculations, an overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, all data is assumed to be correct and factual, verification of all math calculations, and overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of the subject property and all comparables was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of only the subject property was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

**D**

File Number

### Review Analysis
### Purpose, Scope & Limiting Conditions

### CERTIFICATION OF LIMITING CONDITIONS

I certify that, to the best of my knowlege and belief:

a) The facts and data reported by the review appraiser and used in the review process are true and correct.

b) The analysis, opinions, and conclusions in this report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal unbiased professional analysis, opinions and conclusions.

c) I have no (or the specified) present or prospective interest in the property that is the subject of this report, and I have no (or the specified) personal interest or bias with respect to the parties involved.

d) My compensation is not contingent on an action or event resulting from the analysis, opinion or conclusions in, or the use of, this review report.

e) My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

f) I did not (did) personally inspect the subject property of the report under review.

g) No one provided significant professional assistance to the person signing this report. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

**COMMENT:** Departure from binding requirements (a) through (e) is not permitted.

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the Reviewer is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

| REVIEWER | | Date of Review: | 10/04/2007 | |
|---|---|---|---|---|
| Signature: | _Lary Wadley_ | Approved Appraiser #: | | |
| Name: | Lary Wadley | State Certification #: | 10257CRA | State: Ok |
| Title: | | Or State License #: | | State: |

**E**

File No. 0710102

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well-informed or well advised, and each acting in what they consider their own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**SCOPE OF REVIEW:** The scope of this review is limited to the information being provided by the original appraiser; form an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data; form an opinion as to the appropriateness of the appraisal methods and techniques used and develop the reasons for any disagreement; form an opinion as to whether the analyses, opinions, and conclusions in the report under review are appropriate and reasonable, and develop the reasons for any disagreement.

## CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS

**CERTIFICATION:** The Reviewer certifies and agrees that, to the best of his/her knowledge and belief:

1. The facts and data reported by the Reviewer and used in the review process are true and correct.

2. The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. Unless stated elsewhere, I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this review report.

5. My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

6. Unless stated elsewhere in this report, I did not personally inspect the subject property, either interior or exterior, of the report under review.

7. No one provided significant professional assistance to the person signing this review report.

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made this review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

REVIEWER
Signature _Larry Wadley_
Name   Larry Wadley
Date Report Signed 10/04/2007
State Certification # 10257CRA       State Ok
Or State License #                         State

REVIEWER
Signature _Larry Wadley_
Name
Date Report Signed 10/04/2007
State Certification #                      State
Or State License #                        State

*Provided only for addenda with 2-page less rows conform 2-95*
Wadley Appraisal Company

**F**

Borrower: Sidney Scholl
Property Address: 1009 W. B. Meyer Parkway
City: Edmond
Lender: Rose Simmons % John Gile Company

File No.: c710102
Case No.:
State: Ok    Zip: 73003

*State of Oklahoma*

Kim Holland, Insurance Commissioner

## Oklahoma Real Estate Appraiser Board

*This is to certify that:*

# Lary N. Wadley

*has complied with the provisions of the Oklahoma Real Estate Appraisers Act to transact business as a Certified Residential Real Estate Appraiser in the State of Oklahoma.*

*In Witness Whereof, I have hereunto set my hand and caused the seal of my office to be affixed at the City of Oklahoma City, State of Oklahoma, this 5th day of November A.D. 2006.*

Kim Holland, Insurance Commissioner
Chairperson, Oklahoma Real Estate Appraiser Board

Members, Oklahoma Real Estate Appraiser Board

Expires: 12/31/2009

Oklahoma Appraiser Number: *10257CRA*

**G**

## UNIFORM RESIDENTIAL APPRAISAL REVIEW FORM

File No. c710101

Lending Institution Rose Simmons % John Gile Company
Lender's Address 320 N. Broadway, Edmond, Ok 73034
Name of Borrower Sidney Scholl
Property Address 16424 Ernest court, Edmond, Ok 73003
Loan Number _____
Appraised Value $ 495,000
Lender's Appraiser Jerry Gill                                    Date Sept. 20, 2005
Appraiser's Address 4216 N. Porland, Suite 103, Okla. City, Ok 73112    Phone _____
Review Appraiser Lury Wadley
Reviewer's Address  P. O. Box 438, Edmond, Ok 73083               Phone 405-749-7158

### FORMAT AND PRESENTATION / LENDER SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 1. | Is the Appraisal format in conformance with company appraisal requirements? | ☒ | ☐ | ☐ | 2. | Is the lender section of the report complete and accurate? | ☒ | ☐ | ☐ |

### NEIGHBORHOOD SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 3. | Does the neighborhood section provide the reviewer an adequate understanding with respect to locational factors, growth rate, and economic trends, property values, housing supply, marketing time, land use, price ranges, convenience to employment and amenities, adequacy of utilities and recreational facilities, property compatibility, appearance or properties, detrimental conditions and marketability? | | | | 5. | Are comments in the neighborhood section relevant and do they give insight into those conditions which positively and negatively affect the appraised properties value and marketability? | ☐ | ☒ | ☐ |
| | | | | | 6. | Have all fair and poor ratings in the neighborhood section been explained? | ☐ | ☐ | ☒ |
| | | | | | 7. | If marketing time is over six months, has the appraiser commented on the reason for slow market conditions in the subject area? | ☐ | ☐ | ☒ |
| 4. | Does the appraisal report enable the reviewer to spot healthy growth patterns or trends that may indicate a deteriorating neighborhood with limited market appeal? | ☐ | ☒ | ☐ | 8. | If the market is slow, has the appraiser indicated whether or not this has resulted in a decline in values? | ☐ | ☐ | ☒ |
| | | ☐ | ☒ | ☐ | 9. | Is the neighborhood section of the report completed and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments
There are minimal comments on the neighborhood and market area of the subject. It has little information about the subject's subdivision.

### SITE SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 10. | Has the appraiser commented on unfavorable site factors? | ☐ | ☐ | ☒ | 13. | Does the appraiser indicate the subject's zoning and whether or not the subject conforms with present zoning requirements? | ☒ | ☐ | ☐ |
| 11. | Does the appraiser indicate whether or not the subject property meets all the criteria for a desirable site in the area? | ☐ | ☒ | ☐ | 14. | Has the appraiser accurately indicated the dimensions and size of the subject lot? | ☒ | ☐ | ☐ |
| 12. | Has the appraiser addressed and commented on problems relating to poor drainage, flood conditions, adverse easements, encroachments or other detrimental factors? | ☐ | ☐ | ☒ | 15. | Does the appraiser report reveal whether or not site improvements and services to the site are adequate and acceptable in the market place? | ☒ | ☐ | ☐ |
| | | | | | 16. | Is the site section of the appraisal report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments

### IMPROVEMENTS SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 17. | If the subject property is a condominium, are the project improvements and project rating sections complete and accurate? | ☐ | ☐ | ☒ | | amenities, and the value and market appeal of the subject? | | | |
| 18. | Did the appraiser comment on physical and functional inadequacies and indicate whether or not repairs and modernization are needed? | ☐ | ☐ | ☒ | 25. | If there is evidence of dampness, termites or settlement, did the appraiser comment on these factors? | ☐ | ☐ | ☒ |
| 19. | Has the appraiser explained fair and poor improvement ratings? | ☐ | ☐ | ☒ | 26. | Has the appraiser provided the reviewer with a clear or accurate understanding of the physical and functional attributes of the subject property? | ☒ | ☐ | ☐ |
| 20. | Does the appraiser indicate whether or not factors receiving poor or fair ratings, adversely affect property's marketability? | ☐ | ☐ | ☒ | 27. | Is the property rating section accurate as well as consistent with other data contained in the report? | ☒ | ☐ | ☐ |
| 21. | Have factor's relating to age, condition, quality or construction, finish and equipment, as well as size and utility been properly handled? | ☐ | ☐ | ☒ | 28. | Has the appraiser presented information on construction features in a manner that gives an accurate and adequate view of the subject property? | ☐ | ☒ | ☐ |
| 22. | Has the appraiser given serious attention to structural problems? | ☒ | ☐ | ☐ | 29. | Has information relating to the improvement been well handled? | ☐ | ☒ | ☐ |
| 23. | Did the appraiser comment on unusual layouts, peculiar floor plans, inadequate equipment and amenities? | ☐ | ☐ | ☒ | 30. | In the reviewer's opinion, is the descriptive section of the appraisal report (page one) acceptable? | ☒ | ☐ | ☐ |
| 24. | Has the appraiser indicated whether or not factors relating to unusual layouts, peculiar floor plans, inadequate equipment and | ☐ | ☐ | ☒ | 31. | Has the appraiser required all needed repairs? | ☐ | ☐ | ☒ |
| | | | | | 32. | Is the improvement section of the report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments
The improvement section is complete but there is minimal information for the reader to determine the quality and amenities of the property.

### COST SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 33. | Are the appraiser's measurements for gross living area correct? | ☒ | ☐ | ☐ | | depreciation appear reasonable in light of subject's age, condition, state of modernization, size utility and location? | ☒ | ☐ | ☐ |
| 34. | Has the appraiser commented on functional and economic obsolescence? | ☐ | ☐ | ☒ | 37. | Is the estimate of land value appropriate? | ☒ | ☐ | ☐ |
| 35. | In estimating reproduction costs, has the appraiser used cost figures that are appropriate for the local market? | ☐ | ☐ | ☒ | 38. | Are the appraiser's mathematical calculations accurate? | ☒ | ☐ | ☐ |
| 36. | Do figures for physical, functional and economic | ☒ | ☐ | ☐ | 39. | Is the budget analysis section accurate and complete (if condo)? | ☐ | ☐ | ☒ |
| | | | | | 40. | Is the cost section complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments
The cost appears to be less than the market. This is unusual except in areas with extreme appreciation which this Okla. City area does not have.  The cost approach does appear to be more accurate in the report than the market analysis.

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North Nokomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent; however, the National Association of Review Appraisers and Mortgage Underwriters' must be acknowledged and credited.
Produced using ACI software, 800.234.8727 www.aciweb.com

Wadley Appraisal Company

PAGE  05        JOHN GILE PC        4059496518    11/02/2007  15:03

A

## FEDERAL REGULATORY REQUIREMENTS

File No. C710101

*Federal Regulatory Agencies have required that the following be included in an Appraisal Report:*

a) Uniform Standards of Professional Appraisal Practice have been followed and complied with.
b) The Market Value conclusion is the most probable price the property should bring.
c) The format or forms used allow the reader to understand all conclusions and analysis procedures and all supporting documentation used to arrive at the value conclusion.
d) Prior Sales are with 1 year on 1-4 family residential, within 3 years on all other properties.
e) Analysis on current revenues, expenses, and vacancies (or continuing income-producing properties.

f) Marketing time is reasonably estimated, cash flow discounted for marketing time over 12 months.
g) Current market trends affecting value are analyzed.
h) Analysis of appropriate deductions and discounts for proposed construction, partially leased other than market rent, or leof developments with unused units.
i) No direction was given to influence the appraiser.
j) A legal description is included.
k) Any items not real property that impact the market value are identified and valued.
l) A reasonable valuation method explains approaches to market values used and not used.

## MARKET ANALYSIS SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 41. | Has the appraiser selected his or her comparables from the subject neighborhood? | ☐ | ☒ | ☐ | 54. Are the appraiser's mathematical calculations accurate? | | ☒ | ☐ | ☐ |
| 42. | If not, has the appraiser explained why comparables were selected from a different neighborhood? | ☐ | ☒ | ☐ | 55. Does the appraiser's final value conclusion relate the comparables? | | ☐ | ☒ | ☐ |
| 43. | In your opinion is the comparable really similar with respect to location, size, design and style, quality and amenities, as well as size and utility? If no, Comp # ___ needs to be replaced. | ☐ | ☒ | ☐ | 56. Has the appraiser selected good market data and handled it well? | | ☒ | ☐ | ☐ |
| | | | | | 57. Has the appraiser commented on the subject's marketability? | | ☐ | ☒ | ☐ |
| 44. | Are all of the comparables recent sales of similar properties from the subject neighborhood? | ☐ | ☒ | ☐ | 58. Does the appraiser's marketability information appear to be accurate? | | ☐ | ☒ | ☐ |
| 45. | If the comparables are over three months old, has the appraiser explained why he or she failed to use recent sales? | ☐ | ☒ | ☐ | 59. Has the appraiser avoided the appearance of backing into any or all of the approaches to value? | | ☐ | ☒ | ☐ |
| 46. | Are room counts and square foot areas of the subject and comparables similar? | ☒ | ☐ | ☐ | 60. Is there clarity with respect to the appraiser's reasoning? | | ☐ | ☐ | ☒ |
| 47. | Do the sale prices of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 61. Can you read the appraisal report, step by step, and arrive at the same conclusion of Value as the appraiser? | | ☒ | ☐ | ☐ |
| 48. | Do the prices per square foot of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 62. Does the appraiser appear to be an individual offering an independent and impartial third party opinion of value rather than an advocate? | | ☐ | ☒ | ☐ |
| 49. | Has the appraiser bracketed his or her sales data (before making adjustments)? | ☐ | ☒ | ☐ | 63. Are all required photographs attached and do they adequately show the subject and surrounding properties? | | ☐ | ☐ | ☒ |
| 50. | Do time adjustments, for date of sale, appear reasonable in light of market trends and current market conditions? | ☒ | ☐ | ☐ | 64. Is any other needed illustrative material attached and properly complete? | | ☒ | ☐ | ☐ |
| 51. | Has the appraiser avoided numerous adjustments? | ☐ | ☒ | ☐ | 65. If the appraiser is using computer generated data, are the facts and comments in the report accurate and applicable to the subject and comparable opinion? | | ☐ | ☒ | ☐ |
| 52. | Has the appraiser adjusted all comparables in a reasonable and consistent manner? | ☒ | ☐ | ☐ | 66. Does it appear that the appraiser has clearly thought through this process rather than using a computer as a substitute? | | ☒ | ☐ | ☐ |
| 53. | Are total gross adjustments exceeding 25% of the comparable sales price and individual line adjustments exceeding 10% of the comparable sales price adequately explained and justified? | ☒ | ☐ | ☐ | 67. Is the market analysis section complete and accurate? | | ☐ | ☒ | ☐ |

Reviewer's Comments

The comparables are from a subdivision that is much more expensive than the subject's addition.  See the addendum on comparables.

## INCOME APPROACH SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 68. | Has the income approach been completed? | ☐ | ☐ | ☒ | 70. Is supporting data valid and correctly analyzed? | | ☐ | ☐ | ☒ |
| 69. | Has supporting data been submitted? | ☐ | ☐ | ☒ | | | | | |

Reviewer's Comments

The income approach is not relevant.

## RECONCILIATION SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 71. | In your opinion, has the appraiser proven his or her case? | ☐ | ☒ | ☐ | 75. Is the final estimate value weighted by the most appropriate approach to value? | | ☒ | ☐ | ☐ |
| 72. | Do you concur with the value conclusion of the appraiser, based upon data contained within the report? | ☐ | ☒ | ☐ | 76. Is the appraiser's value conclusion reasonable? | | ☐ | ☒ | ☐ |
| | | | | | 77. Has the appraiser signed the report and typed his or her name under the signature? | | ☒ | ☐ | ☐ |
| 73. | Are the appraiser's comments and final reconciliation of value adequate and does the appraisal give insight into the value and marketability of the subject property? | ☐ | ☒ | ☐ | 78. Is there a phone number on the report and/or cover letter which would enable the reviewer to contact the appraiser and clarify a questionable appraisal report? | | ☐ | ☒ | ☐ |
| 74. | Is a clear when approach value was given the most weight in the final estimate of value? | ☐ | ☒ | ☐ | | | | | |

Reviewer's Comments

The valuation is based on comparables from an subdivision that should not have been used for comparables.

## REVIEWER'S SUMMARY

Appraisal report was:   ☐ Good   ☒ Fair   ☐ Poor

Recommendation:   ☐ Accept as is
☒ Have another appraisal prepared by someone else
☐ Accept when revised - See item #
☐ Other _____

Comments
Another valuation is recommended since the comparables were from a noncomparable subdivision.

Field Review was made   ☐ Yes   ☒ No      Sales Price $NA      Appraiser's Value $ 495000

Reviewer's Signature _L.Wadley_   Title _____   Date of Review 10/04/2007
Larry Wadley

Reviewer's Signature _Larry Wadley_   Title _____   Date of Review 10/04/2007

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North NoKomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent, however, the National Association of Review Appraisers and Mortgage Underwriters must be acknowledged and credited.

Wadley Appraisal Company

B

COMPARABLE MARKET ANALYSIS

In reference to the market analysis done for this report, the appraiser used sales from Rose Creek to determine the market value of the subject. There were many sales in Recency Pointe and leaving the subject's addition for comparables was not necessary. The subject property is on the upper size range in the subject's addition, but there were plenty of sales within the subject's addition for a good report. The market range of the subject with using comparables in the Recenty Pointe subdivision would be approximately $488,000 to $478,000 on the date of the appraisal. The cost approach die support this range and not the higher market range the appraiser used by going to the Rose Creek addition.

**C**

File Number

## Review Analysis
## Purpose, Scope & Limiting Conditions

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

### PURPOSE OF THE REVIEW ANALYSIS

The purpose of review analysis is to:

[X] Render an opinion as to the adequacy and appropriateness of an original appraisal made by another appraiser based upon standards set forth by USPAP, FNMA, FHLMC, and Valuation Information Technology, Inc.

[ ] Prevent and detect deficiencies that would materially increase risk to Valuation Information Technology, Inc.

[ ] Provide a basis for positive feedback to the original appraiser in order to eliminate deficiencies and increase the quality of appraisal reports completed for Valuation Information Technology, Inc.

### SCOPE OF REVIEW ANALYSIS

The scope of the review includes:

[X] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, verification of neighborhood, site and improvement data, verification of the factual data of the comparables, verification of all math calculations, an overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, all data is assumed to be correct and factual, verification of all math calculations, and overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of the subject property and all comparables was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of only the subject property was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

D

File Number

### Review Analysis
### Purpose, Scope & Limiting Conditions

## CERTIFICATION OF LIMITING CONDITIONS

I certify that, to the best of my knowledge and belief.

a) The facts and data reported by the review appraiser and used in the review process are true and correct.

b) The analysis, opinions, and conclusions in this report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal unbiased professional analysis, opinions and conclusions.

c) I have no (or the specified) present or prospective interest in the property that is the subject of this report, and I have no (or the specified) personal interest or bias with respect to the parties involved.

d) My compensation is not contingent on an action or event resulting from the analysis, opinion or conclusions in, or the use of, this review report.

e) My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

f) I did not (did) personally inspect the subject property of the report under review.

g) No one provided significant professional assistance to the person signing this report. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

**COMMENT:**  Departure from binding requirements (a) through (e) is not permitted.

**CONTINGENT AND LIMITING CONDITIONS:**  The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the Reviewer is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

| REVIEWER | | |
|---|---|---|
| Signature: | _Larry Wadley (signature)_ | Date of Review:  10/04/2007 |
| Name:  Larry Wadley | | Approved Appraiser #: |
| Title: | | State Certification #:  10257CRA    State:  Ok |
| | | Or State License #:                State: |

**E**

Form C710101

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well-informed or well advised, and each acting in what they consider their own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**SCOPE OF REVIEW:** The scope of this review is limited to the information being provided by the original appraiser; form an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data; form an opinion as to the appropriateness of the appraisal methods and techniques used and develop the reasons for any disagreement; form an opinion as to whether the analyses, opinions, and conclusions in the report under review are appropriate and reasonable, and develop the reasons for any disagreement.

## CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS

**CERTIFICATION:** The Reviewer certifies and agrees that, to the best of his/her knowledge and belief:

1. The facts and data reported by the Reviewer and used in the review process are true and correct.

2. The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. Unless stated elsewhere, I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this review report.

5. My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

6. Unless stated elsewhere in this report, I did not personally inspect the subject property, either interior or exterior, of the report under review.

7. No one provided significant professional assistance to the person signing this review report.

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, it successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

| REVIEWER | | | REVIEWER | | |
|---|---|---|---|---|---|
| Signature | _L. Wadley_ | | Signature | _Lary Wadley_ | |
| Name  Lary Wadley | | | Name | | |
| Date Report Signed 10/04/2007 | | | Date Report Signed 10/04/2007 | | |
| State Certification # 10257CRA | | | State Certification # | | |
| Or State License # | | State  Ok | Or State License # | | State |
| | | State | | | State |

Wadley Appraisal Company

**F**



Borrower: Sidney Scholl
Property Address: 16424 Ernest court
City: Edmond
Lender: Rose Simmons % John Gile Company
File No.: c710101
Case No.:
State: Ok
Zip: 73003

### State of Oklahoma

Kim Holland, Insurance Commissioner

## Oklahoma Real Estate Appraiser Board

This is to certify that:

# Lary N. Wadley

has complied with the provisions of the Oklahoma Real Estate Appraisers Act to transact business as a Certified Residential Real Estate Appraiser in the State of Oklahoma.

In Witness Whereof, I have hereunto set my hand and caused the seal of my office to be affixed at the City of Oklahoma City, State of Oklahoma, this 5th day of November A.D. 2006.

Kim Holland, Insurance Commissioner
Chairperson, Oklahoma Real Estate Appraiser Board

Members, Oklahoma Real Estate Appraiser Board

Expires: 12/31/2009

Oklahoma Appraiser Number 10257CRA

**G**

## UNIFORM RESIDENTIAL APPRAISAL REVIEW FORM    File No. c710103

Lending Institution  Rose Simmons % John Gile Company
Lender's Address 320 N. Broadway, Edmond, Ok 73034
Name of Borrower  Sidney Scholl
Property Address  2032 Wimberley Creek Dr., Moore, Ok 73160
Loan Number
Appraised Value $  192,000                                    Date  Sept. 20, 2005
Lender's Appraiser  Charles Bowling                          Phone
Appraiser's Address  4216 N. Portland, Suite 103, Okla. City, Ok  73112
Review Appraiser  Lary Wadley                                Phone 405-749-7158
Reviewer's Address  P. O. Box 438, Edmond, Ok  73083

### FORMAT AND PRESENTATION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 1. | Is the Appraisal format in conformance with company appraisal requirements? | ☒ | ☐ | ☐ | 2. | Is the lender section of the report complete and accurate? | ☒ | ☐ | ☐ |

### NEIGHBORHOOD SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 3. | Does the neighborhood section provide the reviewer an adequate understanding with respect to locational factors, growth rate, and economic trends, property values, housing supply, marketing time, land use, price ranges, convenience to employment and amenities, adequacy of utilities and recreational facilities, property compatibility, appearance of properties, detrimental conditions and marketability? | ☐ | ☒ | ☐ | 5. | Are comments in the neighborhood section relevant and do they give insight into those conditions which positively and negatively affect the appraised properties value and marketability? | ☐ | ☒ | ☐ |
| | | | | | 6. | Have all fair and poor ratings in the neighborhood section been explained? | ☐ | ☐ | ☒ |
| | | | | | 7. | If marketing time is over six months, has the appraiser commented on the reason for slow market conditions in the subject area? | ☐ | ☐ | ☒ |
| 4. | Does the appraisal report enable the reviewer to spot healthy growth patterns or trends that may indicate a deteriorating neighborhood with limited market appeal? | ☐ | ☒ | ☐ | 8. | If the market is slow, has the appraiser indicated whether or not this has resulted in a decline in values? | ☐ | ☐ | ☒ |
| | | | | | 9. | Is the neighborhood section of the report completed and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments
There are minimal comments on the neighborhood and market area of the subject.  It has little information about the subject's subdivision

### SITE SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 10. | Has the appraiser commented on unfavorable site factors? | ☐ | ☐ | ☒ | 13. | Does the appraiser indicate the subject's zoning and whether or not the subject conforms with present zoning requirements? | ☒ | ☐ | ☐ |
| 11. | Does the appraiser indicate whether or not the subject property meets all the criteria for a desirable lot in this area? | ☐ | ☒ | ☐ | 14. | Has the appraiser accurately indicated the dimensions and size of the subject lot? | ☒ | ☐ | ☐ |
| 12. | Has the appraiser addressed and commented on problems relating to poor drainage, flood conditions, adverse easements, encroachments or other detrimental factors? | ☐ | ☐ | ☒ | 15. | Does the appraiser report reveal whether or not site improvements and services to the site are adequate and acceptable in the market place? | ☒ | ☐ | ☐ |
| | | | | | 16. | Is the site section of the appraisal report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments
Adequate comments on site.

### IMPROVEMENTS SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 17. | If the subject property is a condominium, are the project improvements and project rating sections complete and accurate? | ☐ | ☐ | ☒ | | amenities, limit the value and market appeal of the subject? | ☐ | ☐ | ☒ |
| 18. | Did the appraiser comment on physical and functional inadequacies and indicate whether or not repairs and modernization are needed? | ☐ | ☐ | ☒ | 25. | If there is evidence of dampness, termites or settlement, did the appraiser comment on these factors? | ☐ | ☐ | ☒ |
| 19. | Has the appraiser explained fair and poor improvement ratings? | ☐ | ☐ | ☒ | 26. | Has the appraiser provided the reviewer with a clear and accurate understanding of the physical and functional attributes of the subject property? | ☒ | ☐ | ☐ |
| 20. | Does the appraiser indicate whether or not factors receiving poor or fair ratings, adversely affect property's marketability? | ☐ | ☐ | ☒ | 27. | Is the property rating section accurate as well as consistent with other data contained in the report? | ☒ | ☐ | ☐ |
| 21. | Have factor's relating to age, condition, quality of construction, finish and equipment, as well as size and utility been properly handled? | ☒ | ☐ | ☐ | 28. | Has the appraiser presented information on construction features in a manner that gives an accurate and adequate view of the subject property? | ☐ | ☒ | ☐ |
| 22. | Has the appraiser given serious attention to structural problems? | ☐ | ☐ | ☒ | 29. | Has information relating to the improvement been well handled? | ☐ | ☒ | ☐ |
| 23. | Did the appraiser comment on unusual layouts, peculiar floor plans, inadequate equipment and amenities? | ☐ | ☐ | ☒ | 30. | In the reviewer's opinion, is the descriptive section of the appraisal report (page one) acceptable? | ☒ | ☐ | ☐ |
| 24. | Has the appraiser indicated whether or not factors relating to unusual layouts, peculiar floor plans, inadequate equipment and | | | | 31. | Has the appraiser required all needed repairs? | ☐ | ☐ | ☒ |
| | | | | | 32. | Is the improvement section of the report complete and accurate? | ☒ | ☐ | ☐ |

Reviewer's Comments
The improvement section is complete but there is minimal information for the reader to determine the quality and amenities of the property.

### COST SECTION

| | | YES | NO | N/A | | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|---|---|
| 33. | Are the appraiser's measurements for gross living area correct? | ☒ | ☐ | ☐ | | depreciation appear reasonable in light of subject's age, condition, state of modernization, size utility and location? | ☒ | ☐ | ☐ |
| 34. | Has the appraiser commented on functional and economic obsolescence? | ☐ | ☒ | ☐ | 37. | Is the estimate of land value appropriate? | ☐ | ☒ | ☐ |
| 35. | In estimating reproduction costs, has the appraiser used cost figures that are appropriate for the local market? | ☐ | ☒ | ☐ | 38. | Are the appraiser's mathematical calculations accurate? | ☐ | ☒ | ☐ |
| 36. | Do figures for physical, functional and economic | | | | 39. | Is the budget analysis section accurate and complete (if condo)? | ☐ | ☐ | ☒ |
| | | | | | 40. | Is the cost section complete and accurate? | ☐ | ☒ | ☐ |

Reviewer's Comments
No cost section was used and no explanation was given as to why.

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North Nokomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent, however, the National Association of Review Appraisers and Mortgage Underwriters must be acknowledged and credited.
Produced using ACI software, 800 234 8727 www.aciweb.com

Wadley Appraisal Company

A

File No. c710103

## FEDERAL REGULATORY REQUIREMENTS

*Federal Regulatory Agencies have required that the following information be included in an Appraisal Report:*

a) Uniform Standards of Professional Appraisal Practice have been followed and complied with.

b) The MarketValue conclusion is the most probable price the property should bring.

c) The format or forms used allow the reader to understand all conclusions and analysis procedures and all supporting documentation used to arrive at the value conclusion.

d) Prior Sales are with 1 year on 1-4 family residential, within 3 years on all other properties.

e) Analysis on current revenues, expenses, and vacancies for continuing income-producing properties.

f) Marketing time is reasonably estimated, cash flow discounted for marketing time over 12 months.

g) Current market trends affecting value are analyzed.

h) Analysis of appropriate deductions and discounts for proposed construction, partially leased or leased at lower than market rent, or tract developments with unsold units.

i) No direction was given to influence the appraiser.

j) A legal description is included.

k) Any items and real property that impact the market value are identified and valued.

l) A reasonable valuation method explains approaches to market values used and not used.

## MARKET ANALYSIS SECTION

| | YES | NO | N/A | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|
| 41. Has the appraiser selected his or her comparables from the subject neighborhood? | ☐ | ☒ | ☐ | 54. Are the appraiser's mathematical calculations accurate? | ☒ | ☐ | ☐ |
| 42. If not, has the appraiser explained why comparables were selected from a different neighborhood? | ☐ | ☒ | ☐ | 55. Does the appraiser's final value conclusion relate the comparables? | ☒ | ☐ | ☐ |
| 43. In your opinion is the comparable really similar with respect to location, site, design and style, quality and amenities, as well as size and utility? If no, Comp # 2&3 needs to be replaced. | ☐ | ☒ | ☐ | 56. Has the appraiser selected good market data and handled it well? | ☐ | ☒ | ☐ |
| | | | | 57. Has the appraiser commented on the subject's marketability? | ☐ | ☒ | ☐ |
| | | | | 58. Does the appraiser's marketability information appear to be accurate? | ☐ | ☒ | ☐ |
| 44. Are all of the comparables recent sales of similar properties from the subject neighborhood? | ☐ | ☒ | ☐ | 59. Has the appraiser avoided the appearance of backing into any or all of the approaches to value? | ☐ | ☐ | ☒ |
| 45. If the comparables are over three months old, has the appraiser explained why he or she failed to use recent sales? | ☐ | ☐ | ☒ | 60. Is there clarity with respect to the appraiser's reasoning? | ☒ | ☐ | ☐ |
| 46. Are room counts and square foot areas of the subject and comparables similar? | ☒ | ☐ | ☐ | 61. Can you read the appraisal report, step by step, and arrive at the same conclusion of value as the appraiser? | ☐ | ☒ | ☐ |
| 47. Do the sale prices of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 62. Does the appraiser appear to be an individual offering an independent and impartial third party opinion of value rather than an advocate? | ☐ | ☐ | ☐ |
| 48. Do the prices per square foot of the comparables correlate and indicate comparability? | ☐ | ☒ | ☐ | 63. Are all required photographs attached and do they adequately show the subject and surrounding properties? | ☐ | ☐ | ☒ |
| 49. Has the appraiser bracketed his or her sales data (before making adjustment)? | ☐ | ☒ | ☐ | 64. Is any other needed illustrative material attached and properly compiled? | ☒ | ☐ | ☐ |
| 50. Do time adjustments, for date of sale, appear reasonable in light of market trends and current market conditions? | ☐ | ☐ | ☒ | 65. If the appraiser is using computer generated data, are the facts and comments in the report accurate and applicable to the subject and comparable opinion? | ☐ | ☒ | ☐ |
| 51. Has the appraiser avoided numerous adjustments? | ☒ | ☐ | ☐ | 66. Does it appear that the appraiser has clearly thought through this process rather than using a computer as a substitute? | ☐ | ☐ | ☐ |
| 52. Has the appraiser adjusted all comparables in a reasonable and consistent manner? | ☒ | ☐ | ☐ | 67. Is the market analysis section complete and accurate? | ☐ | ☒ | ☐ |
| 53. Are total gross adjustments exceeding 25% of the comparable sales price and individual line adjustments exceeding 10% of the comparable sales price adequately explained and justified? | ☒ | ☐ | ☐ | | | | |

Reviewer's Comments

The comparables, except for one are from another subdivision.  See the addendum on comparables.

## INCOME APPROACH SECTION

| | YES | NO | N/A | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|
| 68. Has the income approach been completed? | ☐ | ☐ | ☒ | 70. Is supporting data valid and correctly analyzed? | ☐ | ☐ | ☒ |
| 69. Has supporting data been submitted? | ☐ | ☐ | ☒ | | | | |

Reviewer's Comments

The income approach is not relevant.

## RECONCILIATION SECTION

| | YES | NO | N/A | | YES | NO | N/A |
|---|---|---|---|---|---|---|---|
| 71. In your opinion, has the appraiser proven his or her case? | ☐ | ☒ | ☐ | 75. Is the final estimate value weighted by the most appropriate approach to value? | ☒ | ☐ | ☐ |
| 72. Do you concur with the value conclusion of the appraiser, based upon data contained within the report? | ☐ | ☒ | ☐ | 76. Is the appraiser's value conclusion reasonable? | ☐ | ☒ | ☐ |
| | | | | 77. Has the appraiser signed the report and typed his or her name under the signature? | ☒ | ☐ | ☐ |
| 73. Are the appraiser's comments and final reconciliation of value adequate and does the appraisal give insight into the value and marketability of the subject property? | ☐ | ☒ | ☐ | 78. Is there a phone number on the report and/or cover letter which would enable the reviewer to contact the appraiser and clarify a questionable appraisal report? | ☐ | ☒ | ☐ |
| 74. Is it clear which approach value was given the most weight in the final estimate of value? | ☐ | ☒ | ☐ | | | | |

Reviewer's Comments

The valuation is based on comparables from another subdivision given more weight than the one from the subject's addition.

## REVIEWER'S SUMMARY

Appraisal report was:   ☐ Good   ☒ Fair   ☐ Poor

Recommendation:   ☐ Accept as is   ☐ Accept when revised - See item #____
☒ Have another appraisal prepared by someone else   ☐ Other ____

Comments

Another valuation is recommended since the comparables were from a noncomparable subdivision.

Field Review was made   ☐ Yes   ☒ No    Sales Price $198345    Appraiser's Value $ 192000

Reviewer's Signature _____   Title _____   Date of Review 10/04/2007
Gary Wadley

Reviewer's Signature *Gary Wadley*   Title _____   Date of Review 10/04/2007

Copyright © 2001 by the National Association of Review Appraisers and Mortgage Underwriters, 1224 North Nokomis NE, Alexandria Minnesota 56308 USA. This form may be reproduced without written consent. Therefore, this National Association of Review Appraisers and Mortgage Underwriters form is licensed to be photocopied by the purchaser. Programmed by AIG software. 888-234-3772 www.aigsoft.com

Wadley Appraisal Company

**B**

| Borrower: Sidney Scholl | | | |
|---|---|---|---|
| Property Address: 2032 Wimberley Creek Dr. | | Case No.: | |
| City: Moore | | State: Ok | Zip: 73160 |
| Lender: Rosa Simmons % John Gile Company | | | |

File No.: c710103

COMPARABLE MARKET DATA:

One sale from the subject's addition was used in the report and two other sales outside the subject's addition were used. There was at least one other sale from the subject's addition that could have been used. The sales outside the subject's addition support a much higher value than the sales within the subject's addition. The sales outside the addition appear to be given more weight in the report than those within the subject's addition. The sales within the subject's addition would support a market range of $175,000 to $178,000. The sales outside the subject's addition that were given more weight appear to have overestimated the market value of the subject.

C

File Number

# Review Analysis
## Purpose, Scope & Limiting Conditions

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

### PURPOSE OF THE REVIEW ANALYSIS

The purpose of review analysis is to:

[X] Render an opinion as to the adequacy and appropriateness of an original appraisal made by another appraiser based upon standards set forth by USPAP, FNMA, FHLMC, and Valuation Information Technology, Inc.

[ ] Prevent and detect deficiencies that would materially increase risk to Valuation Information Technology, Inc.

[ ] Provide a basis for positive feedback to the original appraiser in order to eliminate deficiencies and increase the quality of appraisal reports completed for Valuation Information Technology, Inc.

### SCOPE OF REVIEW ANALYSIS

The scope of the review includes:

[X] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, verification of neighborhood, site and improvement data, verification of the factual data of the comparables, verification of all math calculations, an overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Desk Review Analysis - No inspection of the property was made by the reviewer. The review of the report, all data is assumed to be correct and factual, verification of all math calculations, and overview of the report regarding completeness of the descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of the subject property and all comparables was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

[ ] Field Review Analysis - An inspection of only the subject property was made. A review of the report, verification of neighborhood, site and improvement data, verification of all the factual data for the comparables, verification of all math calculations, and overview of report regarding completeness of descriptive data and logic of the appraisal analysis, verification of proper licensing/certification.

**D**

File Number

## Review Analysis
## Purpose, Scope & Limiting Conditions

### CERTIFICATION OF LIMITING CONDITIONS

I certify that, to the best of my knowledge and belief:

a) The facts and data reported by the review appraiser and used in the review process are true and correct.

b) The analysis, opinions, and conclusions in this report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal unbiased professional analysis, opinions and conclusions.

c) I have no (or the specified) present or prospective interest in the property that is the subject of this report, and I have no (or the specified) personal interest or bias with respect to the parties involved.

d) My compensation is not contingent on an action or event resulting from the analysis, opinion or conclusions in, or the use of, this review report.

e) My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

f) I did not (did) personally inspect the subject property of the report under review.

g) No one provided significant professional assistance to the person signing this report. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

COMMENT:  Departure from binding requirements (a) through (e) is not permitted.

CONTINGENT AND LIMITING CONDITIONS:  The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

   1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

   2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

   3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

   4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

   5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the Reviewer is affiliated.

   6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

   7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

REVIEWER
Signature: _Lary Wadley_
Name: Lary Wadley
Title: _____

Date of Review: 10/04/2007
Approved Appraiser #: _____
State Certification #: _____  State: ____
Or State License #: _____  State: ____

AO 205

**E**

File No. 0710103

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well-informed or well advised, and each acting in what they consider their own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**SCOPE OF REVIEW:** The scope of this review is limited to the information being provided by the original appraiser; form an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data; form an opinion as to the appropriateness of the appraisal methods and techniques used and develop the reasons for any disagreement; form an opinion as to whether the analyses, opinions, and conclusions in the report under review are appropriate and reasonable, and develop the reasons for any disagreement.

## CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS

**CERTIFICATION:** The Reviewer certifies and agrees that, to the best of his/her knowledge and belief:

1. The facts and data reported by the Reviewer and used in the review process are true and correct.

2. The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. Unless stated elsewhere, I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this review report.

5. My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

6. Unless stated elsewhere in this report, I did not personally inspect the subject property, either interior or exterior, of the report under review.

7. No one provided significant professional assistance to the person signing this review report.

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

| REVIEWER | | REVIEWER | |
|---|---|---|---|
| Signature _Lary Wadley_ | | Signature _Lary Wadley_ | |
| Name _Lary Wadley_ | | Name | |
| Date Report Signed 10/04/2007 | | Date Report Signed 10/04/2007 | |
| State Certification # | State | State Certification # | State |
| Or State License # | State | Or State License # | State |

Wadley Appraisal Company

**F**

| Borrower: Sidney Scholl | | File No.: c710103 |
| Property Address: 2032 Wimberley Creek Dr. | | Case No.: |
| City: Moore | State: Ok | Zip: 73160 |
| Lender: Rose Simmons % John Gile Company | | |

### State of Oklahoma

*Kim Holland, Insurance Commissioner*

## Oklahoma Real Estate Appraiser Board

*This is to certify that:*

# Lary N. Wadley

*has complied with the provisions of the Oklahoma Real Estate Appraisers Act to transact business as a Certified Residential Real Estate Appraiser in the State of Oklahoma.*

*In Witness Whereof, I have hereunto set my hand and caused the seal of my office to be affixed at the City of Oklahoma City, State of Oklahoma, this 5th day of November A.D. 2006.*

*Kim Holland, Insurance Commissioner*
*Chairperson, Oklahoma Real Estate Appraiser Board*

*Members, Oklahoma Real Estate Appraiser Board*

Expires: 12/31/2009

Oklahoma Appraiser Number: 10257CRA

**G**

**RESIDENTIAL APPRAISAL REVIEW SHORT FORM**    File No. 804SCH10| Page #4

**Summary Appraisal Report**

| | |
|---|---|
| Lending Institution | Specter & Specter Evans & Manogue, P.C. |
| Lender's Address | 436 Seventh Ave. The 26th Floor Koppers Building, Pittsburgh, PA 15219 |

| | |
|---|---|
| Name of Borrower | Scholl, Ventura, Cruz , Utsey |
| Property Address | 110 Yale Loop |
| | Mooresville, NC 28117 |

| | |
|---|---|
| Loan Number | |
| Appraised Value $ | 740,500 |
| Lender's Appraiser | Mark D Rohde |
| Appraiser's Address | Rohde Appraisal Service, P.O. Box 4989 Mooresville, NC 28877 |

Date 1/6/2006
Phone 704-309-8521

| | |
|---|---|
| Review Appraiser | Andrew T Picarsic |
| Reviewer's Address | 2207 Hearthstone Ln, Gastonia, NC 28226 |

Phone 704-302-1799

## REVIEW ANALYSIS

**DESCRIPTION:**

| | Acceptable | Unacceptable | N/A | | | Acceptable | Unacceptable | N/A |
|---|:---:|:---:|:---:|---|---|:---:|:---:|:---:|
| 1. Legal Description (verify) | ☒ | ☐ | ☐ | | 5. Improvements | ☒ | ☐ | ☐ |
| 2. Census Tract | ☒ | ☐ | ☐ | | 6. Subject Unit | ☒ | ☐ | ☐ |
| 3. Neighborhood | ☒ | ☐ | ☐ | | 7. Comment Section | ☐ | ☐ | ☐ |
| 4. Site | ☒ | ☐ | ☐ | | | | | |

Remarks:    Description of Improvements has been verified within the limits of the Iredell County GIS system, Realist.com and a current Active listing data sheet.

**COST ANALYSIS SECTION:**

| | Acceptable | Unacceptable | N/A | | | Acceptable | Unacceptable | N/A |
|---|:---:|:---:|:---:|---|---|:---:|:---:|:---:|
| 8. Physical Depreciation | ☐ | ☐ | ☒ | | 12. Adjustments & Calculations | | | |
| 9. Functional Depreciation | ☐ | ☐ | ☒ | | (verify) | ☐ | ☐ | ☒ |
| 10. External Depreciation | ☐ | ☐ | ☒ | | 13. Comments | ☐ | ☐ | ☒ |
| 11. Land to Improvement | | | | | | | | |
| Ratio (verify) | ☐ | ☐ | ☒ | | | | | |

Remarks:    I was not able to determine the accuracy of the cost approach. The appraiser did not site the specific and exact source of the cost approach numbers.  This is essentially a non-issue as the cost approach is not absolutely required to determine market value. On face value the cost approach appeared to be high as compared to the sales comparison approach. Typically these two are most often very close to each other in results.

**MARKET DATA ANALYSIS SECTION:**

| | Acceptable | Unacceptable | N/A | | | Acceptable | Unacceptable | N/A |
|---|:---:|:---:|:---:|---|---|:---:|:---:|:---:|
| 14. Documentation Numbers | | | | | 21. Math Calculations (verify) | ☒ | ☐ | ☐ |
| (verified) | ☒ | ☐ | ☐ | | 22. Comments Section | ☐ | ☒ | ☐ |
| 15. Location Adjustments | ☒ | ☐ | ☐ | | 23. Net Adjustment Ratio | | | |
| 16. Site and View Adjustments | ☐ | ☒ | ☐ | | 1) ___% 2) ___% 3) ___% | ☐ | ☐ | ☒ |
| 17. Quality/Design and | | | | | 24. Gross Adjustment Ratio | | | |
| Appeal Adjustments | ☐ | ☒ | ☐ | | 1) ___% 2) ___% 3) ___% | ☐ | ☐ | ☒ |
| 18. Condition Adjustments | ☒ | ☐ | ☐ | | 25. Comparable Data Sections | ☒ | ☐ | ☐ |
| 19. Room Count and Square | | | | | 26. Income Approach (if App.) | ☐ | ☐ | ☒ |
| Feet Adjustments | ☐ | ☒ | ☐ | | 27. Condo Project Addenda | ☐ | ☐ | ☒ |
| 20. Amenities Adjustments | ☐ | ☒ | ☐ | | | | | |

Remarks:    Appraisal does not differentiate the difference in apparent design and appeal of the subject and comparables.  I was unable to confirm or disqualify the gross living area adjustment rate of $50.00 per slt.  Full bath adjustments($1,000) are extremely low and can not possibly represent the market reaction.  See Attached summary appraisal report for reviewers analysis and conclusions.

**ADDENDA REQUIRED**

| | Acceptable | Unacceptable | N/A | **CONDOMINIUM** | Acceptable | Unacceptable | N/A |
|---|:---:|:---:|:---:|---|:---:|:---:|:---:|
| 28. Plat Map | ☐ | ☐ | ☒ | 37. No. of Units Not Complete | ☐ | ☐ | ☒ |
| 29. Building Sketch | ☒ | ☐ | ☐ | 38. Presale Requirements Not Met | ☐ | ☐ | ☒ |
| 30. Comparable Map | ☒ | ☐ | ☐ | 39. Sale(s) From Project Needed | ☐ | ☐ | ☒ |
| 31. Photo Pages | ☒ | ☐ | ☐ | 40. Sale(s) Out of Project | | | |
| 32. Statement Limiting | | | | Needed | ☐ | ☐ | ☒ |
| Conditions | ☒ | ☐ | ☐ | 41. Addendum A | ☐ | ☐ | ☒ |
| 33. Purchase Agreement | ☒ | ☐ | ☐ | 42. Addendum B | ☐ | ☐ | ☒ |
| 34. Origina Signature | ☐ | ☐ | ☒ | **UNITS** | | | |
| 35. 442 Certification of | | | | 43. Rental Survey | ☐ | ☐ | ☒ |
| Completion | ☐ | ☐ | ☒ | 44. Operating Income Statement | ☐ | ☐ | ☒ |
| 36. Copy of Permit for | | | | | | | |
| Addition/Conversion | ☐ | ☐ | ☒ | | | | |

Remarks:    No significant issues were discovered in this section.  NOTE: Contract to purchase comments do not fully meet USPAP requirement per the scope of work of the URAR Fannie Mae Form.

## REVIEWER'S SUMMARY

| | |
|---|---|
| Appraisal report was: | ☐ Good    ☐ Fair    ☒ Poor |
| Recommendation: | ☐ Accept as is    ☐ Accept when revised - See items # |
| | ☐ Have another appraisal prepared by someone else    ☒ Other    See Retrospective Appraisal Report dtd 5/3/2008 |

Comments:    The review appraisers has found three significant areas of disagreement. 1. Comparables utilized in report all are very superior to the subject im: 1. design & appeal  2. Gross living area 3. Full Bath count.  The appraiser stated that these sales were the best available and that no other superior sales were discovered.  The review appraisers research revealed many other comparable sales that were more like the subject in physical characteristics and design & appeal.  The review appraiser has conducted his independent analysis(appraisal) that demonstrates the market value with significantly more convincing evidence.    See attached Review Appraisers Summary Appraisal Report.

| | |
|---|---|
| Field Review was made | ☒ Yes    ☐ No |
| Sales price   $ 740,500 | Appraiser   $ 740,500    Reviewer's Recommendation   $ 645,000 |
| Reviewer's Signature | Date of Review 4/11/2008 |
| Reviewer's Signature | Date of Review |
| | ☐ See Attached |

Copyright 1988 by the National Association of Review Appraisers and Mortgage Underwriters

Review Form No. 2606
Developed 1/88

Andrew T. Picarsic

Form 006 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**A**

## SUPPLEMENTARY DATA

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| | | 108 Brawley Harbor Place | | 1709 Brawley School Rd | | 106 White Crest Ct | |
| Address | 110 Yale Loop Mooresville, NC 28117 | Mooresville, NC 28117 | | Mooresville, NC 28117 | | Mooresville, NC 28117 | |
| Proximity to Subject | | | | | | | |
| Sales Price | $ 740,500 | $ 685,000 | | $ 719,800 | | $ 778,000 | |
| Price/Gross Liv. Area | $ 235.00 | $ 210.96 | | $ 189.72 | | $ 201.14 | |
| Data Source | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust |
| Sales or Financing | | conventional | | conventional | | conventional | |
| Concessions | | none | | none | | none | |
| Date of Sale/Time | 1/6/2006 | 8/17/2005 | | 12/14/2005 | | 6/16/2005 | |
| Location | The Point | The Point | | The Point | | The Point | |
| Site/View | 1.19 acre | 1.28 acre | | 1.23 acre | | 0.91 acre | |
| Design and Appeal | 1.5 story | 2 story | | 2 story | | 2 story | |
| Quality of Construction | very good | very good | | very good | | very good | |
| Age | 0 | 1 | | 0 | | 4 | |
| Condition | good | good | | good | | good | |
| Above Grade | Total / Bdrms / Baths 10 / 3 / 2.5 | Total / Bdrms / Baths 9 / 4 / 3.5 | | Total / Bdrms / Baths 10 / 4 / 3.5 | | Total / Bdrms / Baths 12 / 4 / 3.5 | |
| Room Count | | | | | | | |
| Gross Living Area | 3,151 Sq. Ft. | 3,247 Sq. Ft. | | 3,794 Sq. Ft. | | 3,868 Sq. Ft. | |
| Basement & Finished | none | none | | none | | none | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | average | average | | average | | average | |
| Heating/Cooling | fha/ca | fha/ca | | fha/ca | | fha/ca | |
| Garage/Carport | 3 garage | 2 garage | | 3 garage | | 2 garage | |
| Porches, Patio, Pools, etc. | patio, outdoor FP arbor, deck | patio swimming pool | | patio | | patio,deck,scrn pch swimming pool | |
| Special Energy Efficient Items | typical for market | typical for market | | typical for market | | typical for market | |
| Fireplace(s) | 1 fireplace | 1 fireplace | | 1 fireplace | | 1 fireplace | |
| Other (e.g. kitchen equip., remodeling) | boat slip | boat slip | | boat slip | | boat slip | |
| Net Adj. (total) | | [ ] + [ ] − $ | | [ ] + [ ] − $ | | [ ] + [ ] − $ | |
| Indicated Value of Subject | | Net % Gross % $ | 685,000 | Net % Gross % $ | 719,800 | Net % Gross % $ | 778,000 |

Comments on Sales Comparison          The three comparable sales from the original report were placed in the grid above with the lowest price sold to the highest price sold. I have done this to demonstrate how the original appraisers final reconciliation was not supported by his own data.  Paired data set from the market were nearly impossible to extract.  Because of the large variances I have employed the Relative Comparison Analysis to the sales above.

Relative Comparison Analysis "A qualitative technique for analyzing comparable sales; used to determine whether the characteristics of a comparable property are inferior, superior, or equal to those of the subject property. Relative comparison analysis is similar to paired data analysis, but quantitative adjustments are not derived."

Comparing the physical differences above clearly demonstrates that the subject is substantially inferior to comparable sale two and three and significantly inferior to comparable number one.  One can then reasonably conclude the subject is worth less then $685,000.

### REVIEWER'S SUMMARY COMMENTS

The report under review under review has complied with USPAP in regards to reporting actual facts available through public sources.

The report under review has not complied with USPAP in regards to the analysis, preparation and reporting of the sales comparison approach.  The value conclusion are are not defensible.  The appraiser utilized sales that were far superior to the subject(see attached Summary Report by Review Appraiser)) .

This is contrary to what the appraiser certified in his report at certification number seven;

#7 I selected and used the sales that are locationally, physically and functionally the most similar to the subject property.

The appraiser also failed to employ correct adjustments for the full baths and amenity differences between the subject and the comparables.  This is contrary to what the appraiser certified in his report at certification number nine;

#9 I have reported adjustments to the comparable sales that reflect the markets reaction to the differences between the subject property and the comparables sales.

The original appraisers report indicates in several places conflicting comments about how he reconciled the sales comparison approach and cost approach. It appears that he gave equal weight to the cost approach and the sales comparison approach to favor the contracted sales price in the report.  His conclusion defies his own reported analysis without explanation.

In conclusion the ignoring of more physically and functionally similar comparables the appraisors has issued a misleading report in contradiction to the requirements of his signed certifications; Fannie Mae Supplemental Standards;  Statement of Work per Washington Mutual Published Appraisal Standards; and 2005 Edition of the Uniform Standards of Professional Appraisal Practice 2005 Edition.  This series of errors resulted in serious violation of the USPAP 2005 Ethics Rule, specifically Conduct section .

See attached Retrospective Summary Appraisal Report dated 5/3/2008.

B

| Borrower/Client | Scholl, Ventura, Cruz , Utsey | | | | |
| Property Address | 110 Yale Loop | | | | |
| City | Mooresville | County | Iredell | State | NC | Zip Code | 28117 |
| Lender | Specter & Specter Evans & Manogue, P.C. | | | | |

**SCOPE OF WORK:**

The reviewer has utilized either the Fannie Mae Form 2000 March 2005/Freddie Mac Form 1032 March 2005, or the Fannie Mae Form 2000A March 2005/Freddie Mac Form 1072 March 2005; which include visual inspections within the scope of work. These inspections include visual assessments of the subject property, areas of the neighborhood and comparables. .

**Conditions of Appraisal Report:** This report is for use only by the client identified in the client line of this report and the TBD General Court of Justice, State of California. Use of this report by others is not permitted by the appraiser. This report is only for the use in pending litigation specific to the subject identified in this report.

**Extraordinary Assumption:**   Review Appraiser makes the extraordinary assumption that the physical on-site data stated in the appraisal report under review is accurate except where noted differently in this report by the review appraiser.   The review report results can and may be adversely affected if the information contained in the report under review is found to be considerably inaccurate or unreliable.

**The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.**

**The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.**

**C**

## Subject Photo Page

| Borrower/Client | Scholl, Ventura, Cruz , Utsey | | | | |
|---|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | | |
| City Mooresville | | County Iredell | | State NC | Zip Code 28117 |
| Lender Specter & Specter Evans & Manoque, P.C. | | | | | |



### Subject Front

| 110 Yale Loop | |
|---|---|
| Sales Price | 740,500 |
| Gross Living Area | 3,151 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | The Point |
| View | 1.19 acre |
| Size | |
| Quality | very good |
| Age | 0 |

### Subject Rear



### Subject Street



D

## Subject Interior Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client  Scholl, Ventura, Cruz , Utsey | | | |
| Property Address  110 Yale Loop | | | |
| City  Mooresville | County  Iredell | State  NC | Zip Code  28117 |
| Lender  Specter & Specter Evans & Manoque, P.C. | | | |



### Subject Interior

110 Yale Loop
| | |
|---|---|
| Sales Price | 740,500 |
| Gross Living Area | 3,151 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | The Point |
| View | 1.19 acre |
| Site | |
| Quality | very good |
| Age | 0 |



### Subject Interior



### Subject Interior

**E**

**Comparable Photo Page**

| | | | |
|---|---|---|---|
| Borrower/Client | Scholl, Ventura, Cruz , Utsey | | |
| Property Address | 110 Yale Loop | | |
| City Mooresville | County Iredell | State NC | Zip Code 28117 |
| Lender | Specter & Specter Evans & Manoque, P.C. | | |



### Comparable 1

108 Brawley Harbor Place

| | |
|---|---|
| Prox. to Subject | 2.6 miles |
| Sale Price | 685000 |
| Gross Living Area | 3,247 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | 1.26 acre |
| Site | |
| Quality | very good |
| Age | 1 |



### Comparable 2

1709 Brawley School Rd

| | |
|---|---|
| Prox. to Subject | 2.6 miles |
| Sale Price | 719,800 |
| Gross Living Area | 3,794 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | 1.23 acre |
| Site | |
| Quality | very good |
| Age | 0 |



### Comparable 3

106 White Crest Ct

| | |
|---|---|
| Prox. to Subject | 2.7 miles |
| Sale Price | 778,000 |
| Gross Living Area | 3,868 |
| Total Rooms | 12 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | 0.91 acre |
| Site | |
| Quality | very good |
| Age | 4 |

F



# APPRAISAL OF REAL PROPERTY

## LOCATED AT:

110 Yale Loop
Lot 1038, Phase 10 of Sconset Village, The Point Map 46 Page 146
Mooresville, NC  28117

## FOR:

Specter & Specter Evans & Manoque
436 Seventh Avenue, The 26th Floor Koppers Building
Pittsburgh, PA 15219

## AS OF:

Effective Date 1/6/2006 - Inspection Date 4/11/2008

## BY:

Andrew T Picarsic
2207 Hearthstone Ln
Gastonia, NC 28056
704-302-1799

**A**

## SUMMARY OF SALIENT FEATURES

| | | |
|---|---|---|
| **SUBJECT INFORMATION** | Subject Address | 110 Yale Loop |
| | Legal Description | Lot 1038, Phase 10 of Sconset Village, The Point Map 46 Page 146 |
| | City | Mooresville |
| | County | Iredell |
| | State | NC |
| | Zip Code | 28117 |
| | Census Tract | 37 097 614.00 |
| | Map Reference | 16740 |
| **SALES PRICE** | Sale Price | $ n/a |
| | Date of Sale | n/a |
| **CLIENT** | Client | Specter & Specter Evans & Manoque, P.C. |
| | Owner | Sidney Scholl,Ventura,Cruz, Utsey |
| **DESCRIPTION OF IMPROVEMENTS** | Size (Square Feet) | 3,151 |
| | Price per Square Foot | $ |
| | Location | The Point |
| | Age | 0 |
| | Condition | good |
| | Total Rooms | 10 |
| | Bedrooms | 3 |
| | Baths | 2.5 |
| **APPRAISER** | Appraiser | Andrew T Picarsic |
| | Date of Appraised Value | 1/6/2006 Retrospective  Inspected on 4/11/2008 |
| **VALUE** | Opinion of Value | $ 645,000 |

Form SSD2_LT --- "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**B**

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.: 804SCH12

## SUBJECT

Property Address: 110 Yale Loop          City: Mooresville          State: NC          Zip Code: 28117
County: Iredell          Legal Description: Lot 1038, Phase 10 of Sconset Village, The Point Map 46 Page 146
Assessor's Parcel #:    4624-36-2138
Tax Year: 2005     R.E. Taxes: $ 3,770.00     Special Assessments: $ none     Borrower (if applicable):  Owner: Scholl, Ventura, Cruz, Utsey
Current Owner of Record:  Sidney Scholl,Ventura,Cruz, Utsey     Occupant: ☒ Owner  ☐ Tenant  ☐ Vacant  ☐ Manufactured Housing
Project Type: ☒ PUD  ☐ Condominium  ☐ Cooperative  ☐ Other (describe)          HOA: $ 2,000  ☒ per year  ☐ per month
Market Area Name:  The Point          Map Reference: 16740          Census Tract: 37 097 614.00
The purpose of this appraisal is to develop an opinion of:  ☒ Market Value (as defined), or  ☐ other type of value (describe)

## ASSIGNMENT

This report reflects the following value (if not Current, see comments):  ☐ Current (the Inspection Date is the Effective Date)  ☒ Retrospective  ☐ Prospective
Approaches developed for this appraisal:  ☒ Sales Comparison Approach  ☐ Cost Approach  ☐ Income Approach  (See Reconciliation Comments and Scope of Work)
Property Rights Appraised:  ☒ Fee Simple  ☐ Leasehold  ☐ Leased Fee  ☐ Other (describe)
Intended Use:  The intended use of this appraisal is to determine the subjects market value on January 6, 2006 for pending litigation in a General Court of Justice
State of California.
Intended User(s) (by name or type):  Law office of Specter & Specter Evans & Manoque, P.C. and the General Court of Justice State of California.
Client:  Specter & Specter Evans & Manoque, P.C.          Address:  436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219
Appraiser:  Andrew T Picarsic          Address:  2207 Hearthstone Ln. Gastonia. NC 28056

## MARKET AREA DESCRIPTION

| Location: | | | Predominant Occupancy | One-Unit Housing | | Present Land Use | Change in Land Use |
|---|---|---|---|---|---|---|---|
| ☐ Urban | ☒ Suburban | ☐ Rural | | PRICE | AGE | One-Unit 95 % | ☒ Not Likely |
| Built up: | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | $(000) | (yrs) | 2-4 Unit % | ☐ Likely *  ☐ In Process * |
| Growth rate: | ☐ Rapid | ☒ Stable | ☐ Slow | ☒ Owner 95 | 500 Low | Multi-Unit % | * To: |
| Property values: | ☒ Increasing | ☐ Stable | ☐ Declining | ☒ Tenant 5 | 4,000 High 7 | Comm'l % | |
| Demand/supply: | ☒ Shortage | ☐ In Balance | ☐ Over Supply | ☒ Vacant (0-5%) | 1,000 Pred 3 | vacant 5 % | |
| Marketing time: | ☐ Under 3 Mos. | ☒ 3-6 Mos. | ☐ Over 6 Mos. | ☐ Vacant (>5%) | | | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends):          Market is the area of Iredell County south of
Hwy 150, west of I-77 along Brawley School Rd known as the "The Pointe". This area is is a self contained market on Lake Norman. The nearest competing
market is the "The Peninsula", another self contained market directly to the south on Lake Norman in Mecklenburg county. Subject neighborhood is a blend of
differing style homes in a Lake front, lake access community with golf, tennis and marina facilities available. The community is in average proximity to schools,
shopping and employment in the area. Major employment centers can be reached via I-77 south to Charlotte or north to Statesville. The Point(Iredell County) is
very attractive to the Lake Norman market as real property taxes are very low compared to neighboring counties, in particular Mecklenburg County. The market
conditions in from January 2005 to January 6, 2006 were good with steady demand and new construction continueing at a normal pace. Prices were relatively
stable to modest increases for non-water front properties.

## SITE DESCRIPTION

Dimensions: 76 x 490 x 277 x 275          Site Area:  01.189 acre
Zoning Classification:  R-20          Description:  Single Family Residential Iredell County
Zoning Compliance:  ☒ Legal  ☐ Legal nonconforming (grandfathered)  ☐ illegal  ☐ No zoning
Are CC&Rs applicable?  ☒ Yes  ☐ No  ☐ Unknown  Have the documents been reviewed?  ☐ Yes  ☒ No  Ground Rent (if applicable) $          /
Highest & Best Use as improved:  ☒ Present use, or  ☐ Other use (explain)

Actual Use as of Effective Date:  Single Family Residential          Use as appraised in this report:  Single Family Residential
Summary of Highest & Best Use:  The subjects current use of single family residential is the highest and best use. This is the maximum legal use per zoning.

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | slight sloop to rear |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | asphalt | | ☒ | Size | Typical for this market |
| Gas | ☒ | ☐ | | Curb/Gutter | concrete | | ☒ | Shape | Wedge shape |
| Water | ☒ | ☐ | | Sidewalk | none | | | Drainage | adequate |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | none | | | View | residential |
| Storm Sewer | ☒ | ☐ | | Alley | none | | | | |

Other site elements:  ☒ Inside Lot  ☐ Corner Lot  ☐ Cul de Sac  ☐ Underground Utilities  ☐ Other (describe)
FEMA Spec'l Flood Hazard Area  ☐ Yes  ☒ No  FEMA Flood Zone  Zone X          FEMA Map # 370313/0200c          FEMA Map Date 3/18/2008
Site Comments:  The subject site is typical in size and terrain in the Sconset village and surround neighborhoods within "The Point". No adverse conditions or
encroachment were observed or discovered  from Iredell On-line sources.

## IMPROVEMENTS

| General Description | | Exterior Description | | Foundation | | Basement ☒ None | Heating | |
|---|---|---|---|---|---|---|---|---|
| # of Units 1 | ☐ Acc.Unit | Foundation | brick+block | Slab | none | Area Sq. Ft. | Type | FHA |
| # of Stories 2 | | Exterior Walls | cedar siding | Crawl Space | 100% | % Finished | Fuel | natural gas |
| Type ☒ Det. ☐ Att. ☐ | | Roof Surface | cedar shake | Basement | none | Ceiling | | |
| Design (Style) 1.5 story | | Gutters & Dwnspts. | aluminum | Sump Pump ☐ | | Walls | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Cons. | | Window Type | dh alm DP | Dampness ☐ | | Floor | Central | yes |
| Actual Age (Yrs.) 0 | | Storm/Screens | DP/yes | Settlement | none | Outside Entry | Other | |
| Effective Age (Yrs.) 0 | | | | Infestation | none | | | |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**          Form GPRES2_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE          3/2007

C

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.: 804SCH12

## DESCRIPTION OF IMPROVEMENTS (continued)

| Interior Description | | Appliances | | Attic | None | Amenities | | | Car Storage | | None |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Hardwood, carpet, cerm | Refrigerator | ☒ | Stairs | ☐ | Fireplace(s) # | one | Woodstove(s) # | Garage | # of cars ( 4 Tot.) | |
| Walls | sheetrock | Range/Oven | ☒ | Drop Stair | ☐ | Patio | brick paver | | Attach. | | |
| Trim/Finish | wood | Disposal | ☒ | Scuttle | ☒ | Deck | raised wood | | Detach. | | |
| Bath Floor | ceramic | Dishwasher | ☒ | Doorway | ☒ | Porch | front stoop | | Blt.-In | 2 | |
| Bath Wainscot | ceramic/fg | Fan/Hood | ☒ | Floor | ☒ | Fence | partial front yard | | Carport | | |
| Doors | wood | Microwave | ☒ | Heated | ☐ | Pool | none | | Driveway | 2 | |
| | | Washer/Dryer | ☒ | Finished | ☐ | | | | Surface | concrete | |

Finished area above grade contains: 10 Rooms  3 Bedrooms  2.5 Bath(s)  3,151 Square Feet of Gross Living Area Above Grade

Additional features: Large Brick outdoor Fireplace and grill, Arbor at patio, Architectural Cedar Shake shingles.

Describe the condition of the property (including physical, functional and external obsolescence): This is a retrospective appraisal performed on 4/18/2008 with an effective date of 1/6/2006. The subject was a new construction build on or about late 2005. The appraiser makes the extraordinary assumption the subject exterior and Interior condition were in like new condition on 1/6/2006. The subjects condition on 4/11/2008 was observed to be good and in like new condition. See attached interior/exterior photos. There was no functional or external obsolescence observed or discovered in government documents.

## SALES COMPARISON APPROACH

**SALES COMPARISON APPROACH TO VALUE (if developed)** ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjust. | COMPARABLE SALE # 2 | +(-) $ Adjust. | COMPARABLE SALE # 3 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 110 Yale Loop | 120 Shelburne Place | | 227 Wild Harbor Rd | | 155 Cape Cod Way | |
| | Mooresville, NC 28117 | Mooresville, NC 28117 | | Mooresville, NC 28117 | | Mooresville, NC 28117 | |
| Proximity to Subject | | 0.52 miles | | 3.00 miles | | 0.58 miles | |
| Sale Price | $ n/a | $ 632,000 | | $ 639,000 | | $ 669,900 | |
| Sale Price/GLA | $ /sq.ft. | $ 180.26 /sq.ft. | | $ 183.88 /sq.ft. | | $ 192.61 /sq.ft. | |
| Data Source(s) | recent mls printout, | mls 503369 | | mls 449147 | | mls 466182 | |
| Verification Source(s) | GIS, prior appraisal | drive by, GIS | | drive by, GIS | | drive by, GIS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | n/a | conventional | | conventional | | conventional | |
| Concessions | n/a | none | | none | | none | |
| Date of Sale/Time | n/a | 10/3/2005 | 0 | 6/2/2005 | 0 | 6/17/2005 | 0 |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | The Point | The Point | | The Point | | The Point | |
| Site | 1.189 acre/interior lot | 1.56 acre/interior lot | 0 | 0.97 acre/interior lot | 0 | 0.90 acre/interior lot | 0 |
| View | residential | residential | | residential | | residential | |
| Design (Style) | 1.5 story | 1.5 Story | | 1.5 Story | | 2 story | |
| Quality of Construction | Very good | Very good | | Very good | | Very good | |
| Age | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Condition | good | good | | good | | good | |
| Above Grade | Total 10 / Bdrms 3 / Baths 2.5 | Total 9 / Bdrms 3 / Baths 3.5 | | Total 9 / Bdrms 3 / Baths 3.5 | | Total 10 / Bdrms 4 / Baths 3.5 | |
| Room Count | | | | | | | |
| Gross Living Area | 3,151 sq.ft. | 3,506 sq.ft. | | 3,475 sq.ft. | | 3,478 sq.ft. | |
| Basement & Finished | none | none | | none | | none | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | average | average | | average | | average | |
| Heating/Cooling | fha/ca | fha/ca | | fha/ca | | fha/ca | |
| Energy Efficient Items | typical for market | typical for market | | typical for market | | typical for market | |
| Garage/Carport | 3 garage | 3 garage | 0 | 3 garage | 0 | 3 garage | 0 |
| Porch/Patio/Deck | dck,patio,outdoor fp | patio | | patio | | patio | |
| deeded boat slip | deeded boat slip | none | | deeded boat slip | | deeded boat slip | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☐ - $ | | ☐ + ☐ - $ | | ☐ + ☐ - $ | |
| Adjusted Sale Price | | Net % | | Net % | | Net % | |
| of Comparables | | Gross % $ 632,000 | | Gross % $ 639,000 | | Gross % $ 669,900 | |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

GP RESIDENTIAL

Form GPRES2_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE     3/2007

D

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.:  804SCH12

**SALES COMPARISON APPROACH (continued)**

Summary of Sales Comparison Approach    The subject conforms to this market and is compatible to the immediate neighborhood and surrounding market area. Comparable data was taken from the local multiple listing service and verified with the County GIS, deemed most reliable.  To enable use of the most proximate similar comparable sales it was necessary to transgress typical area appraisal common practice in regards to sale date of comparable two.  The comparables selected represent the best replacement properties for the subject in this market.

I first considered using the paired data set analysis to determine the adjusted indicated values of the three sales selected for use in this report.  I attempted to extract from the market those paired data sets; i.e. Gross Living Area square footage, full baths, design and appeal to quantify market reaction and subsequent dollar adjustments for the sales comparison approach.  The problem surfaced as the matched paired analysis provided conflicting and contrary adjustment indicators that were simply so unreliable to be of use in this report. This is not unusual in higher end market price points where options and individual taste can drastically change and blur the market. At the end of the day, I've concluded that a comparative relative analysis is the best technique for this assignment given the wide and varied indications from the market extraction method.

**The Dictionary of Real Estate Appraisal, 4th Edition, Appraisal Institute defines Relative Comparison Analysis as:**

**"A qualitative technique for analyzing comparable sales; used to determine whether the characteristics of a comparable property are inferior, superior, or equal to those of the subject property. Relative comparison analysis is similar to paired data analysis, but quantitative adjustments are not derived."**

The three comparable sales in this report were placed in the grid with the lowest price sold to the highest price sold.  The differences in the three sales correspond to the prices paid from low to high.

Indicated Value by Sales Comparison Approach $    645,000

**TRANSFER HISTORY**

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s):  Charlotte Regional MLS, Iredell County GIS/Deed On-line source, Realist.com a private paid data service.

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing:  The subject on 1/6/2006 was a new |
| --- | --- |
| Date:     no prior sale in 36 months | construction single family residential build.  There were no sales of the subject in the prior 36 months. |
| Price:    n/a | |
| Source(s): Iredell GIS/Deed | |
| 2nd Prior Subject Sale/Transfer | |
| Date: | |
| Price: | |
| Source(s): | |

**COST APPROACH TO VALUE (if developed)**    [X] The Cost Approach was not developed for this appraisal.

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value):    n/a

**COST APPROACH**

| ESTIMATED [ ] REPRODUCTION OR [ ] REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ |
| --- | --- | --- | --- | --- |
| Source of cost data: | DWELLING | Sq.Ft. @ $ | | =$ |
| Quality rating from cost service:          Effective date of cost data: | | Sq.Ft. @ $ | | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | | =$ |
| Cost Approach is not necessary for the purpose of this appraisal. | | Sq.Ft. @ $ | | =$ |
| | | Sq.Ft. @ $ | | =$ |
| | | | | =$ |
| | Garage/Carport | Sq.Ft. @ $ | | =$ |
| | Total Estimate of Cost-New | | | =$ |
| | Less        Physical | Functional | External | |
| | Depreciation | | | =$( ) |
| | Depreciated Cost of Improvements | | | =$ |
| | "As-is" Value of Site Improvements | | | =$ |
| | | | | =$ |
| | | | | =$ |
| Estimated Remaining Economic Life (if required):                    Years | INDICATED VALUE BY COST APPROACH | | | =$ |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**

Form GPRES2_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE          3/2007

E

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.: 804SCH12

**INCOME APPROACH TO VALUE (if developed)**  ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $ _n/a_    X Gross Rent Multiplier _n/a_    = $ _n/a_    **Indicated Value by Income Approach**

Summary of Income Approach (including support for market rent and GRM):n/a

**PROJECT INFORMATION FOR PUDs (if applicable)**  ☒ The Subject is part of a Planned Unit Development.

Legal Name of Project:  The Point HOA

Describe common elements and recreational facilities:  Subject neighborhood is a blend of differing style homes in a Lake front, lake access community with golf, tennis, greenways, club house, play areas and marina facilities available for membership or purchase.

Indicated Value by: Sales Comparison Approach $ 645,000    Cost Approach (if developed) $ n/a    Income Approach (if developed) $ n/a

Final Reconciliation  The income approach and cost approach were not necessary nor applicable to this retrospective assignment. The sales comparison approach to value is the most reliable indicator of value.  Based on the ranking of the subject I utilized my professional judgement to determine where along the range of indicated values; $639,000 to $669,900 the subject was most likely to be be perceived to reside by the market.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed,  ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed,  ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:

☒ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is:  $  645,000  , as of:  1/6/2006  , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report.  See attached addenda.

A true and complete copy of this report contains _____ pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:
☐ Scope of Work    ☒ Limiting Cond./Certifications    ☐ Narrative Addendum    ☒ Photograph Addenda    ☐ Sketch Addendum
☐ Map Addenda    ☒ Additional Sales    ☐ Cost Addendum    ☐ Flood Addendum    ☐ Manuf. House Addendum
☐ Hypothetical Conditions    ☐ Extraordinary Assumptions    ☐    ☐    ☐

Client Contact:  Wyatt A. Lison, Esq    Client Name:  Specter & Specter Evans & Manoque, P.C.

E-Mail:  wilson@ssem.com    Address:  436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219

**APPRAISER**

Appraiser Name:  Andrew T Picarsic
Company:
Phone:  704-302-1799
E-Mail:  apicarsic@carolina.rr.com
Date of Report (Signature):  5/3/2008
License or Certification #:  A2986    State:  NC
Designation:
Expiration Date of License or Certification:  6/30/2008
Inspection of Subject:  ☒ Interior & Exterior    ☐ Exterior Only    ☐ None
Date of Inspection:  4/11/2008

**SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable)**

Supervisory or
Co-Appraiser Name:
Company:
Phone:    Fax:
E-Mail:
Date of Report (Signature):
License or Certification #:    State:
Designation:
Expiration Date of License or Certification:
Inspection of Subject:  ☐ Interior & Exterior    ☐ Exterior Only    ☐ None
Date of Inspection:

**GP RESIDENTIAL**

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

# Assumptions & Limiting Conditions

File No.: 804SCH12

| Property Address: | 110 Yale Loop | | City: Mooresville | | State: NC | Zip Code: 28117 |
|---|---|---|---|---|---|---|
| Client: | Specter & Specter Evans & Manoque, P.C. | Address: | 436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219 | | | |
| Appraiser: | Andrew T Picarsic | Address: | 2207 Hearthstone Ln, Gastonia, NC 28056 | | | |

**STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS**

— The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

— The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements, and any such sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. Unless otherwise indicated, a Land Survey was not performed.

— If so indicated, the appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

— The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

— If the cost approach is included in this appraisal, the appraiser has estimated the value of the land in the cost approach at its highest and best use, and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used. Unless otherwise specifically indicated, the cost approach value is not an insurance value, and should not be used as such.

— The appraiser has noted in the appraisal report any adverse conditions (including, but not limited to, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property, or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property, or adverse environmental conditions (including, but not limited to, the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

— The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

— The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.

— If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a workmanlike manner.

— An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment.

— The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.

— An appraisal of real property is not a 'home inspection' and should not be construed as such. As part of the valuation process, the appraiser performs a non-invasive visual inventory that is not intended to reveal defects or detrimental conditions that are not readily apparent. The presence of such conditions or defects could adversely affect the appraiser's opinion of value. Clients with concerns about such potential negative factors are encouraged to engage the appropriate type of expert to investigate.

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**G**

# Definitions & Scope of Work

File No.: 804SCH12

| Property Address: | 110 Yale Loop | | City: Mooresville | State: NC | Zip Code: 28117 |
|---|---|---|---|---|---|
| Client: | Specter & Specter Evans & Manogue, P.C. | Address: | 436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219 | | |
| Appraiser: | Andrew T Picarsic | Address: | 2207 Hearthstone Ln, Gastonia, NC 28056 | | |

**DEFINITION OF MARKET VALUE \*:**Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

\* This definition is from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 between July 5, 1990, and August 24, 1990, by the Federal Reserve System (FRS), National Credit Union Administration (NCUA), Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Office of Comptroller of the Currency (OCC). This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

The Scope of Work is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report. *Reliance upon this report, regardless of how acquired, by any party or for any use, other than those specified in this report by the Appraiser, is prohibited.* The Opinion of Value that is the conclusion of this report is credible only within the context of the Scope of Work, Effective Date, the Date of Report, the Intended User(s), the Intended Use, the stated Assumptions and Limiting Conditions, any Hypothetical Conditions and/or Extraordinary Assumptions, and the Type of Value, as defined herein. The appraiser, appraisal firm, and related parties assume no obligation, liability, or accountability, and will not be responsible for any unauthorized use of this report or its conclusions.

Additional Comments (Scope of Work, Extraordinary Assumptions, Hypothetical Conditions, etc.):

Scope of Work: The accompanying report is based on an interior/exterior observation of all site improvements, GIS data, investigation of the subject neighborhood area of influence, and review of sales data for similar properties. This appraisal has been made with particular attention paid to applicable value-influencing economic conditions and has been processed in accordance with nationally recognized appraisal guidelines. The appraiser is not a licensed home inspector, pest control specialist or licensed general contractors. *I did not inspect the property. I observed the* property. I walked around the subject exterior/interior  and took notes on the improvement. I did not measure the house to determine Gross Living Area. I relied on the Builder sketch and representations by the Marketing Real Estate Agent.  The GLA sources are considered reliable.  If the subject has a crawl space access door I look under the house to see if there was a moisture and mold problem that should be checked by a qualified person/company. I also walked around the interior of the subject and took numerous pictures and notes.  The agent interview provided useful information on interior improvements and upgrades.  This information is the in the appraisers work file for review.  It is the client responsibility to make the decision for any inspections.

NOTE: Scope of Work w/exception to measuring the subject for GLA, Washington Mutual minimum expectations and 2005 published supplemental standards 2005-2006 were utilized and complied with by the appraiser.

EXTRAORDINARY ASSUMPTION: The appraiser makes the extraordinary assumption the subject exterior and interior condition were in like new condition on 1/6/2006.  I based this assumption on a prior appraisal provided with the engagement letter for this report and on Iredell County GIS information.

**GP** RESIDENTIAL    Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2AD_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

**H**

# Certifications

File No.:

| Property Address: 110 Yale Loop | City: Mooresville | State: NC | Zip Code: 28117 |
|---|---|---|---|
| Client: Specter & Specter Evans & Manoque, P.C. | Address: 436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219 | | |
| Appraiser: | Address: 2207 Hearthstone Ln, Gastonia, NC 28056 | | |

**APPRAISER'S CERTIFICATION**

**I certify that, to the best of my knowledge and belief:**

— The statements of fact contained in this report are true and correct.

— The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

— I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

— I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

— My engagement in this assignment was not contingent upon developing or reporting predetermined results.

— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.

— I did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.

— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.

— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification.

**Additional Certifications:**

**Appraisal Institute Member Statement**

The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

| Client Contact: Wyatt A. Lison, Esq | | Client Name: Specter & Specter Evans & Manoque, P.C. |
|---|---|---|
| E-Mail: wlison@ssem.com | Address: | 436 Seventh Ave, The 26th Floor Koppers Building, Pittsburgh, PA 15219 |

| **APPRAISER** | **SUPERVISORY APPRAISER (if required)** or **CO-APPRAISER (if applicable)** |
|---|---|
| *(signature)* | |
| Appraiser Name: Andrew T Picarsic | Supervisory or Co-Appraiser Name: |
| Company: | Company: |
| Phone: 704-302-1799 | Phone: _____ Fax: _____ |
| E-Mail: apicarsic@carolina.rr.com | E-Mail: |
| Date Report Signed: 5/3/2008 | Date Report Signed: |
| License or Certification #: A2986    State: NC | License or Certification #: _____ State: |
| Designation: | Designation: |
| Expiration Date of License or Certification: 6/30/2008 | Expiration Date of License or Certification: |
| Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None | Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None |
| Date of Inspection: 4/11/2008 | Date of Inspection: |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL** Form GPRES2AD_LT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

I

## Subject Photo Page

| Borrower/Client | Owner: Scholl, Ventura, Cruz, Utsey | | | |
|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | |
| City  Mooresville | County  Iredell | State  NC | Zip Code  28117 | |
| Lender  Specter & Specter Evans & Manogue | | | | |



### Subject Front

110 Yale Loop
| | |
|---|---|
| Sales Price | n/a |
| Gross Living Area | 3,151 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | The Point |
| View | residential |
| Site | 1.189 acre/interior lot |
| Quality | Very good |
| Age | 0 |



### Subject Rear



### Subject Street

J

## Subject Interior Photo Page

| Borrower/Client | Owner: Scholl, Ventura, Cruz, Utsey | | | | |
|---|---|---|---|---|---|
| Property Address | 110 Yale Loop | | | | |
| City Mooresville | | County Iredell | | State NC | Zip Code 28117 |
| Lender Specter & Specter Evans & Manoque | | | | | |



**Subject Interior**

110 Yale Loop
| | |
|---|---|
| Sales Price | n/a |
| Gross Living Area | 3,151 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | The Point |
| View | residential |
| Site | 1.189 acre/interior lot |
| Quality | Very good |
| Age | 0 |



**Subject Interior**



**Subject Interior**

**Comparable Photo Page**

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | | | | | | |
| Property Address  110 Yale Loop | | | | | | |
| City  Mooresville | County  Iredell | | State  NC | | Zip Code  28117 | |
| Lender  Specter & Specter Evans & Manogue | | | | | | |



### Comparable 1

120 Shelburne Place

| | |
|---|---|
| Prox. to Subject | 0.52 miles |
| Sale Price | 632,000 |
| Gross Living Area | 3,506 |
| Total Rooms | 9 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | residential |
| Site | 1.56 acre/interior lot |
| Quality | Very good |
| Age | 0 |



### Comparable 2

227 Wild Harbor Rd

| | |
|---|---|
| Prox. to Subject | 3.00 miles |
| Sale Price | 639,000 |
| Gross Living Area | 3,475 |
| Total Rooms | 9 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | residential |
| Site | 0.97 acre/interior lot |
| Quality | Very good |
| Age | 0 |



### Comparable 3

155 Cape Cod Way

| | |
|---|---|
| Prox. to Subject | 0.58 miles |
| Sale Price | 669,900 |
| Gross Living Area | 3,478 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.5 |
| Location | The Point |
| View | residential |
| Site | 0.90 acre/interior lot |
| Quality | Very good |
| Age | 0 |

L

09/28/05   12:08 FAX 405 749 7101          LAWYERS TITLE                          ⧉002
09/28/2005  08:53 FAX 707 938 0556          Malcolm Sowell, Attorney              ⧉802
09/28/05   08:55 FAX 405.749 7101          LAWYERS TITLE                          ⧉002

OMB NO. 2502-0265

| A. | | | B. TYPE OF LOAN: |
|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1. ☐FHA  2. ☐FmHA  3.☒CONV. UNINS.  4. ☐VA  5. ☐CONV. INS. | |
| SETTLEMENT STATEMENT | | 6. FILE NUMBER: 20609-050049 | 7. LOAN NUMBER: 83^-2783-004746041-5 |
| | | 8. MORTGAGE INS CASE NUMBER: | |

C. NOTE:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Sonoma Exchange Corp as Qual. Inter for Stoney Scholl 16424 Earnest Court Edmond, OK 73003 SSN: REDACTED | Bridgeport Development Group 4101 Perimeter Center, Ste. 300 Oklahoma City, OK 73112 SSN: 73-1530834 | Washington Mutual Bank F.A. 3050 Highland Pkwy DGRP-04 Downers Grove, IL 60516 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT:   73-0857003 | I. SETTLEMENT DATE. |
|---|---|---|
| 16424 Earnest Court Edmond, OK 73003 Oklahoma County, Oklahoma 114 Regency Pointe Oklahoma County Oklahoma | Lawyers Title of Oklahoma City, Inc. PLACE OF SETTLEMENT 10900 Hefner Pointe Drive Suite 402A Oklahoma City, OK 73120 | September 28, 2005 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract Sales Price | 495,000.00 | 401. Contract Sales Price | 495,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 12,006.22 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes          to | | 407. County Taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 507,006.22 | 420. GROSS AMOUNT DUE TO SELLER | 495,000.00 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess Deposit (See instructions) | |
| 202. Principal Amount of New Loan(s) | 396,000.00 | 502. Settlement Charges to Seller (Line 1400) | 39,484.F. |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Paid At Application | 75.00 | 504. Payoff of first Mortgage to Spirit Bank/7111360 | 265,185.78 |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. Deposit retained by seller | 5,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes          to | | 511. County Taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 401,075.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 310,670.5- |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER: | |
| 301. Gross Amount Due From Borrower (Line 120) | 507,006.22 | 601. Gross Amount Due To Seller (Line 420) | 425,000.0. |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 401,075.00 ) | 602. Less Reductions Due Seller (Line 520) | 310,670.65- |
| 303. CASH ( X FROM ) ( TO ) BORROWER | 105,931.22 | 603. CASH ( X TO ) ( FROM ) SELLER | 184,329.4. |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.
I HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE AND ACCURATE STATEMENT OF ALL RECEIPTS AND DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS TRANSACTION. I FURTHER CERTIF THAT I HAVE RECEIVED A COPY OF THE HUD-1 SETTLEMENT STATEMENT.

Borrower                                              Seller     Bridgeport Development Group, LLC.
BY: _____                                  BY: _____
Sonoma Exchange Corp. Qualified Interf.                          John Lynch, Manager
Approved BY: _____
Stoney Scholl

TO THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF FUNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNED AS PART OF THE SETTLEMENT OF THIS TRANSACTION.

Lawyers Title of Oklahoma City, Inc.
Settlement Agent

WARNING:  IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES U CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE: TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

09/28/05  WED 11:59  [TX/RX NO 9166]

A

09/28/05  12:08 FAX 405 749 7101        LAWYERS TITLE                    ☒003
09/28/2005 09:54 FAX 707 838 0556       Malcolm Sowell, Attorney         ☒003
09/28/05  08:55 FAX 405 749 7101        LAWYERS TITLE                    ☒003

Page 2

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWERS FUNDS AT SETTLEMENT | PAID FROM SELLERS FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price   $ 495,000.00 @ 7.5000 %   37,125.00 | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. $ 7,425.00     to    Coldwell Banker Advantage | | | |
| 702. $ 29,700.00    to    Remax Associates | | | 37,125.00 |
| 703. Commission Paid at Settlement | | | |
| 704. Transaction Coordination Fee    to   Coldwell Banker Advantage | | | 175.00 |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | | |
| 801. Loan Origination Fee    1.0000 %   to   Washington Mutual Bank F.A. | | 3,960.00 | |
| 802. Loan Discount              %   to | | | |
| 803. Appraisal Fee    to   Washington Mutual Bank F.A. | | 350.00 | |
| 804. Credit Report    to | | | |
| 805. Lender's Inspection Fee    to | | | |
| 806. Mortgage Ins. App. Fee    to | | | |
| 807. Assumption Fee    to | | | |
| 808. Tax Procurement Fee    to   Transamerica Corp | | 50.00 | |
| 809. Flood Certification Fee    to   Transamerica Corp | | 13.00 | |
| 810. Tax Service Fee    to   Washington Mutual Bank F.A. | | 95.00 | |
| 811. Loan Review Fee    to   Washington Mutual Bank F.A. | | 400.00 | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | |
| 901. Interest From  09/28/05  to  10/01/06   @  $   63.740000/day    ( 3 days   5.8750%) | | 191.22 | |
| 902. Mortgage Insurance Premium for    months to | | | |
| 903. Hazard Insurance Premium for    1.0 years  to | | | |
| 904. | | | |
| 905. 2003 Ad Valorem Taxes    Oklahoma County Treasurer | | | |
| 1000. RESERVES DEPOSITED WITH LENDER | | | |
| 1001. Hazard Insurance    months  @  $    per month | | | |
| 1002. Mortgage Insurance    months  @  $    per month | | | |
| 1003. City/Town Taxes    months  @  $    per month | | | |
| 1004. County Taxes    months  @  $    per month | | | |
| 1005. Assessments    months  @  $    per month | | | |
| 1006.    months  @  $    per month | | | |
| 1007.    months  @  $    per month | | | |
| 1008. Aggregate Escrow Adjustment    months  @  $    per month | | | |
| 1100. TITLE CHARGES | | | |
| 1101. Settlement or Closing Fee    to   Lawyers Title of Oklahoma City, Inc. | | 150.00 | |
| 1102. Abstract of Title Search    to   American Eagle Title Insurance Co. | | | 150.00 |
| 1103. Title Examination    to   American Eagle Title Insurance Co. | | 110.00 | |
| 1104. Title Insurance Binder    to   American Eagle Title Insurance Co. | | | |
| 1105. Document Preparation    to   American Eagle Title Insurance Co. | | | |
| 1106. Additional Endorsements    to   American Eagle Title Insurance Co. | | | |
| 1107. Attorney's Fees    to   American Eagle Title Insurance Co. | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance    to   American Eagle Title Insurance Co. | | 1,016.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage    $   396,000.00    50.00 | | | |
| 1110. Owner's Coverage    $   495,000.00    966.00 | | | |
| 1111. Post Closing Title Report    to   American Eagle Title Insurance Co. | | 100.00 | |
| 1112. Courier Fee    to   American Eagle Title Insurance Co. | | 24.00 | |
| 1113. Overnight Handling Fees    to   American Eagle Title Insurance Co. | | | 15.00 |
| 1114. CC&R's    to   American Eagle Title Insurance Co. | | 10.00 | |
| 1115. Wire Fee(s)    American Eagle Title Insurance Co. | | | |
| 1116. PCC/UCC/Other Certificates    American Eagle Title Insurance Co. | | | |
| 1117. Other Escrow Fee(s)    American Eagle Title Insurance Co. | | | |
| 1118. HOA Dues    to   ERC Land Development Group, LLC | | | 132.50 |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | |
| 1201. Recording Fees: Deed $   13.00; Mortgage $   67.00;    Release $ | | 70.00 | |
| 1202. City/County Tax/Stamps: Deed    Mortgage    396.00    Mtg. Tax | | 396.00 | |
| 1203. State Tax/Stamps:    Deed    742.50; Mortgage    Rev. Stamps | | | 742.50 |
| 1204. Mortgage Cert.    to   Oklahoma County Treasurer | | | |
| 1205. Assignment Fee    Oklahoma County Clerk | | 5.00 | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | |
| 1301. Mortgage Inspection Certificate    to   Hughes Survey Company | | 100.00 | |
| 1302. Pest Inspection    to | | | |
| 1303. Property Inspection | | | |
| 1304. Home Warranty Plan    to   RWC Home Warranty | | | 1,104.00 |
| 1305. Refund Checks    to   Sidney Schell | | 5,000.00 | |
| 1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K) | | 12,008.22 | 39,464.00 |

By signing page 1 of this statement, the transaction acknowledge receipt of a completed copy of page 2 of this two page statement.

Lawyers Title of Oklahoma City, Inc.
Settlement Agent

(20003-006549 / 20003-006549 / 27 )

09/28/05  WED 11:59  [TX/RX NO 9166]

**B**

OMB NO. 2502-0265

| A. | | B. TYPE OF LOAN: | | |
|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. | | |
| **SETTLEMENT STATEMENT** | | 6. FILE NUMBER: 20510-060040 | | 7. LOAN NUMBER: |
| | | 8. MORTGAGE INS CASE NUMBER: | | |

C. NOTE:  *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*
1.0    3/98    (20510-060040/PFD/20510-060040/32)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Sonoma Exchange Corp as Qual Inter for Sidney Scholl Carlito S. Cruz Emelda B Venture 1009 WB Meyer Parkway Edmond, OK 73003 | Bridgeport Development Group 4101 Perimeter Center, Ste. 300 Oklahoma City, OK 73112 SSN: 73-1530834 | Washington Mutual Bank, FA |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT:    73-0987009 | I. SETTLEMENT DATE: |
|---|---|---|
| 1009 WB Meyer Parkway Edmond, OK 73003 | Lawyers Title of Oklahoma City, Inc. | October 25, 2005 |
| 11/14 Oak Tree Park Oklahoma County Oklahoma | PLACE OF SETTLEMENT 10900 Hefner Pointe Drive  Suite 402A Oklahoma City, OK 73120 | Disburse 10/28/05 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 564,990.00 | 401. Contract Sales Price | 564,990.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 10,629.24 | 403. | |
| 104. Payoff | | 404. | |
| 105. Payoff | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes             to | | 407. County Taxes             to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. 1st $100 of repairs | | 411. 1st $100 of repairs | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 575,619.24 | **420. GROSS AMOUNT DUE TO SELLER** | 564,990.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 451,792.00 | 502. Settlement Charges to Seller (Line 1400) | 44,866.18 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Paid at Application | | 504. Payoff of first Mortgage to Kirkpatrick Bank | 326,933.44 |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. Deposit retained by seller | 5,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes             to | | 511. County Taxes             to | |
| 212. Assessments              to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 456,792.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 376,799.62 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 575,619.24 | 601. Gross Amount Due To Seller (Line 420) | 564,990.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 456,792.00 ) | 602. Less Reductions Due Seller (Line 520) | 376,799.62 |
| **303. CASH ( X FROM) ( TO) BORROWER** | 118,827.24 | **603. CASH ( X TO) ( FROM) SELLER** | 188,190.38 |

**A**

Page 2

## L. SETTLEMENT CHARGES

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price | $ 564,990.00 @ 7.5000 % | 42,374.25 | | |
| Division of Commission (line 700) as Follows: | | | | |
| 701. $ 19,774.65 to Coldwell Banker Advantage | | | | |
| 702. $ 22,599.60 to Remax Associates | | | | |
| 703. Commission Paid at Settlement | | | | 42,374.25 |
| 704. Transaction Coordination Fee | to Coldwell Banker Advantage | | | 175.00 |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801. Loan Origination Fee 1.0000 % | to Washington Mutual Bank, FA | | 4,517.92 | |
| 802. Loan Discount % | to | | | |
| 803. Appraisal Fee | to Mark IV Appraisal | | 400.00 | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | to Washington Mutual Bank, FA. | | 430.00 | |
| 806. Mortgage Ins. App. Fee | to | | | |
| 807. Assumption Fee | to LERETA Corp | | 50.00 | |
| 808. AM Schedule | | | | |
| 809. Flood Certification Fee | to LERETA Corp | | 13.00 | |
| 810. Tax Service Fee | to Washington Mutual Bank, FA | | 31.00 | |
| 811. Underwriting Fee | | | | |
| 812. Document Preparation Fee | | | | |
| 813. Processing Fee | | | | |
| 814. Courier/Wire Fee | | | | |
| 815. Par plus Cred Loan Orig | to Washington Mutual Bank, FA | | -1,129.46 | |
| 816. Lender Credit to Loan Orig | to Washington Mutual Bank, FA | | -1,129.46 | |
| 817. | | | | |
| 818. | | | | |
| 819. | | | | |
| 820. YSP | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From 10/28/05 to 11/01/05 @ $ 76.120000/day ( 4 days %) | | | 304.48 | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | |
| 904. | | | | |
| 905. 2003 Ad Valorem Taxes | County Treasurer | | 204441440 | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | |
| 1001. Hazard Insurance | months @ $ per month | | | |
| 1002. Mortgage Insurance | months @ $ per month | | | |
| 1003. City/Town Taxes | months @ $ per month | | | |
| 1004. County Taxes | months @ $ per month | | | |
| 1005. Assessments | months @ $ per month | | | |
| 1006. | months @ $ per month | | | |
| 1007. | months @ $ per month | | | |
| 1008. Aggregate Escrow Adjustment | months @ $ per month | | | |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee | to Lawyers Title of Oklahoma City, Inc. | | 150.00 | |
| 1102. Abstract or Title Search | to American Eagle Title Insurance Co. | | | 150.00 |
| 1103. Title Examination | to American Eagle Title Insurance Co. | | 110.00 | |
| 1104. Title Insurance Binder | to American Eagle Title Insurance Co. | | | |
| 1105. Document Preparation | to American Eagle Title Insurance Co. | | | |
| 1106. Additional Endorsements | to American Eagle Title Insurance Co. | | | |
| 1107. Attorney's Fees | to American Eagle Title Insurance Co. | | | |
| (includes above item numbers: ) | | | | |
| 1108. Title Insurance | to American Eagle Title Insurance Co. | | 1,121.00 | |
| (includes above item numbers: ) | | | | |
| 1109. Lender's Coverage | $ 452,000.00 | 50.00 | | |
| 1110. Owner's Coverage | $ 565,000.00 | 1,071.00 | | |
| 1111. Post Closing Title Report | to American Eagle Title Insurance Co. | | 100.00 | |
| 1112. Courier Fee | to American Eagle Title Insurance Co. | | 24.00 | |
| 1113. Overnight Handling Fees | American Eagle Title Insurance Co. | | | |
| 1114. CC&R's | to American Eagle Title Insurance Co. | | 10.00 | |
| 1115. Wire Fee(s) | American Eagle Title Insurance Co. | | | |
| 1116. FCC/UCC/Other Certificates | American Eagle Title Insurance Co. | | | |
| 1117. Other Escrow Fee(s) | American Eagle Title Insurance Co. | | | |
| 1118. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees: Deed $ 13.00 ; Mortgage $ 57.00; Releases $ Filing Fees | | | 70.00 | |
| 1202. City/County Tax/Stamps: Deed Mortgage 451.80 Mtg. Tax | | | 451.80 | |
| 1203. State Tax/Stamps: Deed 847.50 Mortgage Rev. Stamps | | | | 847.50 |
| 1204. Release Cert. to County Treasurer Mtg. Cert. | | | 5.00 | |
| 1205. Assignment Fee County Clerk | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Mortgage Inspection Certificate | to Hughes Survey Company | | 100.00 | |
| 1302. Pest Inspection | to | | | |
| 1303. Property Inspection | | | | |
| 1304. Home Warranty Plan | to RWC Home Warranty | | | 1,319.43 |
| 1305. Refund Deposit | to Bridgeport Development | | 5,000.00 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | 10,629.24 | 44,866.18 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

Lawyers Title of Oklahoma City, Inc.
Settlement Agent

Certified to be a true copy.

{2051G-060040 / 2051G-060040 / 30 }

**B**

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

| | |
|---|---|
| **Borrower:** | Sidney Scholl |
| | Carlito S. Cruz |
| | Emelda B. Ventura |
| **Seller:** | *Bridgeport Development Group* |
| **Lender:** | Washington Mutual Bank, FA |
| **Settlement Agent:** | Lawyers Title of Oklahoma City, Inc. |
| | (405)749-6880 |
| **Place of Settlement:** | 10900 Hefner Pointe Drive  Suite 402A |
| | Oklahoma City, OK 73120 |
| **Settlement Date:** | October 25, 2005 |
| **Disbursement Date:** | October 28, 2005 |
| **Property Location:** | 1009 WB Meyer Parkway |
| | Edmond, OK 73003 |
| | 11/14 Oak Tree Park |
| | Oklahoma County |
| | Oklahoma |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BY: _____
Sonoma Exchange Corp Qualified Inter. for

APPROVED BY: _____

Sidney Scholl

_____
Carlito S. Cruz

_____
Emelda B. Ventura

Bridgeport Development Group, LLC

BY: _____
　　　John Lynch, Manager

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Lawyers Title of Oklahoma City, Inc.
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

C

A.

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

OMB NO. 2502-0265

B. TYPE OF LOAN:

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |
|---|---|---|---|---|

6. FILE NUMBER:
20512-060025

7. LOAN NUMBER:
0047464177

8. MORTGAGE INS CASE NUMBER:

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing, they are shown here for informational purposes and are not included in the totals.*

D. NAME AND ADDRESS OF BORROWER:
Sonoma Exchange Corporation facilitator for
Sidney Scholl, Exchangor
Emelda B. Ventura, Exchangor
Carlito S. Cruz, Exchangor

E. NAME AND ADDRESS OF SELLER:
Bridgeport Development Group
4101 Perimeter Center, Ste. 300
Oklahoma City, OK 73112
SSN: 73-1530834

F. NAME AND ADDRESS OF LENDER:
Washington Mutual Bank, FA
3050 Highland Parkway 5th Floor
Downers Grove, IL 60515

G. PROPERTY LOCATION:
2032 Wimberly Creek Drive
Moore, OK
Cleveland County, Oklahoma
10/2 The Creeks at Wimberley
Cleveland County
Oklahoma

H. SETTLEMENT AGENT:    73-0967009
Lawyers Title of Oklahoma City, Inc.

PLACE OF SETTLEMENT
10900 Hefner Pointe Drive  Suite 402A
Oklahoma City, OK 73120

I. SETTLEMENT DATE:

December 23, 2005

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 199,345.00 | 401. Contract Sales Price | 199,345.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 8,829.40 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes         to | | 406. City/Town Taxes         to | |
| 107. County Taxes            to | | 407. County Taxes            to | |
| 108. Assessments             to | | 408. Assessments             to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 208,174.40 | **420. GROSS AMOUNT DUE TO SELLER** | 199,345.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 153,600.00 | 502. Settlement Charges to Seller (Line 1400) | 14,120.43 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Paid At Application | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. Deposit retained by seller | 5,000.00 |
| 207. | | 507. | |
| 208. Builder Credit | 4,000.00 | 508. Builder Credit | 4,000.00 |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes         to | | 510. City/Town Taxes         to | |
| 211. County Taxes            to | | 511. County Taxes            to | |
| 212. Assessments             to | | 512. Assessments             to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 162,600.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 23,120.43 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 208,174.40 | 601. Gross Amount Due To Seller (Line 420) | 199,345.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 162,600.00 ) | 602. Less Reductions Due Seller (Line 520) | ( 23,120.43 ) |
| **303. CASH ( X FROM ) ( TO ) BORROWER** | 45,574.40 | **603. CASH ( X TO ) ( FROM ) SELLER** | 176,224.57 |

10  3/86    (20512-060025.PFD/20512-060025/29)

**A**

| | | | BORROWER'S FUNDS AT SETTLEMENT | SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price $ @ % = | | | | 12,950.88 |
| Division of Commission (line 700) as Follows: | | | | |
| 701. $ 5,977.08 | to | Coldwell Banker Advantage | | |
| 702. $ 6,973.80 | to | ReMax | | |
| 703. Commission Paid at Settlement | | | | 12,950.88 |
| 704. Transaction Coordination Fee | | to  Coldwell Banker Advantage | | 175.00 |
| Note: Line 701 Includes Adjustment of | -1,000.00  For | | | |
| Note: Line 702 Includes Adjustment of | -1,000.00  For | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801. Loan Origination Fee | 1.0000 % | to  Washington Mutual Bank, FA | 1,536.00 | |
| 802. Loan Discount | % | to | | |
| 803. Appraisal Fee | | to  Washington Mutual Bank, FA | 800.00 | |
| 804. Credit Report | | to | | |
| 805. Lender Credit Appraisal | | to  Washington Mutual Bank, FA | -300.00 | |
| 806. Mortgage Ins. App. Fee | | to | | |
| 807. Assumption Fee | | to | | |
| 808. Tax Procurement Fee | | to  Lereta Corp | 50.00 | |
| 809. Flood Certification Fee | | to  Lereta Corp | 13.00 | |
| 810. Tax Service Fee | | to  Washington Mutual Bank, FA | 31.00 | |
| 811. Loan Review Fee | | to  Washington Mutual Bank, FA | 430.00 | |
| 812. Document Preparation Fee | | | | |
| 813. Processing Fee | | | | |
| 814. Courier/Wire Fee | | | | |
| 815. Lender Credit towards Orig | | to  Washington Mutual Bank, FA | -766.00 | |
| 816. 1031 Exchange Fee | | to  Malcolm Sowell | 700.00 | |
| 817. | | | | |
| 818. | | | | |
| 819. | | | | |
| 820. YSP | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From  12/27/05  to  01/01/06  @  $  24.200000/day  (  5 days  5.7500%) | | | 121.00 | |
| 902. Mortgage Insurance Premium for  months to | | | | |
| 903. Hazard Insurance Premium for  1.0  years  to | | | | |
| 904. | | | | |
| 905. 2003 Ad Valorem Taxes | | Cleveland County Treasurer | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | |
| 1002. Mortgage Insurance | months @ $ | per month | | |
| 1003. City/Town Taxes | months @ $ | per month | | |
| 1004. County Taxes | months @ $ | per month | | |
| 1005. Assessments | months @ $ | per month | | |
| 1006. | months @ $ | per month | | |
| 1007. | months @ $ | per month | | |
| 1008. Aggregate Escrow Adjustment | months @ $ | per month | | |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee | | to  Lawyers Title of Oklahoma City, Inc. | 150.00 | |
| 1102. Abstract or Title Search | | to  Cleveland County Abstract | | 275.00 |
| 1103. Title Examination | | to  American Eagle Title Insurance Co. | 110.00 | |
| 1104. Title Insurance Binder | | to  American Eagle Title Insurance Co. | | |
| 1105. Document Preparation | | to  American Eagle Title Insurance Co. | | |
| 1106. Additional Endorsements | | to  American Eagle Title Insurance Co. | | |
| 1107. Attorney's Fees | | to  American Eagle Title Insurance Co. | | |
| (includes above item numbers: | | ) | | |
| 1108. Title Insurance | | to  American Eagle Title Insurance Co. | 600.40 | |
| (includes above item numbers: | | ) | | |
| 1109. Lender's Coverage | $  154,000.00 | 50.00 | | |
| 1110. Owner's Coverage | $  199,345.00 | 550.40 | | |
| 1111. Post Closing Title Report | | to  Cleveland County Abstract | 100.00 | |
| 1112. Courier Fee | | to  American Eagle Title Insurance Co. | 24.00 | |
| 1113. Overnight Handling Fees | | to  American Eagle Title Insurance Co. | | 15.00 |
| 1114. CC&R's | | to  American Eagle Title Insurance Co. | 10.00 | |
| 1115. Wire Fee(s) | | American Eagle Title Insurance Co. | | |
| 1116. FCC/UCC/Other Certificates | | to  American Eagle Title Insurance Co. | 150.00 | |
| 1117. Other Escrow Fee(s) | | American Eagle Title Insurance Co. | | |
| 1118. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees:  Deed  $  13.00 ; Mortgage  $  ; Releases $ | | | 13.00 | |
| 1202. City/County Tax/Stamps:  Deed  ; Mortgage  154.00  Mtg. Tax | | | 154.00 | |
| 1203. State Tax/Stamps:  Deed  299.25; Mortgage  Rev. Stamps | | | | 299.25 |
| 1204. Mortgage Cert. | | to  Cleveland County Treasurer | 5.00 | |
| 1205. Assignment Fee | | Cleveland County Clerk | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Mortgage Inspection Certificate | | to  Hughes Survey Company | 100.00 | |
| 1302. Pest Inspection | | to | | |
| 1303. Property Inspection | | | | |
| 1304. Home Warranty Plan | | to  RWC Home Warranty | | 405.30 |
| 1305. Refund Earnest Money | | to  Sidney Scholl | 5,000.00 | |
| **1400. TOTAL SETTLEMENT CHARGES** (Enter on Lines 103, Section J and 502, Section K) | | | 8,829.40 | 14,120.43 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two-page statement.

Lawyers Title of Oklahoma City, Inc.
Settlement Agent

| 20612-060025 | 20612-060025 / 29 |

**B**

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

on title only

**Borrower:** Sidney Scholl    (sole borrower)
Emelda B. Ventura and Carlito S. Cruz
**Seller:** Bridgeport Development Group
**Lender:** Washington Mutual Bank, FA
**Settlement Agent:** Lawyers Title of Oklahoma City, Inc.
(405)749-6880
**Place of Settlement:** 10900 Hefner Pointe Drive, Suite 402A
Oklahoma City, OK 73120
**Settlement Date:** December 23, 2005
**Property Location:** 2032 Wimberely Creek Drive
Moore, OK
Cleveland County, Oklahoma
10/2 The Creeks at Wimberley
Cleveland County
Oklahoma

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Bridgeport Development Group, LLC

Sonoma Exchange Corp

Approved By: _____    BY: _____
Sidney Scholl                                  John Lynch, Manager

_____
Emelda B. Ventura

_____
Carlito S. Cruz

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Lawyers Title of Oklahoma City, Inc.
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**C**

12/27/2005 13:40 FAX 405 749 7101    Malcolm Sowell, Attorney    ☑ 003

12/22/05  13:40 FAX 405 749 7101    LAWYERS TITLE    ☑ 003

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

| | |
|---|---|
| Borrower: | Sidney Scholl |
| | Emelda B. Ventura and Carlito S. Cruz |
| Seller: | Bridgeport Development Group |
| Lender: | Washington Mutual Bank, FA |
| Settlement Agent: | Lawyers Title of Oklahoma City, Inc. |
| | (405)749-6880 |
| Place of Settlement: | 10900 Hefner Pointe Drive  Suite 402A |
| | Oklahoma City, OK 73120 |
| Settlement Date: | December 23, 2005 |
| Property Location: | 2032 Wimberely Creek Drive |
| | Moore, OK |
| | Cleveland County, Oklahoma |
| | 10/2 The Creeks at Wimberley |
| | Cleveland County |
| | Oklahoma |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

*Malcolm Sowell*

Sonoma Exchange Corp.

Bridgeport Development Group, LLC

BY: _____

John Lynch, Manager

Approved By: _____
Sidney Scholl

_____
Emelda B. Ventura

_____
Carlito S. Cruz

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Lawyers Title of Oklahoma City, Inc.
Settlement Agent

WARNING:  It is a crime to knowingly make false statements to the United States on this or any similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

**D**

OMB NO. 2502-0265

| A. | | | |
|---|---|---|---|
| **U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT** | | B. TYPE OF LOAN: | |

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |
|---|---|---|---|---|

**SETTLEMENT STATEMENT**

6. FILE NUMBER: 0601 SCHOLL
7. LOAN NUMBER: 0047465596
8. MORTGAGE INS CASE NUMBER:

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0  3/86  (0601SCHOLL/PF0/0601 SCHOLL21)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| SIDNEY SCHOLL<br>110 YALE LOOP<br>MOORESVILLE, NC 28115 | SIMONINI BUILDERS, INC. | WASHINGTON MUTUAL BANK<br>3050 HIGHLAND PKWY 7TH FL<br>DOWNERS GROVE, IL 60515 |

| G. PROPERTY LOCATION:<br>110 YALE LOOP<br>MOORESVILLE, NC 28115<br>IREDELL County, North Carolina | H. SETTLEMENT AGENT:<br>Surane & Pross<br>PLACE OF SETTLEMENT<br>19520 W. Catawba Avenue #313<br>Cornelius, NC 28031 | I. SETTLEMENT DATE:<br>January 18, 2006<br>Disburse:01/23/06 |
|---|---|---|

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 740,796.00 | 401. Contract Sales Price | 740,796.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 11,506.46 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes            to | | 406. City/Town Taxes          to | |
| 107. County Taxes               to | | 407. County Taxes             to | |
| 108. Assessments                to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 752,302.46 | **420. GROSS AMOUNT DUE TO SELLER** | 740,796.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 25,000.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 592,000.00 | 502. Settlement Charges to Seller (Line 1400) | 75,576.60 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. CR. FOR CLOSING COSTS | 12,963.93 | 504. Payoff of first Mortgage to BB&T/NOTE #70 | 573,308.05 |
| 205. 1031 EXCHANGE PROCEEDS | 32,316.28 | 505. Payoff of second Mortgage | |
| 206. | | 506. Deposit retained by seller | 25,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes            to | | 510. City/Town Taxes          to | |
| 211. County Taxes               to | | 511. County Taxes             to | |
| 212. Assessments                to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 662,280.21 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 673,884.65 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 752,302.46 | 601. Gross Amount Due To Seller (Line 420) | 740,796.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 662,280.21) | 602. Less Reductions Due Seller (Line 520) | ( 673,884.65) |
| **303. CASH ( X FROM) ( TO ) BORROWER** | 90,022.25 | **603. CASH ( X TO ) ( FROM ) SELLER** | 66,911.35 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower _____
SIDNEY SCHOLL

Seller    SIMONINI BUILDERS, INC.

BY: _____
        President

ATTEST: _____

Secretary/Treasurer

**A**

Page 2

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ 740,796.00 @ 10.0000 % 74,079.60 | | | |
| *Division of Commission (line 700) as follows:* | | | |
| 701. $ 22,223.88  to  CARLYLE PROPERTIES | | | |
| 702. $ 51,855.72  to  CRESCENT COMMUNITIES REALTY, LLC | | | |
| 703. Commission Paid at Settlement | | | 74,079.60 |
| 704. to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee  1.0000 %  to  WASHINGTON MUTUAL BANK | | 5,920.00 | |
| 802. Loan Discount  0.2500 %  to  WASHINGTON MUTUAL BANK | | 1,480.00 | |
| 803. Appraisal Fee  to  WASHINGTON MUTUAL BANK | | 450.00 | |
| 804. Credit Report  to | | | |
| 805. Lender's Inspection Fee  to | | | |
| 806. Mortgage Ins. App. Fee  to | | | |
| 807. Assumption Fee  to | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| 812. Flood Fee  to  LERETA | | 13.00 | |
| 813. Tax Service Fee  to  WASHINGTON MUTUAL BANK | | 81.00 | |
| 814. LOAN REVIEW FEE  to  WASHINGTON MUTUAL BANK | | 430.00 | |
| 815.  WASHINGTON MUTUAL BANK | | | |
| 816. | | | |
| 817. | | | |
| 818. | | | |
| 819. | | | |
| 820. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From  01/23/06  to  02/01/06  @ $  95.690000/day  ( 9 days  5.9000%) | | 861.21 | |
| 902. Mortgage Insurance Premium for  months to | | | |
| 903. Hazard Insurance Premium for  1.0 years to | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance  months @ $  per month | | | |
| 1002. Mortgage Insurance  months @ $  per month | | | |
| 1003. City/Town Taxes  months @ $  per month | | | |
| 1004. County Taxes  months @ $  per month | | | |
| 1005. Assessments  months @ $  per month | | | |
| 1006.  months @ $  per month | | | |
| 1007.  months @ $  per month | | | |
| 1008. Aggregate Adjustment  months @ $  per month | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or Closing Fee  to | | | |
| 1102. Abstract or Title Search  to  METROLINA TITLE RESEARCH | | 67.25 | |
| 1103. Courier Fee/Copy Fee  to  Surane & Pross | | 65.00 | 15.00 |
| 1104. Title Insurance Binder  to | | | |
| 1105. Document Preparation  to | | | |
| 1106. 1031 EXCHANGE  to  MALCOLM SOWELL | | 700.00 | |
| 1107. Attorney's Fees  to  Surane & Pross | | 425.00 | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance  to  MOREHEAD TITLE | | 831.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage  $ | | | |
| 1110. Owner's Coverage  $ | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $  20.00 ; Mortgage $  98.00 ;  Releases $ | | 118.00 | |
| 1202. City/County Tax/Stamps: Deed  ; Mortgage | | | |
| 1203. State Tax/Stamps:  Revenue Stamps  1,482.00 ; Mortgage | | | 1,482.00 |
| 1204. RECORDING FEE  to  PROFESSIONAL ERRAND SERVICES | | 45.00 | |
| 1205. POWER OF ATTORNEY  to  Register of Deeds | | 20.00 | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey  to | | | |
| 1302. Pest Inspection  to | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | 11,506.46 | 75,576.60 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

_____
Surane & Pross
Settlement Agent

Certified to be a true copy.

{ 0601 SCHOLL / 0601 SCHOLL /21 }

**B**